IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re                                        : Chapter 11
                                             :
PJ Finance Company, LLC, *et al.*,[1]        : Case No. 11-_____ (_____)
                                             :
            Debtors.                         : (Joint Administration Requested)
                                             :
---------------------------------------------------------------x

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF LENDERS' CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 363 AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)

The above-captioned debtors and debtors in possession in these chapter 11 cases (collectively, the "Debtors"), by this motion (the "Motion") seek entry of an order, pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code"), and in accordance with Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors' use of cash collateral on an emergency interim basis, effective as of the Petition Date (as defined below) through the time of the final hearing on the Motion and on a final basis; (ii) granting the Debtors authority to provide interim and final adequate protection and determining such provision of adequate protection is adequate under the circumstances of these cases; and (iii) setting a final hearing on the use of cash collateral. In support of this Motion, the Debtors rely on the *Declaration of Michael Husman in Support of Chapter 11*

---

[1] The Debtors are the following seven entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): PJ Finance Company, LLC (8895), PJ Holding Company Manager, LLC (8895), PJ Holding Company, LLC (8895), Alliance PJRT GP, Inc. (1787), Alliance PJWE GP, L.L.C. (8133), Alliance PJRT Limited Partnership (1789) and Alliance PJWE Limited Partnership (8198). The mailing address of each of the Debtors solely for purposes of notices and communications is 1200 North Ashland Avenue, Suite 600, Chicago, Illinois 60622.

*Petitions and First Day Motions* (the "First Day Declaration"), which has been or will be filed with the Court. In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are in possession of their properties and continuing to operate their business as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee or official committee of unsecured creditors has been appointed in these cases.

3. The Debtors are real estate companies engaged in the acquisition, ownership, operation, management, leasing, financing, mortgaging and selling of 32 apartment communities comprising 9,504 units located in the states of Arizona, Florida, Georgia, Tennessee and Texas (the "Properties" and collectively, the "Portfolio").

4. The day-to-day operations of the Portfolio are managed by a third-party, WestCorp Management Group One, Inc. ("WestCorp"), pursuant to Management Agreements dated November 9, 2006 (the "Management Agreements") and a Sub-Management Agreement dated July 1, 2008.

5. On November 9, 2006, Alliance PJRT Limited Partnership and Alliance PJWE Limited Partnerships (collectively, the "Partnerships" or the "Borrowers") entered into an

2

Amended and Restated Loan Agreement[2] with Column Financial Inc. (along with its successors and assigns from time to time, the "Originating Lender"), whereby the Originating Lender agreed to make a loan to the Partnerships in the principal amount of $475,000,000 with a maturity date of November 11, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan" or the "Prepetition Loan Agreement" and together with the other documents, instruments, notices and recordings executed, delivered and recorded, collectively, the "Prepetition Loan Documents").[3]

6. On May 1, 2007, the Originating Lender sold the Prepetition Loan Documents to Credit Suisse First Boston Mortgage Securities Corp. ("Credit Suisse"). Credit Suisse purchased the Loan in order to include it in a portfolio of loans that Credit Suisse securitized by the issuance of commercial mortgage-backed securities ("CMBS"). Pursuant to that certain Pooling and Servicing Agreement, dated as of May 1, 2007 (the "Pooling and Servicing Agreement"), Credit Suisse contributed the Prepetition Loan Documents to a trust. Under the Pooling and Servicing Agreement, Bank of America, N.A. acts as successor trustee (the "Trustee" or the "Prepetition Lender")[4] and caused the issuance and sale of mortgage pass-through certificates in multiple classes denoted the Credit Suisse Commercial Mortgage Pass-Through Certificates, Series 2007-C2. Wachovia Bank, N.A. acts as the master servicer (the "Master Servicer") and Torchlight Loan Services, LLC acts as special servicer (the "Special Servicer"). Pursuant to the

---

[2] At that time, the Portfolio was also subject to a senior mezzanine loan and a junior mezzanine loan, but as a result of the senior mezzanine lender's exercise of its remedies under the Uniform Commercial Code, it conducted a sale on September 4, 2009 of the pledged equity interests of the Debtors, thereby taking such interests in full satisfaction of the senior mezzanine debt.

