IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
:
In re                                        :  Chapter 11
                                             :
PJ Finance Company, LLC, et al.,[1]          :  Case No. 11-_____ (_____)
                                             :
            Debtors.                         :  (Joint Administration Requested)
                                             :
------------------------------------------------------------x

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR AN
ORDER PURSUANT TO 11 U.S.C. §§ 105(A) AND 363(B) AND FEDERAL
RULE OF BANKRUPTCY PROCEDURE 6004 AUTHORIZING DEBTORS'
ENTRY INTO A FINANCING ARRANGEMENT AND PERFORMANCE
THEREUNDER IN CONNECTION WITH THEIR PLAN OF REORGANIZATION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move the Court for entry of an order, in substantially the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (i) authorizing the Debtors to enter into the commitment letter (the "Commitment Letter," attached hereto as Exhibit B), dated March 2, 2011, as amended from time to time, by and among certain of the Debtors and Gaia Real Estate Investments LLC (the "Investor") to provide the Debtors with $42 million in new financing as set forth in the Commitment Letter (the "Financing Arrangement") that will enable the Debtors to consummate a plan of reorganization and (ii) granting certain related relief. In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors are the following seven entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): PJ Finance Company, LLC (8895), PJ Holding Company Manager, LLC (8895), PJ Holding Company, LLC (8895), Alliance PJRT GP, Inc. (1787), Alliance PJWE GP, L.L.C. (8133), Alliance PJRT Limited Partnership (1789) and Alliance PJWE Limited Partnership (8198). The mailing address of each of the Debtors solely for purposes of notices and communications is 1200 North Ashland Avenue, Suite 600, Chicago, Illinois 60622.

## Jurisdiction and Venue

1. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## Background

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are in possession of their properties and continuing to operate their business as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee or official committee of unsecured creditors has been appointed in these cases.

3. The Debtors are real estate companies engaged in the acquisition, ownership, operation, management, leasing, financing, mortgaging and selling of 32 apartment communities comprising 9,504 units located in the states of Arizona, Florida, Georgia, Tennessee and Texas (the "Properties" and collectively, the "Portfolio").

4. The day-to-day operations of the Portfolio are managed by a third-party, WestCorp Management Group One, Inc. ("WestCorp"), pursuant to Management Agreements dated November 9, 2006 (the "Management Agreements") and a Sub-Management Agreement dated July 1, 2008.

5. On November 9, 2006, Alliance PJRT Limited Partnership and Alliance PJWE Limited Partnerships (collectively, the "Partnerships") entered into an Amended and Restated Loan Agreement[2] with Column Financial Inc. (along with its successors and assigns from time to time, the "Originating Lender"), whereby the Originating Lender agreed to make a loan to the Partnerships in the principal amount of $475,000,000 with a maturity date of November 11, 2016

---

[2] At that time, the Portfolio was also subject to a senior mezzanine loan and a junior mezzanine loan, but as a result of the senior mezzanine lender's exercise of its remedies under the Uniform Commercial Code, it conducted a sale on September 4, 2009 of the pledged equity interests of the Debtors, thereby taking such interests in full satisfaction of the senior mezzanine debt.

(as amended, restated, supplemented or otherwise modified from time to time, the "Loan" or the "Prepetition Loan Agreement" and together with the other documents, instruments, notices and recordings executed, delivered and recorded, collectively, the "Prepetition Loan Documents").[3]

6. On May 1, 2007, the Originating Lender sold the Prepetition Loan Documents to Credit Suisse First Boston Mortgage Securities Corp. ("Credit Suisse"). Credit Suisse purchased the Loan in order to include it in a portfolio of loans that Credit Suisse securitized by the issuance of commercial mortgage-backed securities ("CMBS"). Pursuant to that certain Pooling and Servicing Agreement, dated as of May 1, 2007 (the "Pooling and Servicing Agreement"), Credit Suisse contributed the Prepetition Loan Documents to a trust. Under the Pooling and Servicing Agreement, Bank of America, N.A. acts as successor trustee (the "Trustee" or the "Prepetition Lender")[4] and caused the issuance and sale of mortgage pass-through certificates in multiple classes denoted the Credit Suisse Commercial Mortgage Pass-Through Certificates, Series 2007-C2. Wachovia Bank, N.A. acts as the master servicer (the "Master Servicer") and Torchlight Loan Services, LLC acts as special servicer (the "Special Servicer"). Pursuant to the Prepetition Loan Documents, the Loan is secured by mortgages and deeds of trust encumbering all of the Properties in favor of the Trustee. The Partnerships are currently indebted on the Loan in the amount of $475 million plus accrued and unpaid interest, costs and fees.

7. The Prepetition Loan Agreement is administered through a lockbox and all rents from operations of the Properties flow through the lockbox account (the "Lockbox"). After being swept daily by the Master Servicer, the rents are then distributed once a month to, and for the benefit of, the Debtors pursuant to a "waterfall" mechanism described below. As of the Petition Date, the amounts received by the Debtors through the "waterfall" are insufficient to

---

[3] The Debtors have not completed their investigation respecting the extent, validity, priority, perfection and avoidability of the claims and liens evidenced by the Prepetition Loan Documents and reserve all rights. Nothing set forth herein shall be construed as a waiver or admission against interest on the part of the Debtors with respect thereto.

[4] On July 26, 2010, a UCC-3 Financing Statement Amendment was filed with the Delaware Department of State, stating that Wells Fargo Bank, N.A. assigned its right, title and interest as trustee to Bank of America, N.A.

sustain the Debtors' operations, as the Debtors continue to experience an ongoing monthly operating expense shortfall.

8.  As of the date hereof, the Partnerships have trade payables outstanding in an amount of approximately $4.4 million for expenses incurred in the ordinary course of operating the Properties.

9.  Owing to a combination of internal problems among the Debtors' previous shareholders and management team, the severe economic recession and the current overleveraged debt structure of the Debtors, the Portfolio currently yields insufficient rents to service both its suffocating monthly debt service obligations and those obligations related to its day to day operations. Indeed, the combination of the severe economic recession and the lasting effects of the recent decline in the multi-family real estate market has resulted in the aggregate value of the Properties to be dramatically less than the amount of the Debtors' outstanding secured debt under the Prepetition Loan Agreement.

10. Currently, all of the Debtors' cash is swept into a blocked account and after the Master Servicer funds amounts for, among other things, (i) a tax and insurance reserve, (ii) interest due on the Loan and (iii) a capital expenditure/repair reserve, the Debtors receive an amount intended for payment of the monthly operating expenses of the Debtors, including for payment of fees and expenses owing to the Manager and the Debtors' obligations related to their day to day operations. The Debtors believe, however, that the funding of certain of such reserves is excessive. Due to the large percentage of the Debtors' cash that was funded pre-petition in payment of Loan obligations and reserves through the "waterfall" mechanism, the Debtors have insufficient cash available to pay obligations for the Debtors' day to day operations as they come due. As a result of this insufficient cash flow, the Debtors have been unable to relet units as leases expire or vacancies otherwise occur in the ordinary course, or to convert vacated "off-line" rental units into lease-ready units, and make repairs and improvements on other units and in common areas. Currently, over 1,700 of the total number of units are unable to be rented as there is insufficient cash available to invest in these units to return them to move-in condition

and, with the upcoming notices to vacate in the next thirty days, this number will continue to increase to more than 20% of the Debtors' total units, as the Debtors do not currently have the funds to repair these vacated units. This grim reality will result in a further decline in the Debtors' revenue and create added stress on their ability to meet their obligations.

11. In order to ensure that the Properties do not deteriorate further and thus cause a further decline in revenue and value, the Debtors require a significant cash infusion and restructuring of the Loan in order to continue to operate the Properties. Working with their advisors, the Debtors have developed a comprehensive business plan that addresses the Debtors' cash flow challenges and have attempted to introduce their plan to both the Special Servicer and the Master Servicer. A critical element of this plan is the infusion of new equity capital in the Debtors' business, and the Debtors have worked diligently to attract a third-party investor to invest new equity capital into the Debtors. Unfortunately, both the Master Servicer and the Special Servicer have refused to engage in any meaningful discussions related to the Debtors' deteriorating financial condition or the Debtors' strategy to develop a consensual solution to address those problems. Accordingly, the Debtors have been left with no choice, but to file petitions under Chapter 11 of the Bankruptcy Code.

12. An integral, and indeed critical, component of the Debtors' strategy for emergence from chapter 11 is new financing. Having been literally starved for the cash necessary to maintain and improve their properties, the Debtors require financing to, among other things, fund working capital needs of reorganized Alliance PJRT Limited Partnership and Alliance PJWE Limited Partnership and certain affiliated Debtor entities (collectively, "Newco"). Not only will new capital enable a stabilization and improvement in the operating performance of their properties for the benefit of all stakeholders, but such financing is essential for creditor recoveries under a plan of reorganization. The new investment of $42 million will increase the value of the collateral for all stakeholders beyond the current value. Through this Motion, the Debtors are seeking to move this process forward by requesting approval to enter into, on "a stalking horse basis," the Financing Arrangement, which will provide them with, in

the aggregate, $42 million of financing as described below. As described herein, in conjunction with their financial advisor, the Debtors will be prepared to conduct a marketing process to determine whether "higher and otherwise better" financing is available from other potential investors. The Debtors believe that this open process, when combined with the extensive marketing efforts accomplished prior to the commencement of these cases, will ensure that the financing arrangement that is approved pursuant to the Plan is in the best interest of all stakeholders in these cases.

## Summary of Proposed Terms of Investment

A. <u>The Financing Arrangement</u>

13. The following is a brief summary of certain of the key provisions of the proposed Financing Arrangement in Newco pursuant to the Commitment Letter.[5]

**Investor:** Gaia Real Estate Investments LLC (the "Investor") and certain other investor(s), if any, selected by the Investor in its sole discretion.[6]

**Owner:** PJ Finance Company, LLC ("Owner")

---

[5] The following summary of the Commitment Letter is for the Court's convenience and is qualified in its entirety by reference to the Commitment Letter. In the event of any conflict between this summary and the terms and conditions of the Commitment Letter, the terms and conditions of the Commitment Letter shall govern.

[6] The Investor specifically reserves the right to add additional third-party investors to participate in the Financing Arrangement. In the event no additional investors are identified by the Investor for participation, the Investor has nevertheless agreed to consummate the Financing Arrangement on its own.

| | |
|---|---|
| **Purchase Price; Corporate Structure and Conditions Precedent:** | Investor shall fund $41 million and an affiliate of the Owner ("Owner Affiliate") will fund $1 million in exchange for 100% of the equity interests of the entity that will be formed to consummate the Chapter 11 reorganization ("Newco") (collectively, the "New Money Investment"), subject to the terms and conditions set forth herein.[7] Owner will work with its attorneys and accountants to seek to structure the investment in a way that is tax efficient for the Investor.[8] Investor and Owner each acknowledge and agree that this Letter of Intent contains the economic terms of this proposed investment that are agreeable to Investor and Owner; provided, however, each party further acknowledges and agrees to work closely with their respective attorneys in order to confirm the exact legal structure of this proposed investment. |
| **Governance:** | Newco shall have a five person Board of Directors comprised of three members selected by Investor, one member selected by Owner Affiliate and one member selected by PJ Finance Company Manager, LLC ("PJFCM"). |
| **Mezzanine Loan:** | Up to $20.0 million of the New Money Investment may be structured as an unsecured mezzanine loan (or other subordinated debt) at 14% interest for a term that ends upon the later of (i) 10 years or (ii) the maturity date of Owner's senior credit facility. Newco shall have the option to defer payments until maturity. |
| **Assumption of Guarantees:** | In connection with the New Money Investment, the Investor (or any entity controlled by it) will arrange a replacement non-recourse carveout guaranty with respect to any financing relating to the Property. |
| **Use of Proceeds:** | The $42.0 million will be spent by Newco as directed by the Board of Directors to fund closing costs (as described below), operations of the Property and other necessary expenses (including capital expenditures), and the payment of administrative, priority and unsecured claims in an amount to be agreed upon. |

---

[7] Mr. Kenneth Woolley is an indirect equity holder in the Owner and is an equity holder in Gaia.
[8] To satisfy its internal accounting and tax structures, the Investor is making the investment in the form of both mezzanine debt and equity. All of the proceeds from the investment will be available immediately for use by the Debtors in connection with their exit from chapter 11.

| | |
|---|---|
| **Milestones:** | As a condition precedent to the New Money Investment, the following must occur (the "Milestones"): |

1. The Debtors shall commence a chapter 11 filing in the Court on or before March 7, 2011;
2. The Debtors shall file with the Court a motion seeking approval of the New Money Investment and Investor subject to a higher and better offers (the "New Money Motion") on or before March 9, 2011;
3. The New Money Motion shall be approved by the Court on or before March 21, 2011;
4. On or before May 16, 2011, the Debtors shall file a Plan of Reorganization (in a form reasonably satisfactory to the Investor) and accompanying Disclosure Statement with the Court; and
5. On or before July 15, 2011, the Court shall enter an order confirming the Debtors' Plan of Reorganization ("Confirmation").

| | |
|---|---|
| **Purchase Option:** | Subsequent to the Confirmation, Owner Affiliate shall have the option to purchase 20.0% of the equity of Newco from Investor for $4.4 million. In the event that Owner Affiliate exercises such option, Investor will provide financing to Owner Affiliate for the entire purchase price at 8% annual interest rate (interest accrued to maturity). The note will be non-recourse and secured by Owner Affiliate's 20.0% interest in Newco. |
| **Property Management:** | WestCorp Management Group One, LLC ("WestCorp") shall be the property manager for the Properties, subject to a duly executed property management agreement under market terms. |
| **Additional Conditions Precedent:** | Closing shall be subject to: |
| | No material title defects or material deficiency; |
| | Loan modification terms with the current Lender in a form that is reasonably satisfactory to the Investor; |
| | Satisfactory agreement with the Lender over transfer and/or contemplated investment terms including capital repair escrow and approval of our designated property manager; |

Chapter 11 reorganization plan and final and binding Court order with respect thereto (both in a form that is reasonably satisfactory to the Investor);

All liens and lawsuits against the underlying properties to be resolved and satisfied; and

Indemnification over all environmental issues that might have originated during the time of Owner's control of the Property.

| | |
|---|---|
| **Due Diligence:** | Owner shall cooperate to provide Investor full access to all due diligence materials reasonably requested by Investor. |
| **Closing Conditions:** | The Closing will be conditioned on such normal and customary conditions as are typically set forth in comparable transactions of this nature. |
| **Financing:** | The closing is not subject to a financing contingency. |
| **Exclusivity:** | Investor and Owner (and their agents and affiliates) shall work together exclusively to consummate the transaction described herein, to negotiate in good faith solely with each other, to cease negotiating with any and all other potential purchasers, lenders and investors for any competing proposal for the transaction contemplated herein or any similar equity or debt financing until the latest to occur of (i) fourteen (14) calendar days after a petition seeking Chapter 11 protection with respect to the Property is filed with the Court, or (ii) the entry by the Court of an order approving the New Money Motion ("Exclusivity Period"). |
| | Moreover, the above exclusivity shall apply even in the case where the parties worked together but failed to secure from the Court an order approving the New Money Motion in the sense that, during the Exclusivity Period, Owner and Investor shall be barred from contracting, negotiating or joining forces with any third party for the purpose of taking ownership or control of the Property or benefitting in any other way from the Property. |
| **Closing Costs:** | The parties shall be responsible for paying all of their respective costs and expenses in connection with this transaction, including, without limitation, the cost of its counsel, advisors and other professionals employed by it in connection herewith; provided, however, that the Debtors |

|                   | shall seek approval from the Court for the Investor's reimbursement for up to $250,000 of reasonable, documented fees and expenses incurred in connection with the New Money Investment in the event that the Court approves of a new money investment by a third party instead of by Investor (the "Expense Reimbursement"). Investor shall pay all transaction fees due and payable pursuant to the engagement agreement between Owner and CBRE Capital Advisors, Inc ("CBRE") out of the proceeds of the New Money Investment. Investor acknowledges and agrees that Investor has not contacted or dealt with any brokers or finders in connection with this proposed transaction. |
|---|---|
| **Break-Up Fee:** | In consideration of the Investor's prior and future efforts expended in pursuing the transactions described in the Commitment Letter, in the event that the Court approves of a new money investment by a third party instead of the Investor, the Debtors agree to seek the permission of the Court to pay to the Investor a break-up fee of $1,000,000.00 (the "Break-Up Fee" and, together with the Expense Reimbursement, the "Investor Protections"). |

14. The Debtors recognized early on in the restructuring process that their success in emerging from chapter 11 would be tied to the ability to raise new capital in a difficult market. Accordingly, the Debtors' investment bankers CBRE began a "new money" process more than six months ago. This process involved contacting over seventeen (17) potential investors, with five (5) investors completing confidentiality agreements and engaging in due diligence. In the end, the Investor's financing of $42 million emerged as the most viable financing alternative, recognizing the urgency underlying the Debtors' chapter 11 efforts.

15. Although the Debtors have determined that the Investor's proposal is the best available, the Debtors and CBRE wish to ensure that the transaction with the Investor is the best that can be obtained in order to maximize the return to the Debtors' creditors. Accordingly, the Debtors' agreement with Investor provides the Debtors with the opportunity to conduct a new marketing process for this financing, provided that the Court approves the Investor receiving Investor Protections should an alternative financing source emerge from this process. The

Debtors, in the exercise of their business judgment, believe that the Investor Protections are a necessary inducement for the Investor, and further believe that having the Investor committed to this financing — and effectively serving as a floor — while determining if more favorable financing exists will motivate further interest in the Debtors.

16. To this end, the Debtors and CBRE are updating their diligence materials and are prepared to immediately commence the following steps to determine the "highest and otherwise best" financing commitment:

   a. CBRE will communicate with all parties previously contacted to determine if they have a further interest in serving as the financing source. To the extent parties express any interest in proceeding, upon confirmation that a confidentiality agreement is in place, the Debtors will provide the party with access to the data room that is currently in place and coordinate such other diligence, including management meetings as the parties may reasonably request.

   b. CBRE will canvas the market and contact all likely investment parties (both strategic and financial) with a "teaser" memorandum and, if any parties subsequently express interest in serving as the financing source (i) provide them with a confidentiality agreement and (ii) provide them with access to the data room that is currently in place and coordinate such other diligence, including management meetings as the parties may reasonably request.

   c. The Debtors and the Committee will establish a "bid-deadline" in advance of the hearing on the Disclosure Statement, by which all interested parties must submit the terms of their proposed financing. The parties may, but will not be required to, base their financing on the Commitment Letter. The Debtors and Committee will mutually determine which alternative financing proposals are deemed "Qualified Proposals," and which proposal among those submitted constitutes the "highest and otherwise best" financing proposal.

17. In the event that Qualified Proposals are received, the Debtors will conduct a competitive process and determine which of the Qualified Proposals provides the most beneficial financing for the Debtors' estates and shall be included in the Plan.

## Relief Requested

18. By this Motion, the Debtors respectfully request entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, authorizing the Debtors (a) to enter into the Financing Arrangement and (b) to perform their obligations thereunder, including the payment of fees and expenses and the provision of certain indemnities provided for therein.

## Basis for Relief Requested

### Financing Arrangement

19. The Debtors require financing in order to facilitate confirmation of the Plan and ensure the Debtors' post-reorganization operational success and the maximum return to creditors. Section 105(a) of the Bankruptcy Code allows this Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

20. Section 363(b)(1) provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A court can authorize a debtor to use property of the estate pursuant to Section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. <u>Meyers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir 1996); <u>In re Delaware & Hudson R.R. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991); <u>The Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)</u>, 973 F.2d 141, 143 (2d Cir. 1992). Under section 363 of the Bankruptcy Code, a debtor in possession may use, sell or lease property of the estate outside the ordinary course of business if: (i) it has an articulated business justification, (ii) it provides adequate notice to all creditors, and (iii) a hearing is held on the proposed use. <u>See</u> <u>Fulton State Bank v. Schipper (In re Schipper)</u>, 933 F.2d 513, 515 (7th Cir. 1991).

21. The debtor has the burden to establish that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. <u>See</u> <u>In re Lionel</u>

Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. See In re Integrated Resources, Inc., 147 BR. 650, 656 (S.D.N.Y. 1992); see also In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. Integrated Resources, Inc., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)); see In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions."). Thus, the Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification. See Schipper, 933 F 2d at 515; Lionel, 722 F.2d at 1071.

22. The Debtors, in consultation with CBRE, have exercised their sound business judgment in determining that entering into the Financing Arrangement and payment of the fees and expenses in connection with the Financing Arrangement will yield the best result for the Debtors' estates and will provide a committed level of financing necessary for the Debtors to emerge successfully from these Bankruptcy Cases. Where use of estate property outside of the ordinary course of business is in aid of a debtor's reorganization, the Court has wide discretion to tailor relief pursuant to section 363(b) of the Bankruptcy Code. In re Montgomery Ward Holding Corp., et al. 242 B.R. 147, 154-56 (D. Del 1999); see also Lionel, 722 F.2d 1063 (2d Cir. 1983).

23. Obtaining a cost-effective capital source to facilitate the Debtors' exit from chapter 11 is critical to the success of the overall restructuring efforts of the Debtors. The Debtors believe that they have obtained favorable terms for the exit financing, based on negotiations and consultation with their advisors. The Financing Arrangement is a product of extensive negotiations conducted in good faith and on an arms-length basis. As such, it contains competitive terms and conditions, including the proposed fees, that are favorable in light of the

other proposals received by the Debtors. Additionally, the Debtors believe that the Investor brings useful experience that will facilitate the Debtors' exit from chapter 11. The Investor is a U.S. real estate investment company headquartered in New York City, with offices in Tel Aviv, Israel which specializes in real estate investments for insurance companies, pension funds, private funds, foundations, and high net worth individuals. The Investor has extensive experience investing in and operating income-producing real estate, including multi-family rental properties. In light of the foregoing, the Debtors believe that they should be authorized to enter into the Financing Arrangement, perform their obligations thereunder and pay certain fees and expenses in connection therewith, as necessary.

24. The Debtors believe that the relief requested herein will allow the Debtors to emerge successfully from these Bankruptcy Cases and maximize value for the benefit of their estates and creditors. By granting the relief requested herein, the Debtors will be able to ensure sufficient post-reorganization liquidity, thereby increasing the likelihood of successfully emerging from chapter 11.

25. Accordingly, as illustrated above, cause exists to approve the Financing Arrangement as proposed herein.

**Investor Protections**

26. As noted above, the Investor proceeded in reliance on promises by the Debtors to seek approval of the Investor Protections. The Debtors submit that the Investor Protections are a necessary component of obtaining financing outside the ordinary course of business under section 363 of the Bankruptcy Code. As an analogy, in the context of 363 sales, such protections have encouraged potential purchasers to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. See, e.g., In re Comdisco Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a

necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . due diligence"); In re Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "[agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

27.   Moreover, bid protections, which serve a similar purpose as the Investor Protections sought by this Motion, have been approved in other chapter 11 cases in this Court. See, e.g., In re Nortel Networks Inc., Case No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale, or 5.9%); In re Tallygenicom, L.P., Case No. 09-10266 (Bankr. D. Del. Feb. 19, 2009) (approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); In re Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384 (Bankr. D. Del. Feb. 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with a $11 million sale, or up to 11.4%); In re Archway Cookies LLC, Case No. 08-12323 (Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25 million sale, or 3.8%); In re Wickes Holdings. LLC, et al., Case No. 08-10212 (KJC) (Bankr. D. Del. Feb. 19, 2008) (authorizing debtor to enter into stalking horse agreement providing break-up fee of up to 3%); In re Tweeter

Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) (authorizing debtor to pay stalking horse's termination fee); In re Radnor Holdings, Case No. 06-10110 (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted).

28. A proposed incentive, such as the Investor Protections, should be approved when it is in the best interests of the estate. In re S.N.A. Nut Co., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); see also In re America West Airlines. Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1997). Typically, this requires that the incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy. Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

29. In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. O'Brien Envtl. Energy, 181 F.3d at 536. The court determined that Calpine's right to break-up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. Id. at 537. The Debtors believe that approval of the Investor Protections will create such a competitive process with respect to the exit financing needed by the Debtors.

30. First, the Break-Up Fee induced the Investor to submit a term sheet that will serve as a minimum floor upon which other investors may rely. Therefore, the Investor has provided a material benefit to the Debtors, their estates and their respective creditors by encouraging other investors and increasing the likelihood that the best possible price and terms for the Financing Arrangement will be received. See, e.g., Comdisco, Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefit to the debtor's

estate); Kmart, Case No. 02-B02474 (SPS) (Bankr. N.D. Ill. May 10, 2002); Integrated Resources, 147 B.R. at 659 (noting that termination payment is an "important tool to encourage bidding and to maximize the value of the debtor's assets").

31. Second, the proposed Investor Protections are the result of an arm's-length negotiated agreement between the Debtors and the Investor. There is no evidence or reason to believe that the relationship between the Debtors and the Investor has been tainted by self-dealing or manipulation.

32. Third, the Debtors believe that the proposed Investor Protections are fair and reasonably compensate the Investor for taking actions that will benefit the Debtors' estates. The Investor Protections compensate the Investor for diligence and professional fees the Investor incurred in pursuing the Financing Arrangement and negotiating the terms of the Investor Commitment Letter on an expedited timeline so that the Debtors could move forward with soliciting support for their Plan, while at the same time ensuring that the Debtors maximize the value of the Financing Arrangement for their estates and creditors.

33. Fourth, the Debtors do not believe that the Investor Protections will have a chilling effect on the process of soliciting investment in Newco. Rather, the Investor has increased the likelihood that a more favorable new money investment will be provided by permitting other qualified bidders to rely on the diligence performed by the Investor, and moreover, by allowing qualified bidders to utilize the "form" of the Investor investment as a "floor". The Exclusivity Period is operative only from the date the Investor Commitment Letter is executed through the date on which the Court enters an order granting this Motion. Because this time period occurs well before approval of the Disclosure Statement and confirmation of the Plan, it obviously cannot chill the interest of other potential investors.

34. Finally, the Investor Protections will be paid only if, among other things, the Debtors select an investor other than the Investor to consummate the Investor Protections. Accordingly, no Investor Protections will be paid unless prior to July 1, 2011, Debtors consummate a transaction or series of related transactions involving an equity or debt investment

or sale of substantially all of its assets that is approved by the Court as an alternative to the transactions set forth in the Commitment Letter. With the Investor Protections capped at $1,250,000, representing less than 3.0% of the Investor's funding commitment, the Investor Protections are a relatively small price to pay for the certainty of the Financing Arrangement and the groundwork laid by the Investor for the Debtors to receive other investment offers. In sum, the Investor Protections are reasonable under the circumstances and will enable the Debtors to maximize the value for the Newco stock while limiting any chilling effect in the investment solicitation process.

### Effectiveness

35. Rule 6004(h) of the Bankruptcy Rules provides that an "order authorizing the use, sale or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Given that the entry of an order approving this Motion is necessary for the Debtors to be able to engage in a competitive financing process and move forward with their Plan, the Debtors request that any order approving the Motion be effective immediately.

### Notice

36. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware, (b) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (c) the Trustee, (d) the Special Servicer and (e) the Master Servicer. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no further notice of this Motion is required.

[remainder of this page left intentionally blank]

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed as <u>Exhibit A</u> hereto, granting this Motion and such other and further relief as the Court deems just and proper.

Dated: March 7, 2011
       Wilmington, Delaware

Respectfully submitted,

_____
Stuart M. Brown (DE 4050)
Michelle E. Marino (DE 4577)
EDWARDS ANGELL PALMER & DODGE LLP
919 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 777-7770
Facsimile: (302) 777-7263
Email: sbrown@eapdlaw.com
       mmarino@eapdlaw.com

-and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: richard.chesley@dlapiper.com
       kim.newmarch@dlapiper.com

PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION