# EXHIBIT C



INVESTMENT BANKING

200 Park Avenue – Suite 2005
New York, NY 10166

212 656 0546 Tel
212 656 0565 Fax

www.cbrecap.com

March 3, 2011

PJ Finance Company, LLC
1200 North Ashland Avenue, Suite 600
Chicago, IL 60622

Gentlemen:

This letter agreement confirms the understanding and agreement (the "Agreement") between CBRE Capital Advisors, Inc. ("CBRE Cap") and PJ Finance Company, LLC ("PJ Finance," together with its affiliates and subsidiaries, the "Company") regarding the retention of CBRE Cap by the Company effective as of March 3, 2011 (the "Effective Date") for the purposes set forth herein.

1. Assignment Scope.

The Company hereby retains CBRE Cap as its financial advisor and investment banker to provide it with financial advisory services in connection with any Restructuring, Debt Financing, New Equity and/or Sale Transaction (as such terms are defined below), and to assist the Company in analyzing, structuring, negotiating, and effectuating any Restructuring, Debt Financing, New Equity and/or Sale Transaction, on the terms and conditions set forth herein. As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring or reorganization (whether or not pursuant to chapter 11 of title 11 of the United States Code ((the "Bankruptcy Code")) and/or recapitalization of all or a significant portion of the Company's outstanding indebtedness (including senior debt, junior debt, and other on and off balance sheet indebtedness), trade claims, other unsecured claims, leases (both on and off balance sheet), litigation-related claims and obligations, or other liabilities (collectively, the "Existing Obligations") that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations (collectively, the "Stakeholders"); rescheduling of the maturities of Existing Obligations; a change in interest rates, repurchase, settlement or forgiveness of Existing Obligations; any other material amendment or modification of Existing Obligations; conversion of Existing Obligations into equity; an exchange offer involving the issuance of new securities in exchange for Existing Obligations; the issuance of new securities, sale or disposition of assets, sale of debt or equity securities or other interests or other similar transaction or series of transactions.

2. Appointment and Acceptance.

CBRE Cap agrees, in consideration of the compensation provided in Section 3 below, to perform such of the following financial advisory and investment banking services as the Company may reasonably request, including:

(a) Reviewing and analyzing the Company's business, operations and financial projections;

(b) Evaluating the Company's potential debt capacity in light of its cash flows;

(c) Assisting in the determination of an alternative capital structure for the Company and long term business plan;

(d) Assisting in the determination of a range of values for the Company on a going concern basis;

(e) Providing strategic advice with regard to the Restructuring and advising the Company on tactics and strategies for negotiating with the Stakeholders;

(f) Rendering financial advice to the Company and participating in meetings or negotiations with, among other parties, the Stakeholders and/or rating agencies or other appropriate parties in connection with any Restructuring;

(g) Advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to the Restructuring;

(h) Advising and assisting the Company in evaluating a potential Debt Financing[1] by the Company, and on behalf of the Company, contacting potential sources of capital as the Company may designate and assisting the Company in implementing such a Debt Financing;

(i) Advising and assisting the Company in evaluating potential New Equity,[2] contacting potential sources of capital as the Company may designate and assisting the Company in implementing such a New Equity;

(j) Assisting the Company in preparing documentation within CBRE Cap's area of expertise that is required in connection with the Restructuring;

---

[1] As used in this Agreement, the term "Debt Financing" means any transaction or series of transactions, that is not a Restructuring, New Equity or Sale Transaction, involving the public or private issuance, sale, or placement of debt securities, instruments, or obligations of the Company, including any debtor-in-possession financing or exit financing in connection with a case under the Bankruptcy Code.

[2] As used in this Agreement, the term "New Equity" means any transaction or series of transactions, that is not a Restructuring, Debt Financing or Sale Transaction, involving the public or private issuance, sale, or placement of equity securities or instruments of the Company.

    (k)    Assisting the Company in identifying, contacting and evaluating candidates for a potential Sale Transaction[3], advising the Company in connection with negotiations and aiding in the consummation of a Sale Transaction;

    (l)    Attending meetings of the Company's Board of Directors and its committees with respect to matters on which we have been engaged to advise you;

    (m)    Providing testimony, as necessary, with respect to matters on which we have been engaged to advise you in any proceeding before the Bankruptcy Court (as such term is defined below); and

    (n)    Providing the Company with other advisory services as are usually provided in connection with the analysis and negotiation of a Restructuring as required and mutually agreed.

In performing its services pursuant to this Agreement, CBRE Cap is not assuming any responsibility for the decision of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Restructuring, Debt Financing, Sale Transaction, or other transaction. CBRE Cap shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements; nor shall CBRE Cap be responsible for providing any tax, legal or other specialist advice.

3. <u>Fees</u>.

As consideration for the services to be provided under this Agreement, the Company shall pay CBRE Cap the following fees and expenses:

    (a)    A monthly advisory fee in the amount of $125,000 (the "<u>Monthly Fee</u>"), payable in advance on each monthly anniversary of the Effective Date; <u>provided</u>, that the first Monthly Fee shall be payable in arrears upon the one month anniversary of the Effective Date; <u>provided</u>, <u>further</u>, that fifty percent (50%) of the aggregate amount of Monthly Fees paid by the Company shall be credited against the aggregate amount of

---

[3]    As used in this Agreement, the term "Sale Transaction" means any transaction or series of transactions, that is not a Restructuring, Debt Financing or New Equity, involving (a) an acquisition, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly, combined with another company; (b) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding equity interests of the Company or possessing a majority of the then outstanding voting power of the Company (except as may occur with current Stakeholders as a result of a Restructuring); or (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of all or substantially all of assets, securities or other interests of the Company.

      any Restructuring Fee, Debt Financing Fee, New Equity Fee and Sale Transaction Fee payable pursuant to the terms set forth herein.

(b)   A fee equal to (i) 0.625% of the aggregate amount of indebtedness forgiven or re-tranched, up to $50,000,000 and (ii) 0.875% of the aggregate amount of indebtedness forgiven or re-tranched in excess of $50,000,000 (the "Restructuring Fee"). Except as otherwise provided herein, a Restructuring shall be deemed to have been consummated upon (i) the binding execution and effectiveness of all necessary waivers, consents, amendments or restructuring agreements between the Company and its creditors involving the compromise of the face amount of such Existing Obligations or the conversion of all or a material part of such Existing Obligations into alternative securities, including equity, in the case of an out-of-court restructuring; or (ii) the execution, confirmation and consummation of a Plan of Reorganization pursuant to an order of the Bankruptcy Court, in the case of an in-court restructuring. The Restructuring Fee will be:

(I) earned on the earliest of:

(x) consummation of the Restructuring, and

(y) in the event that the Company attempts to implement the Restructuring by means of a pre-negotiated plan of reorganization under chapter 11 of the Bankruptcy Code, the receipt of sufficient commitments, agreements or other expressions of the intention to accept such plan that the Company elects to file a chapter 11 case and therein represent to the Bankruptcy Court hearing such case that the Company will seek to confirm a plan based on the pre-negotiated plan, and

(II) payable, in cash, on the consummation of the Restructuring.

(c)   A transaction fee equal to 1.00% of the Aggregate Consideration (as such term is defined below) received from any Sale Transaction by the Company, payable upon the consummation of any such Sale Transaction, whether in connection with the consummation of a Restructuring or otherwise (the "Sale Transaction Fee").

(d)   A fee equal to (i) in the event that Gaia Real Estate Investments LLC (and/or its affiliates or subsidiaries, collectively, "Gaia") is the new equity investor, (W) 1.25% of the aggregate gross proceeds in New Equity raised, up to the first $30,000,000, (X) 1.00% of the aggregate gross proceeds in New Equity raised in excess of $30,000,000 but less than $60,000,000, (Y) 0.75% of the aggregate gross proceeds in New Equity raised in excess of $60,000,000 but less than $90,000,000 and (Z) 0.50% of the aggregate gross proceeds in New Equity raised in excess of $90,000,000; and (ii) for any other new equity investor, (W) 2.50% of the aggregate gross proceeds in New Equity raised, up to the first $30,000,000, (X) 2.00% of the aggregate gross proceeds in New Equity raised in excess of $30,000,000 but less than $60,000,000, (Y) 1.50% of

    the aggregate gross proceeds in New Equity raised in excess of $60,000,000 but less than $90,000,000 and (Z) 1.00% of the aggregate gross proceeds in New Equity raised in excess of $90,000,000 (the "New Equity Fee"). Notwithstanding anything to the contrary contained herein, CBRE Cap acknowledges and agrees that CBRE Cap shall not be entitled to any Fees whatsoever with respect to any New Equity and/or loans made to the Company (whether as part of a Restructuring, Debt Financing, New Equity, Sale Transaction or any other transaction) by any of the following parties or any of their affiliates, subsidiaries, members, partners, shareholders or otherwise related entities: (1) Everest Real Estate Fund, LLC; (2) Equibase Capital Group, LLC; (3) PJ Finance Company, LLC; and /or (4) Westcorp Management Group One (each being an "Excluded Party").

(e)  A fee equal to 0.75% of the aggregate gross proceeds raised in a Debt Financing, payable upon consummation of any such Debt Financing (the "Debt Financing Fee" and together with the Monthly Fee, the Restructuring Fee, the New Equity Fee and the Sale Transaction Fee, the "Fees").

(f)  Reimbursement of all reasonable and necessary out-of-pocket expenses incurred during this engagement, including, but not limited to, reasonable travel and lodging as per firm policy, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of CBRE Cap's counsel, and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

(g)  As part of the compensation payable to CBRE Cap hereunder, the Company agrees to indemnify CBRE Cap and certain related persons and entities in the manner set forth in the indemnification provisions attached hereto as Appendix A and incorporated by reference in its entirety to this Agreement.

(h)  All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash when such amounts are due and payable pursuant to the terms herein.

  As used in this Agreement, the term "Aggregate Consideration" means, without duplication, (x) the total amount of cash and the fair market value (on the date of payment) of all of the property paid or payable (including amounts paid into escrow) in connection with the Sale Transaction (or any related transaction), including amounts paid or payable in respect of convertible securities, preferred equity securities, warrants, stock appreciation rights, option or similar rights, whether or not vested, plus (y) without duplication of any amounts included in clause (x) above, (A) in the case of a sale of equity, the product of the percentage of the equity of the Company or relevant Company entity, as applicable, acquired by the buyer(s) multiplied by the principal amount of all indebtedness for borrowed money or other liabilities of the Company or relevant Company entity, as applicable, remaining at closing of the sale, or, (B) in case of a sale of assets, all indebtedness for borrowed money or other liabilities assumed by the third party. For purposes of calculating Aggregate Consideration, (i)

all shares or equity interests will be deemed transferred where a Sale Transaction is effected by the transfer of shares or equity interests, (a) constituting more than a majority of the then outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, or (b) possessing more than a majority of the then outstanding voting power of the outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, and (ii) the value of securities (whether debt or equity) that are freely tradable in an established public market will be determined on the basis of the average closing price in such market for the 10 trading days prior to the closing of the Sale Transaction (the "Valuation Date"); and the value of securities that have no established public market or other property will be the fair market value of such securities or other property on such Valuation Date and any restricted stock (i.e., stock in a public company not freely tradable) received shall be valued at 85% of the public market price of such stock (as determined above). Aggregate Consideration shall also be deemed to include pension liabilities and guarantees by the Company of monies borrowed assumed directly or indirectly by a third party. If the Aggregate Consideration is subject to increase by contingent payments related to future events, the portion of CBRE Cap's fee relating thereto shall be determined by the Company together with CBRE Cap in good faith and paid to CBRE Cap upon consummation of the Sale Transaction.

4. Additional Engagements.

The Company further understands that if CBRE Cap is asked to act for the Company in any other formal additional capacity relating to this engagement, but not specifically addressed in this Agreement (including, but not limited to, independent valuation or appraisal of the Company's assets, or the delivery of a fairness or solvency opinion) then such activities shall constitute separate engagements and the terms and conditions of any such additional engagements will be embodied in one or more separate written agreements, containing provisions and terms to be mutually agreed upon, including without limitation appropriate indemnification provisions. The indemnification provisions in Appendix A attached hereto shall apply to any such additional engagements, unless superseded by indemnification provisions set forth in a separate Appendix A applicable to any such additional engagements, and shall remain in full force and effect regardless of any completion, modification or termination of CBRE Cap's engagement hereunder.

5. Indemnification.

The Company agrees to indemnify CBRE Cap and certain related persons and entities in the manner set forth in Appendix A, which is attached hereto and incorporated by reference in its entirety to this Agreement, and shall remain in full force and effect regardless of any completion, modification or termination of CBRE Cap's engagement hereunder.

6. Retention in Chapter 11 Proceedings.

In the event the Company commences or becomes a debtor under chapter 11 of the Bankruptcy Code, the Company shall promptly apply to the bankruptcy court asserting jurisdiction over the Company's chapter 11 case or cases (the "Bankruptcy Court") for approval pursuant to Sections 327 and 328 of the Bankruptcy Code of (i) this Agreement (or a modified version thereof to which CBRE Cap has agreed in writing, if so modified, the "Approved Agreement") and (ii) CBRE Cap's retention

by the Company under the terms of the Approved Agreement, in each case subject to the standard of review provided in Section 328(a) of the Bankruptcy Code and not subject to any other standard of review under Section 330 of the Bankruptcy Code. The Company will use its best efforts to obtain the Bankruptcy Court's approval of the Company's payment of CBRE Cap's fees and expenses *nunc pro tunc* to the Effective Date of this Agreement and of the other obligations of the Company provided in this Agreement. Upon such approval by the Bankruptcy Court, CBRE Cap will act as the Company's exclusive financial advisor on the terms and subject to the conditions hereof. The Company shall supply CBRE Cap with a draft of such application and any proposed order approving CBRE Cap's retention sufficiently in advance of the filing of such application and proposed order to enable CBRE Cap and its counsel to review and comment thereon. CBRE Cap shall have no obligation to provide any services under this Agreement in the event the Company becomes a debtor under the Bankruptcy Code unless CBRE Cap's retention under the terms of this Agreement is approved under Section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to CBRE Cap in all respects in its sole discretion. CBRE Cap acknowledges that in the event the Bankruptcy Court approves its retention by the Company, CBRE Cap's fees and expenses will be subject to the jurisdiction and approval of the Bankruptcy Court under Section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders. In the event that the Company becomes a debtor under chapter 11 of the Bankruptcy Code and CBRE Cap's engagement hereunder is approved by the Bankruptcy Court, the Company shall (x) pay all fees and expenses of CBRE Cap hereunder as promptly as practicable in accordance with the terms hereof, subject to Bankruptcy Court approval and (y) file with the Bankruptcy Court, as the Bankruptcy Court allows, any and all necessary applications with respect to such fees and expenses. In agreeing to seek the retention of CBRE Cap under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that CBRE Cap's general professional experience and expertise, its knowledge of the industry in which the Company operates and its capital markets and merger and acquisition capabilities will inure to the benefit of the Company in pursuing any transaction, the value to the Company of CBRE Cap's services hereunder derives in substantial part from that experience and expertise and that, accordingly, the structure and amount of the Fees is reasonable irrespective of the number of hours to be expended by CBRE Cap's professionals in the performance of the services provided hereunder.

7. <u>Information</u>.

The Company will furnish or cause to be furnished to CBRE Cap such current and historical financial information and other information regarding the business of the Company as necessary or appropriate in connection with this engagement (all such information so furnished being the "<u>Information</u>"). The Company represents and warrants to CBRE Cap that all of the foregoing Information will be accurate and complete in all material respects at the time it is furnished, and agrees to keep CBRE Cap advised of all developments materially affecting the Company or its financial position. In performing its services pursuant to this Agreement, including in connection with any valuation of the Company, CBRE Cap shall be entitled to rely upon Information furnished to it by the Company or that is publicly available, may assume the accuracy and completeness of such Information and shall not assume any responsibility for independent verification of any such Information. With

respect to any financial forecasts and projections made available to CBRE Cap by the Company, CBRE Cap shall be entitled to assume that such forecasts and projections have been reasonably prepared on bases reflecting the best currently available estimates and judgment of Company management. CBRE Cap will not, as part of its engagement, undertake any independent valuation or appraisal of any of the assets or liabilities of the Company or of any third party, or opine or give advice to the Board of Directors, the Company or management or shareholders with respect thereto.

8. Termination.

CBRE Cap's engagement hereunder (i) shall be terminated upon the consummation of any Restructuring and (ii) may be terminated upon 10 days' written notice without cause, by either the Company or CBRE Cap; termination for cause by either party will occur forthwith. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses payable through the date of termination, the status of CBRE Cap as an independent contractor and the limitation as to whom CBRE Cap shall owe any duties will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification provisions as set forth in Appendix A and the confidentiality provisions provided herein, and (c) CBRE Cap shall be entitled to a Fee in the event that a Restructuring, Debt Financing, New Equity and/or Sales Transaction on terms (including the parties thereto) that are substantially similar to the terms of a Restructuring, Debt Financing, New Equity and/or Sale Transaction proposal made in good faith by the Company or one or more Stakeholders prior to the termination of this Agreement is consummated at any time prior to the expiration of 12 months following the termination of this Agreement.

9. Other.

(a) No fee payable to any other person, by you or any other party, shall reduce or otherwise affect any fee payable hereunder to us.

(b) It is understood and agreed that nothing contained in this Agreement shall constitute an express or implied commitment by CBRE Cap or any of its respective affiliates and subsidiaries to underwrite, place or purchase any securities in a financing or otherwise, which commitment shall only be set forth in a separate underwriting, placement agency or purchase agreement, as applicable, relating to the financing.

(c) In order to coordinate our efforts on behalf of the Company during the period of our engagement hereunder, the Company will promptly inform CBRE Cap of any discussions, negotiations, or inquiries regarding a potential transaction, including any such discussions or inquiries that have occurred during the six month period prior to the date of this Agreement. In the event that CBRE Cap receives an inquiry concerning any transaction, we will promptly inform the Company of such inquiry.

(d) Except as required by applicable law or in the case of negotiations with holders of Existing Obligations or other interested parties, any advice to be provided by CBRE Cap under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors or, if appropriate in the

      Company's judgment, in any filings in a chapter 11 proceeding) without the prior written consent of CBRE Cap. All services, advice and information and reports provided by CBRE Cap to the Company in connection with this assignment shall be for the sole benefit of the Company and shall not be relied upon by any other person.

(e) The Company acknowledges and agrees that CBRE Cap will provide its financial advice exclusively to the governing board and senior management of PJ Finance, and to the equity holders of PJ Finance who are equity holders as of the Effective Date, and not to the Company's other constituencies or Stakeholders. The Company's governing board and senior management will make all decisions for the Company regarding whether and how the Company will pursue a Restructuring and on what terms and by what process. In so doing, the Company's governing board and senior management will also obtain the advice of legal, tax and other business advisors and consider such other factors which they consider appropriate before exercising their independent business judgment in respect of a Restructuring, Debt Financing, New Equity and/or Sale Transaction. The Company further acknowledges and agrees that CBRE Cap has been retained to act solely as financial advisor to the Company and does not in such capacity act as a fiduciary for the Company or any other person. CBRE Cap shall act as an independent contractor and any duties of CBRE Cap arising out of its engagement pursuant to this Agreement shall be owed solely to the Company.

(f) In connection with the services to be provided hereunder, CBRE Cap may employ the services of its affiliates and subsidiaries and may share with any such entity any information concerning the Company, provided that CBRE Cap and such entities shall hold any non-public information confidential in accordance with their respective customary policies relating to nonpublic information. Any such entity so employed shall be entitled to all of the benefits afforded to CBRE Cap hereunder and to all the benefits of the indemnification provisions as set forth in Appendix A and shall be entitled to be reimbursed for its costs and expenses on the same basis as CBRE Cap.

(g) In the event that, as a result of or in connection with CBRE Cap's engagement by the Company, CBRE Cap becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse CBRE Cap for the reasonable fees and expenses of its counsel incurred in responding to such a request. Nothing in this paragraph shall affect in any way the Company's obligations pursuant to the indemnification provisions as set forth in Appendix A.

(h) Nothing in this Agreement shall be construed to prohibit or limit the ability of CBRE Cap or its affiliates from pursuing, investigating, analyzing or engaging in other business relationships with entities other than the Company, notwithstanding that such entities may be engaged in a business which is similar to the business of the Company; provided, however, that CBRE Cap may not represent any clients with respect to any of

the transactions concerning the Company that are the subject of this Agreement if such representation is (i) hostile to the interests of the Company or its assets or (ii) otherwise in competition with the interests of the Company or its assets.

(i) The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company, CBRE Cap and any other person entitled to indemnification as set forth in this Agreement (including the indemnification provisions as set forth in Appendix A). The Company agrees that the Company's obligations pursuant to this Agreement shall be joint and several.

(j) This Agreement (including the indemnification provisions as set forth in Appendix A) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the Agreement in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

(k) The parties hereby agree that any action or proceeding based on the Agreement or arising out of CBRE Cap's engagement hereunder, shall be brought and maintained exclusively in the courts of the State of New York or in the United States District Court for the Southern District of New York; provided, if the Company commences a chapter 11 case, all legal proceedings pertaining to this engagement arising after such case is commenced may be brought in the Bankruptcy Court handling such case. The parties irrevocably submit to the jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based on the Agreement or arising out of CBRE Cap's engagement hereunder and irrevocably agree to be bound by any judgment rendered thereby in connection with such action or proceedings. The parties hereby irrevocably waive, to the fullest extent permitted by law, any objection they may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same. Each of the parties hereto (and, to the extent permitted by law, on behalf of their respective equity holders and creditors) hereby irrevocably waives any right it may have to a trial by jury in respect of any claim based upon, arising out of or in connection with this Agreement or transactions contemplated hereby. Each of the parties agrees to service of process by mail. Neither party to this Agreement nor any affiliate thereof shall be liable for any lost or prospective profits or any other indirect, consequential, special, incidental, punitive, or other exemplary losses or damages,

whether based in contract, warranty, indemnity, negligence, strict liability or other tort or otherwise, regardless of the foreseeability or the cause thereof.

(l) This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which will constitute one and the same agreement. A facsimile or electronic version of an executed document will have the same force and effect as an original.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to CBRE Cap the duplicate copy of this Agreement.

Very truly yours,

CBRE CAPITAL ADVISORS, INC.

By: _____

Name:
Title:

Accepted and Agreed to as
of the date first written above:

PJ FINANCE COMPANY, LLC

By: *[signature]*
Name: Michael W. Husman
Title: Authorized Signatory

Appendix A

Indemnification Provisions

The Company agrees to indemnify and hold harmless CBRE Cap and its affiliates and their respective directors, officers, employees, consultants, agents and controlling persons (each such person, an "Indemnified Party") from and against any losses, claims, damages and liabilities, joint or several (collectively, the "Damages"), to which such Indemnified Party may become subject in connection with or otherwise relating to or arising from (i) any transaction contemplated by this Agreement or the engagement of or performance of services by an Indemnified Party hereunder or (ii) an untrue statement or an alleged untrue statement by or on behalf of the Company of a material fact or the omission or alleged omission by or on behalf of the Company to state a material fact necessary in order to make a statement not misleading in light of the circumstances under which it was made with respect to all Information furnished to CBRE Cap or to be made available to a prospective party for consideration with respect to any transaction contemplated hereunder, and will reimburse each Indemnified Party for all reasonable fees and expenses (including the reasonable fees and expenses of counsel) (collectively, "Expenses") as incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (collectively, the "Proceedings") arising therefrom, whether or not such Indemnified Party is a formal party to such Proceeding; provided, that the Company will not be liable to any such Indemnified Party to the extent that any Damages are found by a court of competent jurisdiction in a final, non-appealable decision to have resulted from the gross negligence or willful misconduct of the Indemnified Party seeking indemnification hereunder. The Company also agrees that no Indemnified Party will have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of the Company arising out of or in connection with any transactions contemplated by this Agreement or the engagement of or performance of services by any Indemnified Party hereunder except to the extent that any Damages are found by a court of competent jurisdiction in a final, non-appealable decision to have resulted from the gross negligence or willful misconduct of the Indemnified Party.

If for any reason other than due to a failure to meet the standard of care set forth above, the foregoing indemnity is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless in accordance with this Agreement, then the Company will contribute to the amount paid or payable by an Indemnified Party as a result of such Damages (including all Expenses incurred) in such proportion as is appropriate to reflect the relative benefits received or sought to be received by the Company and its security holders and creditors on the one hand, and the Indemnified Parties on the other hand, in connection with the matters covered by this Agreement or, if the foregoing allocation is not permitted by applicable law, not only such relative benefits but also the relative faults of such parties as well as any relevant equitable considerations. The Company agrees that for purposes of this paragraph, the relative benefits to the Company and its security holders and creditors and the Indemnified Parties in connection with the matters covered by this Agreement will be deemed to be in the same proportion

that the total value paid or received or to be paid or received by the Company and its security holders and creditors in connection with the transaction for which CBRE Cap has been engaged to provide services as contemplated by this Agreement, whether or not consummated, bears to the fees paid or proposed to be paid to CBRE Cap for such services under this Agreement.

The Company agrees not to enter into any waiver, release or settlement of any Proceeding (whether or not CBRE Cap or any other Indemnified Party is a formal party to such Proceeding) in respect of which indemnification may be sought hereunder without the prior written consent of CBRE Cap (which consent will not be unreasonably withheld or delayed), unless such waiver, release or settlement includes an unconditional release of CBRE Cap and each Indemnified Party from all liability arising out of such Proceeding.

The indemnity, reimbursement and contribution obligations of the Company hereunder will be in addition to any liability which the Company may otherwise have to any Indemnified Party and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or an Indemnified Party. The provisions of this Appendix A shall survive the modification, termination or expiration of this Agreement.