UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

_____
                                        )
In re:                                  ) Chapter 11
                                        )
PJ FINANCE COMPANY, LLC, *et al.*,      ) Case No. 11-10688 (BLS)
                                        )
                                        ) Jointly Administered
         Debtors.                       )
                                        ) Re:  Docket Nos. 7, 19
                                        )
                                        ) "Opt Out" Deadline: 3/23/11
                                        ) Hearing Date: 4/6/11, 9:00 a.m.
_____ )

OBJECTION OF CERTAIN UTILITY COMPANIES TO THE
MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION
FOR ENTRY OF INTERIM AND FINAL ORDERS ESTABLISHING
ADEQUATE ASSURANCE PROCEDURES WITH RESPECT TO THEIR UTILITY
PROVIDERS PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE

Georgia Power Company ("Georgia Power"), Salt River Project

("SRP") Florida Power Corporation d/b/a Progress Energy Florida

("PEF"), and Arizona Public Service ("APS") (collectively, the

"Utilities"), by counsel, hereby object to the *Motion of the Debtors*

*and Debtors In Possession For Entry of Interim and Final Orders*

*Establishing Adequate Assurance Procedures With Respect to Their*

*Utility Providers Pursuant to Section 366 of the Bankruptcy Code*

(the "Utility Motion")and set forth the following:

## Introduction

Section 366(c)(2) requires a Chapter 11 debtor to provide

utilities with adequate assurance of payment that is satisfactory to

the utility within 30 days of the Petition Date. If a debtor

believes the amount of the utility's request pursuant to Section

366(c)(2) needs to be modified, the debtor can file a motion
pursuant to Section 366(c)(3) seeking to modify the amount of the
utility's request.  Despite the foregoing, the Debtors filed the
Utility Motion at the outset of this case that sought, without
evidence or supporting documentation, to establish that the Debtors'
offer to deposit $247,350.86 into a segregated account (the "Escrow
Account"), which supposedly represents two-weeks of the Debtors'
average utility charges, constitutes adequate assurance of payment.

As an initial matter, the Escrow Account is not relevant and
should not even be considered by this Court because it is not a form
of adequate assurance of payment set forth in Section 366(c)(1)(A),
nor the security requested by the Utilities (cash deposits) pursuant
to Section 366(c)(2), the amount of which the Debtors can seek to
modify pursuant to Section 366(c)(3).  If, however, the Court does
consider the Escrow Account, the Utilities do not agree that the
Escrow Account constitutes adequate assurance of payment and it
certainly is not adequate assurance of payment satisfactory to the
Utilities.  Moreover, with respect to the Escrow Account, the
Debtors failed to explain: (i) who would hold the Escrow Account;
(ii) how the Utilities would access the Escrow Account; and (iii)
whether the Utilities will still have access to the Escrow Account
if the Debtors default on their obligations concerning their use of
cash collateral.  In addition, because in the normal course of
business the Debtors routinely open and close accounts with the

Utilities pursuant to agreements with the Utilities, a specified adequate assurance amount is not appropriate in this case.

Furthermore, as case law is clear that adequate assurance of payment is to be determined on a case-by-case basis, it is remarkable how a two-week deposit or two-week escrow account are the debtor's proposed **form** and **amount** of adequate assurance in virtually every bankruptcy case filed in this District.

The Debtors, as customers of the Utilities, are aware that the Utilities: (1) bill the Debtors on a monthly basis in arrears and provide the Debtors with generous trade terms; and (2) are allowed to obtain a deposit to cover their billing exposure. With the foregoing knowledge, the Debtors should be required, at a minimum, to set forth a factual and evidentiary basis why this Court should consider modifying the amount that the Utilities are entitled to request. In this case, the Utilities are requesting adequate assurance of payment in the form of two month cash deposits.

This Court should deny the Utility Motion as not being properly before the Court because: (1) the Utility Motion does not address the Utilities' deposit requests; (2) the Utility Motion does not seek to modify the amount of the Utilities' deposit requests; and (3) the Debtors fail to provide the Utilities with adequate assurance of payment pursuant to Section 366(c) of the Bankruptcy Code.

3

## Facts

### Procedural Facts

1.     On March 7, 2011 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.     The Debtors' cases are being jointly administered.

### The Utility Motion

3.     On the Petition Date, the Debtors filed the Utility Motion.

4.     No proper notice of the Utility Motion was given to the Utilities prior to the Court entering the *Interim Order Granting Motion of the Debtors and Debtors In Possession For Entry of Interim and Final Orders Establishing Adequate Assurance Procedures With Respect to Their Utility Providers Pursuant to Section 366 of the Bankruptcy Code* (the "Interim Utility Order") on March 8, 2011.

5.     Because the Utilities were not served with the Utility Motion and the Debtors never attempted to contact the Utilities regarding their adequate assurance requests prior to the filing of the Utility Motion, they had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing on the

Utility Motion that took place on March 8, 2011, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice and a hearing" to the Utilities.

6.      Through the Utility Motion, the Debtors seek to avoid the procedural and substantive requirements of Section 366.  Instead of responding to adequate assurance demands of their utility companies, the Debtors elected to file the Utility Motion and seek Court approval for their own form of adequate assurance in the form of the Escrow Account.  Utility Motion at ¶ 13.

7.      In the Utility Motion, the Debtors allege that the two week amounts for each of their utility providers listed on Exhibit A to the Utility Motion includes (i) utility services for common areas of the apartment complexes, such as management offices, lobbies, hallways, and parking lots, and (ii) master accounts held by the Debtors for vacant apartment units to ensure that utilities are paid for all vacant units until a new tenant leases the premises and establishes utility account in his or her name.  Utility Motion at ¶ 12.  The "master accounts" identified by the Debtors refer to the automatic turn-on agreements in place with the Utilities which provide that once a tenant vacates a unit the account, the account will be placed into the Debtors' name instead of having utility service terminated. As a result of the foregoing, the Debtors are routinely opening and closing accounts with the Utilities.

8.   The Debtors also contend that the two week amounts set forth on Exhibit A for the master accounts are supposedly based upon the amounts billed to such accounts for January 2011.  Utility Motion at ¶ 12.  However, the number of vacant units reflected for the Utilities on Exhibit A is substantially less than the actual number of vacant units identified by the Utilities.  Indeed, with respect to PEF, Exhibit A only reflects approximately one-third of the actual number of vacant apartment units identified by PEF and billed to the Debtors.

9.   As the number of apartment vacancies increase, the post-petition exposure for the Utilities would also increase.  Simply put, the actual number of vacant units in the Debtors' name is constantly in flux.  As such, a mechanism has to be established whereby the actual number of vacant units in the Debtors' name are periodically identified, with the resulting two-month adequate assurance deposits to the Utilities recalculated.

10.   The Interim Utility Order granted the Utility Motion, including the establishment of the Escrow Account, on an interim basis.

11.   The Interim Utility Order also approved "Opt-Out Procedures" which provides that if a utility wants to opt-out of the Debtors' proposed Adequate Assurance Procedures, the utility must file and serve a notice so that it actually received within 15 days of entry of the Interim Utility Order, i.e., by March 23, 2011.  The

6

Interim Utility Order further provides that any utility that does not timely file an Opt-Out Notice is deemed to consent to, and shall be bound by, the Adequate Assurance Procedures. Interim Utility Order at ¶ 6. All of the foregoing is nonsense and not authorized by Section 366 or any other provision of the Bankruptcy Code. Despite the foregoing, the Utilities sent the Debtors an Opt-Out Notice on March 22, 2011.

## Facts Concerning the Debtors

12.  The Debtors are real estate companies engaged in the acquisition, ownership, operation, management, leasing, financing, mortgaging and selling of real property (the "Properties," and collectively, the "Portfolio").  The Portfolio consists of 32 apartment communities comprising 9,504 units located in the states of Arizona, Florida, Georgia, Tennessee, and Texas.  *Declaration of Michael W. Husman In Support Of First Day Pleadings* at ¶ 6 (hereinafter "Husman Dec. at ¶ __").

13.  The day-to-day operations of the Portfolio are managed by a third-party, WestCorp Management Group One, Inc. (the "Manager") pursuant to Management Agreements dated November 9, 2006 (the "Management Agreements"). Husman Dec. at ¶ 6.

## The Debtors' Capital Structure

14.  On November 9, 2006, Debtors Alliance PJRT Limited Partnership ("PJRT") and Alliance PJWE Limited Partnership ("PJWE," together with PJRT, collectively referred to as the "Partnerships"),

SL1 1061472v1/000000.00000

entered into an Amended and Restated Loan Agreement with Column
Financial, Inc. (along with its successors and assigns, the
"Originating Lender"), whereby the Originating Lender agreed to make
a loan to the Partnerships in the principal amount of $475 million
with a maturity date of November 11, 2016 (as amended, restated,
supplemented or otherwise modified, the "Loan" or the "Prepetition
Loan Agreement" and together with other documents, collectively the
"Prepetition Loan Documents").  Husman Dec. at ¶ 12.

15.   The Partnerships are currently indebted on the Loan in
the amount of $475 million plus accrued and unpaid interest, costs
and fees.  Husman Dec. at ¶ 13.

16.   The Prepetition Loan Agreement is administered through a
lockbox and all rents from operations of the Properties flow through
the lockbox account (the "Lockbox").  After being swept daily by
Wachovia Bank, N.A. (the "Master Servicer"), the rents are then
distributed once a month to the Debtors pursuant to a "waterfall"
mechanism.  As of the Petition Date, the amounts received by the
Debtors through the "waterfall" are insufficient to sustain the
Debtors' operations, and the Debtors continue to experience an
ongoing monthly operating expense shortfall.  Husman Dec. at ¶ 14.

17.   The Debtors' claim that absent the filing of their chapter
11 petitions and obtaining the use of cash collateral, the
Properties will deteriorate, vacancy rates will rise, the operating
shortfall will start to accelerate, employees will leave, the

8

Manager may attempt to cancel the Management Agreements and tenants will terminate their leases. Husman Dec. at ¶ 14.

18. As of the Petition Date, the Partnerships have outstanding trade payables of approximately $4.4 million for expenses incurred in the ordinary course of operating the Properties. Husman Dec. at ¶ 15.

### Events Leading to Commencement of the Debtors' Chapter 11 Cases

19. The Debtors admit that their real estate portfolio does not yield sufficient rents to service both their monthly debt service obligations and obligations related to day-to-day operations. Husman Dec. at ¶ 16.

20. As a result of insufficient cash flow, the Debtors have been unable to re-lease units as leases expire or vacancies otherwise occur in the ordinary course, or to convert vacated "off-line" rental units into lease-ready units, and make repairs and improvements on other unites and in common areas. Currently, over 1,700 of the 9,504 total number of units are unable to be rented because there is insufficient cash available to invest in these units to return them to move-in condition and, with the upcoming notices to vacate in the next thirty days, this number will continue to increase to more than 20% of the Debtors' total units, as the Debtors do not currently have the funds to repair vacated units. This scenario will result in further decline in the Debtors' revenue and create added stress on their ability to meet their obligations.

SL1 1061472v1/000000.00000

Husman Dec. at ¶ 17.

21.    The Debtors claim that they require a significant cash infusion and restructuring of the Loan in order to operate the Properties and to ensure that the Properties do not deteriorate further, thereby causing a further decline in revenue and value. Husman Dec. at ¶ 18.

22.    The Debtors further claim that a critical element of their comprehensive business plan is the infusion of new equity capital in the Debtors' business.  According to the Debtors, the Master Servicer and the Special Servicer have refused to engage in any meaningful discussions related to the Debtors' deteriorating financial condition or the Debtors' plan to address those problems. Husman Dec. at ¶ 18.

23.    The Debtors have obtained a commitment from Gaia Real Estate Investments LLC ("Gaia") to invest approximately $42 million in the Debtors.  Husman Dec. at ¶ 19.

### The Debtors' Use of Cash Collateral

24.    On the Petition Date, the Debtors filed the *Motion of the Debtors and Debtors In Possession For Entry of Interim and Final Orders (I) Authorizing the Use of Lenders' Cash Collateral, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 351 and 363 and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* (the "Cash Collateral Motion").  Attached to the Cash Collateral Motion as Exhibit "1" is an Initial Budget (the "Budget")

10

which in part budgets (i) $125,000 for utility expenses for each of the first two weeks of the case, (ii) $339,479 for utility deposits, and (iii) $250,000 to Debtors' counsel.

25.  On March 8, 2011, the Court entered the *Interim Order (I) Authorizing the Use of Lenders' Cash Collateral, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* (the "Interim Cash Collateral Order").

26.  In addition to authorizing the Debtors' use of cash collateral on an interim basis, the Interim Cash Collateral Order also approved a carve-out of up to $1 million for the payment of the fees and expenses of Debtors' counsel.

## Facts Concerning the Utilities

27.  Each of the Utilities provided the Debtors with prepetition utility goods and/or services and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

28.  Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 15 to 30 days to pay the applicable bill.  If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account.  If the Debtors fail to pay the bill after

11

the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or their service will be disconnected. Accordingly, under the Utilities' billing cycles, the Debtors could receive at least 2 months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

29.   In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities are providing the following web site links to the tariffs and/or state laws, regulations and/or ordinances:

Georgia Power:
http://www.georgiapower.com/pricing/gpc_rates.asp

SRP:
    Rules and Regulations:
    http://www.srpnet.com/about/rulesregs.aspx

    Price Plans:
http://www.srpnet.com/prices/pdfx/Standard_Electric_Price_Plans_Jan2011.pdf

PEF:
http://www.progress-energy.com/aboutenergy/rates/index.asp#b3

APS:
http://www.aps.com/main/services/business/rates/BusRatePlans_9.html?id

12

30.  Subject to a reservation of Georgia Power's right to supplement their post-petition deposit request once additional accounts belonging to the Debtors are subsequently identified, Georgia Power's estimated prepetition debt and post-petition deposit requests are as follows:

| **Utility** | **No. of Accts.** | **Est. Prepet. Debt** | **Dep. Request** |
|---|---|---|---|
| Georgia Power | 90 | $n/a | $13,430 (2-month) |

31.  Subject to a reservation of SRP's right to supplement their post-petition deposit request once additional accounts belonging to the Debtors are subsequently identified, SRP's estimated prepetition debt and post-petition deposit requests are as follows:

A.  Prepetition Security

    i.  $35,310 cash deposit

    ii.  Estimated prepetition debt - $27,525.75

    iii. Estimated credit remaining after application of prepetition deposit to prepetition debt pursuant to Section 366(c)(4)- $7,784.25.

B.  Commercial Meters

    i.  7

    ii.  2 month deposit request for these 7 meters is $8,365.

13

C. Residential Accounts

    i. 680 units x $275 per unit = $187,000

D. Total Two Month Deposit Request - $195,365

32. Subject to a reservation of APS' right to supplement their post-petition deposit request once additional accounts belonging to the Debtors are subsequently identified, APS' estimated prepetition debt and post-petition deposit requests are as follows:

A. Commercial Meters

    i. 17

    ii. 2.5 month deposit request for these 17 accounts is $23,840.

B. Residential Meters

    i. 203

    ii. 203 x $250 per unit = $57,550

C. Total Deposit Request - $81,390

33. Subject to a reservation of PEF's right to supplement their post-petition deposit request once additional accounts belonging to the Debtors are subsequently identified, PEF's estimated prepetition debt and post-petition deposit requests are as follows:

A. Current Active Accounts – 51

B. Prepetition Information

    i. Estimated Prepetition Debt – Not yet known

    ii. PEF held a prepetition cash deposit totaling

SL1 1061472v1/000000.00000

$11,725 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. Any remainder of the prepetition petition deposits after recoupment can be applied to PEF's post-petition deposit request.

   C. Post-Petition Deposit Request – 2 month: $14,930

# **Discussion**

 **A. THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

 Sections 366(b) and (c) of the Bankruptcy Code, in pertinent part, provide:

 (b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.

 (c)(1)(A) For purposes of this subsection, the term "assurance of payment" means
   (i) a cash deposit;
   (ii) a letter of credit;
   (iii) a certificate of deposit;
   (iv) a surety bond;
   (v) a prepayment of utility consumption; or
   (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

  (B) For purposes of this subsection an administrative expense priority shall not constitute an assurance of payment,

  (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

15

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

(B) In making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider
    (i) the absence of security before the date of the filing of the petition;
    (ii) the payment by the debtor of charges for utility service in a timely manner before the date of the filing of the petition; or
    (iii) the availability of an administrative expense priority.

(4) Notwithstanding any other provision of law, with respect to a case subject to this subsection, a utility may recover or set off against a security deposit provided to the utility by the debtor before the date of the filing of the petition without notice or order of the court.

11 U.S.C. §366.

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997)("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner.").

A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the

16

petition.  If a debtor believes the **amount** of the utility's request

needs to be modified, then the debtor can file a motion under

Section 366(c)(3) requesting the court to modify the **amount** of the

utility's request.

In this case, the Debtors completely ignored the Utilities'

adequate assurance of payment requests.  Instead, the Debtors filed

the Utility Motion to improperly shift the focus of their

obligations under Section 366(c) from modifying the amount of the

adequate assurance of payment requested by and acceptable to the

Utilities to setting the amount of the adequate assurance of payment

acceptable to the Debtors. Accordingly, this Court should not reward

the Debtors for their failure to comply with the requirements of

Section 366(c) and deny the Utility Motion as to the Utilities. *See*

*In re Viking Offshore (USA), Inc.*, 2008 WL 782449 at *3 (Bankr. S.D.

Tex. Mar. 20, 2008) ("The relief requested by Debtors would reverse

the burden, by making an advance determination that the proposed

assurance was adequate. . . . the court lacks the power to reverse

the statutory framework for provision of adequate assurance of

payment."); *see also In re Pilgrim's Pride Corporation*, Case No. 08-

45664 (DML)(Docket No. 447), United States Bankruptcy Court For the

Northern District of Texas, *Memorandum Order* entered on January 5,

2009 (Denying debtors' motion seeking to establish adequate

assurance of payment); *see also In re Ramsey Holdings, Inc.*, Case

No. 09-13998-M (TLM), United States Bankruptcy Court For the

17

Northern District of Oklahoma, *Order Denying Debtor's Amended Motion For Entry of an Order Pursuant To Section 366 of the Bankruptcy Code Deeming Utility Companies Adequately Assured of Future Performance* entered on December 21, 2009 (Denying debtor's motion seeking to establish adequate assurance of payment, and holding that the debtor is required by Section 366 to first approach its utility providers and attempt to arrange a mutually agreeable form of adequate assurance of payment, and if such attempts are unsuccessful, the debtor can then petition the Court to establish adequate assurance.).

> **1.    The Debtors' Proposed Escrow Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide The Utilities With Adequate Assurance of Payment.**

As an initial matter, this Court should not even consider the Escrow Account.  Section 366(c)(3) of the Bankruptcy Code specifically provides that a debtor can only seek to modify the amount of a deposit request made pursuant to Section 366(c)(2).  The Utilities have not requested nor would they accept the Escrow Account as adequate assurance of payment.  Therefore, the Escrow Account is not relevant and should not be considered by this Court.

In addition, the Escrow Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

> i.    This Court only has authority under Section 366(c)(3) to modify the <u>amount</u> of the Utilities' deposit requests.  Neither the Debtors nor this Court have the

18

authority to establish the <u>form</u> of adequate assurance of payment, i.e., the creation of an escrow account instead of the form of adequate assurance that the Utilities are requesting from the Debtors.

ii.    The Debtors have failed to propose any procedures as to when and how the Utilities could obtain funds from the Escrow Account.  The Utilities would presumably have to incur legal fees and costs to file and litigate an application for payment of post-petition administrative expenses, which would be for at least one month's service, because the Utilities bill the Debtors on a monthly basis.

iii.   The Utilities bill the Debtors monthly in arrears so any request by the Utilities upon the Escrow Account would be, at a minimum, for monthly bills. Accordingly, the Escrow Account that would supposedly contain the Debtors' estimated cost of two-weeks of utility charges would be undercapitalized from the outset.

iv.    It is not clear if the Escrow Account will remain if the Debtors default on their use of cash collateral.

Accordingly, the Court should not approve the Escrow Account as adequate assurance to the Debtors' utility providers on a final basis because: (1) the Escrow Account is not a **<u>form</u>** permitted by Section 366(c)(1)(A) or the form of adequate assurance requested by the Utilities; and (2) because it is an otherwise unreliable form of adequate assurance.

**2.    The Utility Motion Should Be Denied As To The Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying The Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amount of the Utilities' requests for the adequate assurance of payment deposits set forth above.  Under

19

Section 366(c)(3), the Debtors have the burden of proof as to whether the amount of the Utilities' adequate assurance of payment requests should be modified. *See In re Stagecoach Enterprises, Inc.,* 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof). However, the Debtors do not provide the Court with any evidence or factually supported documentation to explain how or why the amount of the Utilities' adequate assurance requests should be modified. Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities. *See In re Lucre, Inc.*, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005) (holding that the right of a debtor or trustee to seek modification of a utility's deposit request "arises only after the adequate assurance payment has been agreed upon by the parties.").

**B.  THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366(C) OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases. Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

20

```
(i) a cash deposit;
(ii) a letter of credit;
(iii) a certificate of deposit;
(iv) a surety bond;
(v) a prepayment of utility consumption; or
(vi) another form of security that is mutually agreed
upon between the utility and the debtor or the trustee.
```

A determination of adequate assurance is within the court's discretion, and is made on a case-by-case basis, subject to the new requirements of Section 366(c). *See In re Utica Floor Maintenance, Inc.*, 25 B.R. 1010, 1016 (Bankr. N.D.N.Y. 1982); *In re Cunha*, 1 B.R. 330, 332-33 (Bankr. E.D. Va. 1979). Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985). Based on the Debtors' anticipated utility consumption, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of bills is approximately two (2) months. Accordingly,

21

the deposits requested by the Utilities are reasonable. *See In re Stagecoach*, 1 B.R. at 735-36 (holding that a two month deposit is appropriate where the debtor could receive sixty (60) days of service before termination of services because of the utilities' billing cycle.); *see also In the Matter of Robmac, Inc.*, 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

As set forth above, the Utilities' adequate assurance requests are based on: (1) the Utilities' billing exposure created by their applicable Tariffs; and (2) amounts that the applicable public service commissions, which are neutral third-party entities, permit the Utilities to request from their customers. Although the Utilities recognize that this Court is not bound by the Tariffs, the Tariffs are extremely relevant information of a determination made by an independent entity on the appropriate amount of adequate assurance that should be paid to the Utilities.

In contrast, the Debtors do not provide an objective or evidentiary basis for their proposed adequate assurance in the form of two-week escrow account. Additionally, the number of vacant units reflected for the Utilities on Exhibit A is substantially less than the actual number of vacant units identified by the Utilities as being in the Debtors' names, and presumably substantially less for the Debtors' other utilities as well. As such, the supposed two-week escrow account would contain significantly less than even two-weeks of the Debtors' utility charges. Furthermore, the

22

Debtors' proposed two-week escrow account would not cover the Utilities' monthly invoices and is inadequate to cover the exposure that the Utilities would face if the Debtors fail to timely pay for one month's service and receive another month's service before a Utility could terminate service for the post-petition payment default.

Moreover, the Debtors admit that their liquidity problems and financing crisis are severe. As indicated above, Debtors are unable to operate post-petition without immediate access to cash collateral. Recognizing that the Debtors' financial situation is dire, Debtors' counsel has ensured that the payment of Debtors' counsel are secured through the $1 million Carve-Out. The bottom line is that if the Debtors want to continue to receive the Utilities' generous trade terms established by the Tariffs (i.e. bills issued monthly in arrears with due dates 15 to 30 days thereafter), they need to provide the Utilities with more security than a two-week escrow account.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities;

2.    Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities; and

3. Providing such other and further relief as the Court
   deems just and appropriate.


Dated:    March 23, 2011          STEVENS & LEE, P.C.

                                  /s/ John D. Demmy_____
                                  John D. Demmy (DE Bar No. 2802)
                                  1105 North Market Street, 7th Floor
                                  Wilmington, Delaware 19801
                                  Telephone: (302) 425-3308
                                  E-mail:  jdd@stevenslee.com

                                  and

                                  Russell R. Johnson III
                                  John M. Craig
                                  Law Firm of Russell R. Johnson III, PLC
                                  2258 Wheatlands Drive
                                  Manakin-Sabot, Virginia  23103
                                  Telephone: (804) 749-8861
                                  Facsimile: (804) 749-8862
                                  E-mail:  russj4478@aol.com

                                  *Counsel For Georgia Power Company, Salt
                                  River Project, Florida Power
                                  Corporation d/b/a Progress Energy
                                  Florida and Arizona Public Service*

SL1 1061472v1/000000.00000