[3] The Debtors have not completed their investigation respecting the extent, validity, priority, perfection and avoidability of the claims and liens evidenced by the Prepetition Loan Documents and reserve all rights. Nothing set forth herein shall be construed as a waiver or admission against interest on the part of the Debtors with respect thereto.

[4] On July 26, 2010, a UCC-3 Financing Statement Amendment was filed with the Delaware Department of State, stating that Wells Fargo Bank, N.A. assigned its right, title and interest as trustee to Bank of America, N.A.

3

Prepetition Loan Documents, the Loan is secured by mortgages and deeds of trust encumbering all of the Properties in favor of the Trustee. The Partnerships are currently indebted on the Loan in the amount of $475 million plus accrued and unpaid interest, costs and fees.

7. The Prepetition Loan Agreement is administered through a lockbox and all rents from operations of the Properties flow through the lockbox account (the "Lockbox"). After being swept daily by the Master Servicer, the rents are then distributed once a month to, and for the benefit of, the Debtors pursuant to a "waterfall" mechanism described below. As of the Petition Date, the amounts received by the Debtors through the "waterfall" are insufficient to sustain the Debtors' operations, as the Debtors continue to experience an ongoing monthly operating expense shortfall.

8. As of the date hereof, the Partnerships have trade payables outstanding in an amount of approximately $4.4 million for expenses incurred in the ordinary course of operating the Properties.

9. Owing to a combination of internal problems among the Debtors' previous shareholders and management team, the severe economic recession and the current overleveraged debt structure of the Debtors, the Portfolio currently yields insufficient rents to service both its suffocating monthly debt service obligations and those obligations related to its day to day operations. Indeed, the combination of the severe economic recession and the lasting effects of the recent decline in the multi-family real estate market has resulted in the aggregate value of the Properties to be dramatically less than the amount of the Debtors' outstanding secured debt under the Prepetition Loan Agreement.

10. Currently, all of the Debtors' cash is swept into a blocked account and after the Master Servicer funds amounts for, among other things, (i) a tax and insurance reserve, (ii)

4

interest due on the Loan and (iii) a capital expenditure/repair reserve, the Debtors receive an amount intended for payment of the monthly operating expenses of the Debtors, including for payment of fees and expenses owing to the Manager and the Debtors' obligations related to their day to day operations. The Debtors believe, however, that the funding of certain of such reserves is excessive. Due to the large percentage of the Debtors' cash that was funded pre-petition in payment of Loan obligations and reserves through the "waterfall" mechanism, the Debtors have insufficient cash available to pay obligations for the Debtors' day to day operations as they come due. As a result of this insufficient cash flow, the Debtors have been unable to relet units as leases expire or vacancies otherwise occur in the ordinary course, or to convert vacated "off-line" rental units into lease-ready units, and make repairs and improvements on other units and in common areas. Currently, over 1,700 of the total number of units are unable to be rented as there is insufficient cash available to invest in these units to return them to move-in condition and, with the upcoming notices to vacate in the next thirty days, this number will continue to increase to more than 20% of the Debtors' total units, as the Debtors do not currently have the funds to repair these vacated units. This grim reality will result in a further decline in the Debtors' revenue and create added stress on their ability to meet their obligations.

11. To secure the Borrowers' obligations under the Prepetition Loan Agreement, the Borrowers granted security interests (the "Prepetition Senior Liens") in favor of the Trustee on substantially all of the Borrowers' real and personal property, pursuant to those certain Mortgages, Deeds to Secure Debt and Deeds of Trust, each dated as of November 9, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "Mortgages"), which, among other things, grant mortgage liens on and over each of the thirty two Properties, leases and rents.

5

12. In order to ensure that the Properties do not deteriorate further and thus cause a further decline in revenue and value, the Debtors require a significant cash infusion and restructuring of the Loan in order to continue to operate the Properties. Working with their advisors, the Debtors have developed a comprehensive business plan that addresses the Debtors' cash flow challenges and have attempted to introduce their plan to both the Special Servicer and the Master Servicer. A critical element of this plan is the infusion of new equity capital in the Debtors' business, and the Debtors have worked diligently to attract a third-party investor to invest new equity capital into the Debtors. Unfortunately, both the Master Servicer and the Special Servicer have refused to engage in any meaningful discussions related to the Debtors' deteriorating financial condition or the Debtors' strategy to develop a consensual solution to address those problems. Accordingly, the Debtors have been left with no choice, but to file petitions under Chapter 11 of the Bankruptcy Code.

## **RELIEF REQUESTED**

13. Through this Motion, the Debtors seek emergency interim authorization to use Cash Collateral subject to a budget for the purpose of avoiding immediate and irreparable harm to their respective bankruptcy estates pending a final hearing, and further authorization pursuant to a final order on the Motion. In consideration for use of Cash Collateral, the Debtors seek authority from the Court to grant the Trustee and Special Servicer, for themselves and for the benefit of the holders of the CMBS, adequate protection and a determination that the Debtors' provision of such adequate protection is adequate under the circumstances of these cases. Further, the Debtors request that the Court schedule a final hearing on the use of Cash Collateral and, following such a hearing, enter a final order authorizing use of Cash Collateral.

14. The Debtors propose to use Cash Collateral immediately following the Court's entry of an interim order authorizing such use for general and administrative expenses related to

EAST\44237715.12

the Debtors' operation of their businesses in the ordinary course and the administration of their bankruptcy estates, the vast majority of which shall be used to preserve and maintain the Properties. The Debtors' proposed use of Cash Collateral is for the purposes and amounts set forth in the Initial Budget, attached hereto as Exhibit 1 (the "Initial Budget" and any subsequent budget, a "Budget") and incorporated herein and subject to the terms and conditions detailed in the proposed Interim Order, attached hereto as Exhibit 2 (the "Proposed Interim Order").

15. Bankruptcy Code section 363(c)(2) provides that a debtor-in-possession may not use cash collateral unless an entity that has an interest in such cash collateral consents or the court approves the use, conditioned on the provision of adequate protection. 11 U.S.C. § 363(c)(2). Section 363(p) further provides that at a hearing on the use of cash collateral, the party asserting an interest in such cash collateral has the burden of proof on the issues of the validity, priority, or extent of such interest, and the debtor-in-possession has the burden of proof as to the issue of adequate protection. 11 U.S.C. § 363(p). Bankruptcy Rule 4001(b)(2) provides that a court may not hold a final hearing on a motion to use cash collateral earlier than fourteen (14) days after service of such motion, but may authorize the use of cash collateral prior to a final hearing as necessary to avoid immediate and irreparable harm to the debtor's estate pending a final hearing. Fed. R. Bankr. P. 4001(b)(2).

16. The Debtors recognize that the Trustee and Special Servicer, for themselves and for the benefit of the holders of the CMBS, assert an entitlement to adequate protection of the security interests in the Prepetition Collateral within the meaning of sections 361 and 363 of the Bankruptcy Code. The Debtors further acknowledge that, in consideration of the Debtors' use of Cash Collateral, the Trustee and Special Servicer, for themselves and for the benefit of the

holders of the CMBS, are entitled to adequate protection of the security interests in and liens upon the Prepetition Collateral.

17. In consideration for the Debtors' use of the Cash Collateral, the Debtors propose to grant the Trustee and Special Servicer, for themselves and for the benefit of the holders of the CMBS as their interests appear, adequate protection to the extent of any diminution of the Special Servicer's interest as of the Petition Date, as detailed in Paragraph 7 of the Proposed Interim Order, in the form of additional and replacement security interests in and liens upon certain of the Debtors' prepetition and postpetition real and personal, tangible and intangible property and assets, including, without limitation, post-petition leases, the Lockbox and all rents and deposits deposited therein (to the extent allowed under 11 U.S.C. § 552(b)(1)), and causes of action (excluding actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550, 552(b) and 553 of the Bankruptcy Code (the "Avoidance Actions") and the proceeds and recoveries from the Avoidance Actions (the "Avoidance Action Proceeds"), and the proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds (collectively, the "Postpetition Collateral").

18. The adequate protection security interests and liens granted to the Trustee and Special Servicer, for themselves and for the benefit of the holders of the CMBS, in connection with the Debtors' use of Cash Collateral shall be subject to the Carve-Out (as defined and detailed in Paragraph 14 of the Proposed Interim Order), and shall be valid and perfected without the need for the execution or filing of any further documents or instruments.

**Essential Terms of the Proposed Use of Cash Collateral**

19. Consistent with Bankruptcy Rule 4001(b)(1) and the requirements of Del. Bankr. L.R. 4001-2(a)(i) and (ii), the Debtors hereby highlight certain provisions in the Proposed

Interim Order and provide a summary of the essential terms of the proposed use of Cash Collateral as follows:

    (a)    **506(c) Waiver**: Subject to entry of the Final Order, and in consideration of the use of Cash Collateral in accordance with the Initial Budget and the Carve-Out, no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the Budget by any Debtor or any other person or entity shall be imposed against the Trustee, Special Servicer, the holders of the CMBS or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise, and the Debtors, on behalf of their estates, waive any such rights. (See ¶ 11 of the Proposed Interim Order).

    (b)    **Grant of Adequate Protection to Prepetition Lender**: Pursuant to ¶¶ 7 and 8 of the Proposed Interim Order the Debtors propose to grant the Trustee and Special Servicer, for themselves and for the benefit of the holders of the CMBS, as their interests appear, adequate protection in the form of the following:

        (i)    Replacement Liens. Granting, pursuant to Sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, continuing, valid, binding, enforceable and perfected first priority liens and security interests by each of the Debtors in and on all of the Postpetition Collateral to the same extent, priority and enforceability held on the Prepetition Collateral as of the Petition Date (the "Adequate Protection Senior Liens"). The Adequate Protection Senior Liens shall be subordinate only to the Prepetition Senior Liens, the Prior Liens and Carve-Out.

        (ii)    Adequate Protection Senior Claim. Pursuant to section 507(b) of the Bankruptcy Code, an allowed super-priority administrative expense claim (the "Adequate Protection Senior Claim") against each Debtor and its respective estate to the extent of any diminution in the Prepetition Collateral and to the extent the Replacement Liens prove inadequate to adequately protect such interests. The Adequate Protection Senior Claim shall be subordinate only to the Carve-Out.

        (iii)    Adequate Protection Senior Obligations. The Adequate Protection Senior Liens and Adequate Protection Senior Claim shall secure the payment of the Adequate Protection Senior Obligations in an amount equal to any diminution in the value of the Trustee's and Special Servicer's interests in the Prepetition Collateral from and after the Petition Date (the "Adequate Protection Senior Obligations"), including, without limitation, any such diminution resulting from the following: (i) the use by the Debtors of the

9

Prepetition Collateral, including, without limitation, the Cash Collateral, (ii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, (iii) the physical deterioration, consumption, use, sale, lease, or disposition of the Prepetition Collateral, or (iv) the imposition and payment of the Carve-Out. Other than the Carve-Out and Prior Liens, no other claims, administrative expenses, liens or security interests, whether for adequate protection or otherwise, shall be senior or equal to or *pari passu* with the Prepetition Senior Liens, Adequate Protection Senior Liens or Adequate Protection Senior Claims, without the express written consent of the Special Servicer given in accordance with the Prepetition Loan Documents (which consent may be withheld in its sole discretion). All parties retain and reserve all their rights to dispute the validity, priority, enforceability and perfection of any asserted Prior Lien and the Prepetition Lender's claims and liens.

(c) **Carve-Out**: Paragraph 14 of the Proposed Interim Order details the priority, extent, terms and conditions of the Carve-Out. (See ¶ 14 of the Proposed Interim Order).

(d) **Continued Payment of Tax and Insurance Reserves**: Paragraph 10 details the terms and conditions of the continuation of funding reserves for and payments of taxes and insurance (See ¶ 9 of the Proposed Interim Order).

**Basis for Relief Requested**

**A. Debtors' Need to Use Cash Collateral to Avoid Immediate and Irreparable Harm to their Properties and Estates**

20. Court approval of use of Cash Collateral is absolutely vital to the Debtors' efforts to stabilize their operations, reorganize and maximize value for their estates, employees and creditors. As noted above, the amounts received by the Debtors through the waterfall mechanism under the Prepetition Loan Documents are insufficient to sustain the Debtors' operations, as the Debtors continue to experience an ongoing monthly operating expense shortfall. Absent obtaining use of Cash Collateral, the Properties will deteriorate, vacancy rates will rise, the operating shortfall will start to accelerate, employees will leave, the Manager may attempt to cancel the Management Agreements and tenants will terminate their leases (see First

10

Day Declaration). Thus, the Debtors require the use of Cash Collateral to avoid immediate and irreparable harm to their Properties and bankruptcy estates.

**B.　The Court Should Approve the Motion Because the Trustee and the Special Servicer, for Themselves and for the Benefit of Holders of the CMBS, Have Been Adequately Protected**

21.　The Debtors propose to provide adequate protection as contemplated by sections 361 and 363(c)(2) of the Bankruptcy Code and hereby seek the Court's approval thereof. Further, the Debtors seek a determination that the adequate protection proposed and to be provided under the Proposed Interim Order and Final Order is adequate under the circumstances of these cases. The Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. 11 U.S.C. § 361. What constitutes adequate protection must be evaluated on a case-by-case basis. In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) (citing In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987)); In re Martin, 761 F.2d 472, 476 (8th Cir. 1985).

22.　Adequate protection is meant to ensure that secured lenders receive the value for which they originally bargained. In re Swedeland, 16 F.3d at 564 (citing O'Connor, 808 F.2d at 1396) ("[T]he whole purpose of adequate protection for a creditor is to ensure that the creditor receives the value for which he bargained pre bankruptcy"). Courts have also noted that the "essence of adequate protection is the assurance of the maintenance and continued recoverability of the lien value during the interim between the filing, and the confirmation." In re Arriens, 25 B.R. 79, 81 (Bankr. D. Or. 1982). The purpose of the adequate protection requirement is to protect secured creditors from diminution in value from the debtor's use of the collateral during the administration of its case. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); In re

Becker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Ledgmere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

23. In this case, the Debtors' request for use of Cash Collateral and the protections proposed under this Motion and described in greater detail in the Proposed Interim Order, under the circumstances, are reasonable, appropriate and sufficient to satisfy the standard of "adequate protection" and maintain the value of the Prepetition Collateral.

### C. The Use of Cash Collateral Will Preserve the Value of the Debtors' Assets and Prepetition Lenders' Collateral

24. If the Debtors are not authorized to use Cash Collateral, their businesses will continue to deteriorate, the Debtors will be forced to shutter more rental units and suffer from insufficient cash to fund the day-to-day operations of the business (see First Day Declaration). The use of Cash Collateral, therefore, is critical to the Debtors' ability to operate their businesses going forward and to maximize the value of their assets for the benefit of their creditors. Furthermore, if the Debtors' Properties are starved of crucial cash, the new money financing that is essential for the reorganization of these Debtors will evaporate, dooming the Debtors to a chaotic liquidation.

25. Pursuant to section 363(c)(2) of the Bankruptcy Code a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). As set forth in the First Day Declaration, the Debtors attempted to engage the Master Servicer and Special Servicer in discussions regarding the Prepetition Loan Agreement, but to date have not been successful in their efforts to commence such negotiations. Accordingly, the Debtors do not know whether or not the Master

Servicer or the Special Servicer consents to the Debtors' use of Cash Collateral under the terms set forth herein.

26. It is well established that a bankruptcy court, if possible, should resolve issues in favor of preserving a debtor's business as a going concern. See, e.g., In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984) ("A debtor, attempting to reorganize a business under chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild. Without the availability of cash . . . the congressional policy favoring rehabilitation over economic failure would be frustrated.").

27. As discussed above, the Debtors propose to use Cash Collateral, in the ordinary course of their businesses and to fund the administration of their cases, on an interim basis pending a final hearing. The Debtors' proposed use of Cash Collateral includes, among other things, authority to expend the funded reserves for insurance proceeds and repairs subject to the Budget. If the Debtors cannot use Cash Collateral during the interim period, they will have insufficient cash to sustain their day-to-day operations and may be forced to convert these chapter 11 cases to chapter 7. The cessation of business operations will irreparably harm the value of the Debtors' assets. The Debtors' use of Cash Collateral will allow the Debtors to maintain operations and preserve (and likely enhance) the value of their businesses and properties, and thereby, the value of their estates.

**D.    Interim Approval for the Use of Cash Collateral Should Be Granted And A Final Hearing Should Be Scheduled**

28. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the

EAST\44237715.12

motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

29. Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and on an interim basis (a) authorize the Debtors to use the Cash Collateral in order to (i) maintain and finance the ongoing operations of the Debtors and the administration of their estates, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule a Final Hearing

30. In furtherance of this request, the Debtors shall, within three (3) business days of the entry of the Interim Order by the Court, serve by overnight mail, a copy of this Motion with its attachments, a copy of the entered Interim Order, and a notice of the Final Hearing on the date established by the Court on: (i) the Office of the United States Trustee; (ii) the creditors holding the largest unsecured claims against the Debtors' estates on a consolidated basis; (iii) the Trustee; (iv) the Master Servicer; and (v) the Special Servicer.

31. The Debtors further request that any party in interest who objects to the relief sought at the Final Hearing be required to file an objection, which objection shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; and (iii) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware and served upon the following parties no later than fourteen (14) days from the date of the entry of the Interim Order: (a) proposed counsel to the Debtors: DLA Piper LLP (US), 203 North LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn: Richard A. Chesley), and Edwards Angell Palmer & Dodge LLP, 919 North Market Street, 15th Floor, Wilmington, Delaware 19801 (Attn: Stuart M. Brown); (b) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35,

EAST\44237715.12

Wilmington, Delaware 19801, (Attn: Jane Leamy, Esq.); (c) the Trustee; (d) the Master Servicer; and (e) the Special Servicer.

32. Accordingly, the Debtors respectfully request that the Court schedule the Final Hearing on this Motion at the Court's convenience no sooner than fourteen days following the entry of the Interim Order. Such relief is necessary in order to maintain and preserve the ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' respective estates.

## **NOTICE**

33. Notice of this Motion on an interim basis has been given to: (a) the Office of the United States Trustee for the District of Delaware, (b) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (c) the Trustee, (d) the Special Servicer and (e) the Master Servicer. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). The Debtors submit that notice of the Interim Hearing and the relief requested in the Motion is due and sufficient notice and complies with Section 102(1) of the Bankruptcy Code, Bankruptcy Rule 2002, and 4001(b)(1), and the Local Rules.

*[remainder of page intentionally left blank]*

EAST\44237715.12

WHEREFORE, the Debtors respectfully request that the Court enter an interim order substantially in the form attached hereto as Exhibit 2: (a) granting the relief sought herein and (b) granting to the Debtors such other and further relief as the Court may deem proper.

Dated: March 7, 2011
Wilmington, Delaware

Respectfully submitted,

_____
Stuart M. Brown (DE 4050)
Michelle E. Marino (DE 4577)
EDWARDS ANGELL PALMER & DODGE LLP
919 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 777-7770
Facsimile: (302) 777-7263
Email: sbrown@eapdlaw.com
mmarino@eapdlaw.com

-and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: richard.chesley@dlapiper.com
kim.newmarch@dlapiper.com

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION