# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
In re:                                               :   Chapter 11
                                                     :
                                                     :   Case No. 11-10688 (BLS)
PJ Finance Company, LLC, et al.,¹                    :   (Jointly Administered)
                                                     :
                                                     :   D.I. 8
                          Debtors.                   :
                                                     :   Hearing Date: April 6, 2011 at 9:00 a.m. (ET)
                                                     :   Objection Deadline: April 1, 2011 at 4:00 p.m. (ET)
-----------------------------------------------------x
```

## LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(A) AND 363(B) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004 AUTHORIZING DEBTORS' ENTRY INTO A FINANCING ARRANGEMENT AND PERFORMANCE THEREUNDER IN CONNECTION WITH THEIR PLAN OF REORGANIZATION

The Official Committee of Unsecured Creditors (the "Committee")[2] of the above-captioned debtors and debtors-in-possession (the "Debtors"), by their undersigned proposed counsel, hereby submits this limited objection (the "Objection") to the Motion of the Debtors for an Order Pursuant to §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 6004 Authorizing Debtors' Entry into a Financing Arrangement and Performance Thereunder in Connection with Their Plan of Reorganization, dated March 7, 2011 [D.I. 8]  (the "Motion").

In support of this Limited Objection, the Committee respectfully states as follows:

---

[1]  The Debtors are the following seven entities: (the last four digits of their respective taxpayer identification numbers, if any, follow in parenthesis): PJ Finance Company, LLC (8895), PJ Holding Company Manager, LLC (8895), PJ Holding Company, LLC (8895), Alliance PJRT GP, Inc. (1787), Alliance PJWE GP, L.L.C. (8133), Alliance PJRT Limited Partnership (1789) and Alliance PJWE Limited Partnership (8198).  The mailing address of each of the Debtors solely for purposes of notices and communication is 1200 North Ashland Avenue, Suite 600, Chicago, Illinois 60622.

[2]  Any term not specifically defined herein shall have the meaning ascribed to it in the Motion or Insider Letter of Intent (defined herein), as applicable.

## PRELIMINARY STATEMENT

By the Motion, the Debtors seek authorization to enter into a certain *non-binding* letter of intent, dated March 2, 2011 (the "Letter of Intent") between PJ Finance Company, LLC ("PJ Finance Parent") and Gaia Real Estate Investments LLC ("Gaia").[3] Among other things, the non-binding Letter of Intent proposes to grant *at this time* certain investor protections to Gaia in connection with the proposed reorganization of the Debtors' business funded by Gaia and Kenneth Woolley in exchange for the equity interest in the reorganized debtors,[4] even though the "legal structure" and many key aspects of the possible transaction have yet to be negotiated between the Debtors and Gaia. (Letter of Intent, p. 1.)

A primary problem with the Letter of Intent is that it merely outlines the proposal and does not bind Gaia to anything of any substance. In particular, the Letter of Intent states that it is "merely an expression of interest of [Gaia] and [PJ Finance Parent] in consummating the transaction" and it "is subject, in all events, to the preparation, negotiation, execution and delivery by each of [Gaia] and [PJ Finance Parent] of a definitive contract." (Letter of Intent, p. 5.)

Even though Gaia is not bound in any way by the Letter of Intent to provide the Debtors' estates even one penny of the proposed $42 million investment referenced therein, the Letter of Intent nevertheless provides for a $1 million break-up fee and expense reimbursement of up to $250,000 to Gaia, and it also imposes a draconian "exclusivity period" on the Debtors which

---

[3] Upon information and belief, PJ Finance Parent is the direct or indirect parent of each of the Debtors. As explained further herein, Kenneth Woolley is a substantial indirect equity holder in PJ Finance Parent and Gaia and also is connected with WestCorp Management Group One, LLC (the non-debtor property manager for all of the Debtors' properties).

[4] Gaia reserves the right to convert $20 million of its new funding into a mezzanine loan at 14% interest per year.

forbids the Debtors from speaking with other possible investors that could possibly offer higher consideration than Gaia as a "stalking-horse" bidder for the Debtors' business.

Under the circumstances, while the Committee is not *per* se opposed to Gaia being stalking horse plan sponsor in connection with a firm, binding offer, the Debtors have not met the "sound business judgment" standard upon which they rely for approval of the Motion. The Committee's specific objections to the Motion, among others, include:

- The Motion proposes an illusory transaction because the Letter of Intent provides, at best, an outline of the economic terms of the proposed transaction, but does not bind Gaia to any obligation other than to a general confidentiality provision.

- Approving the current form of Letter of Intent is not in the best interests of the Debtors' creditors because it is opposed by the Committee and the Special Servicer[5] who together represent close to $480 million in claims in the Debtors' cases (i.e., essentially all of the claims in the Debtors' chapter 11 cases).

- The transaction proposed by the Letter of Intent currently provides no specified distribution whatsoever for the Debtors' general unsecured creditors.

- The marketing process enshrined in the Letter of Intent jettisons long-standing rules, customs and practices in this District designed to maximize the value obtained from such efforts, and therefore, there is no assurance that this process will maximize the values received by creditors under the plan.

- The proposed transaction fails to be the rigorous standards necessary to insure that an insider sponsored transaction like the one here is designed to create a level playing field to maximize value.[6]

- Prior to consideration of the Motion, the Committee should have an opportunity to take discovery to determine whether the Debtors have engaged in an appropriate marketing of the Debtors' business and whether the transaction contemplated by the Letter of Intent will maximize the value of the Debtors' assets for their creditors.

---

[5]     Upon information and belief, the Special Servicer opposes the Motion.

[6]     In just two sentences in the Motion and Letter of Intent, the Debtors reveal that Kenneth Woolley ("Woolley") is an indirect equity holder in PJ Finance Parent and is an equity holder in Gaia. (Motion, n. 7; Letter of Intent, n.2.)  Upon information and belief, Woolley, or entities he controls, possess *significant* financial and ownership interests in PJ Finance Parent, Gaia and WestCorp.

- The combined amount of the proposed $1.25 million break-up fee -- totaling, approximately 3% of the cash portion of the purchase price -- is unwarranted and excessive given the current absence of an open and competitive process and the numerous deficiencies contained in the Letter of Intent.

Accordingly, for the reasons discussed herein, the Committee respectfully requests that the Court deny the Motion without prejudice to the Debtors' right to resubmit the Motion with a revised form of Letter of Intent acceptable to the Committee.

## PROCEDURAL BACKGROUND

1. On March 7, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases are being jointly administered.

2. On March 16, 2011, the Office of the United States Trustee for the District of Delaware ("US Trustee"), at an organizational meeting of creditors, appointed five of the Debtors' largest unsecured creditors to serve as members of the Committee. On March 24, 2011, the U.S. Trustee filed the First Amended Notice of Appointment of Committee of Unsecured Creditors to appoint two additional creditors to serve as members of the Committee.[7] The Committee has selected Hahn & Hessen LLP and Landis Rath & Cobb LLP to serve as co-counsel to the Committee and Carl Marks Advisory Group as its financial advisors in these chapter 11 cases.

---

[7] The Committee is presently comprised of the following seven members: (i) Quantum Asset Development, Inc., (ii) Alliance Tax Advisors, LLC, (iii) Genie Services, Inc., (iv) Richmond & Associates Landscaping, Ltd., (v) Texmenian Contractors Inc., d/b/a Red Carpet Cleaning, (vi) One Call Sourcing International LLC d/b/a Aimsco/MRO and (vii) Nature's Paintbrush.

## MOTION, LETTER OF INTENT & PROPOSED ORDER

3.      On March 7, 2011, the Debtors filed the Motion [D.I. 8].  As an exhibit to the Motion, the Debtors attached the proposed Letter of Intent.  Motion, Exh. B.  The following represents a brief summary of certain information contained in the Motion, the Letter of Intent and the proposed order approving the Motion (the "Proposed Order").

4.      The Letter of Intent is a "non-binding" agreement.  Motion, Exh. B ("Letter of Intent") at 5.

5.      In particular, the Letter of Intent states that: (i) it contains only "the economic terms of [the] proposed investment"; (ii) "the exact legal structure of [the] proposed investment" is not yet known; (iii) it is "merely an expression of interest of [Gaia] and [PJ Finance Parent] in consummating the transaction" described therein; (iv) it "does not include all of the material terms which must necessarily be a part of such transaction"; and (v) it "is subject, in all events, to the preparation, negotiation, execution and delivery by each of [Gaia] and [PJ Finance Parent] of a definitive contract"  Letter of Intent at 1, 5.

6.      The Letter of Intent outlines a possible transaction whereby Gaia funds $41 million and an unnamed affiliate of PJ Finance Company ("PJ Finance Parent Affiliate") funds an additional $1 million to acquire 100% of the equity interests of the entity that will be formed to own the Debtors' business and consummate the Debtors' chapter 11 reorganization ("Insider Newco").  Letter of Intent at 1.

7.     The Letter of Intent indicates that the $42 million will be used by Insider Newco, as directed by its new board of directors,[8] to (i) pay up to $2.25 million in closing costs related to the transaction,[9] (ii) fund operations of the Debtors' properties, and (iii) provide for "the payment of administrative, priority and unsecured claims in an amount to be agreed upon". Letter of Intent at 2.

8.     As a condition for the proposed transaction, the Letter of Intent requires the Debtors to satisfy the following deadlines (collectively, the "Deadlines"): (i) March 7, 2011 (commence the chapter 11 cases); (ii) March 9, 2011 (file the Motion); (iii) March 21, 2011 (the Motion is approved by this Court);[10] (iv) May 16, 2011 (filing a disclosure statement and reorganization plan that are both "in a form reasonably satisfactory to" Gaia); and (v) July 15, 2011 (this Court confirms the reorganization plan). Letter of Intent at 3.

9.     The Letter of Intent provides that, after completion of the transaction and creation of Insider Newco, WestCorp will continue to be the property manager for all of the properties comprising the Debtors' estate. Letter of Intent at 3.

---

[8]    The board of Directors of Insider Newco will be comprised of the following five individuals: (i) three members selected by Gaia; (ii) on member selected by the unnamed PJ Finance Parent Affiliate; and (iii) one member selected by an entity described as "PJ Finance Company Manager, LLC" (neither the Motion nor the Insider Letter of Intent provides any information regarding this entity).

[9]    The amount to be paid will depend upon whether the proposal submitted by Gaia, or another investor, is chosen as the highest or otherwise best proposal. If this Court approves Gaia's proposal, the closing costs include the sum of (i) up to $250,000 in expense reimbursements to be paid to Gaia (the "Expense Reimbursement"), *plus* (iii) a "New Equity Fee" to be paid to CBRE Capital Advisors, Inc. (the proposed financial advisors and investment bankers to the Debtors, "CBRE") in an amount that the Committee estimates will total approximately $500,000 (the "New Equity Fee"). Letter of Intent, p. 5. On the other hand, if this Court approves a transaction with another investor, the closing costs include at least the sum of (i) a $1 million "break-up" fee to be paid to Gaia, *plus* (ii) the Expense Reimbursement (up to $250,000), *plus* (iii) a New Equity Fee in an amount that the Committee estimates will total almost $ 1 million (a different formula applies to the New Equity Fee paid to CBRE related to a proposal submitted by a non-Gaia investor). Id.

[10]   Although the deadline of March 21, 2001 has passed, Gaia has not terminated the Letter of Intent. Accordingly, the Committee submits that this deadline, as well as the other remaining deadlines, can be extended by Gaia without difficulty.

10.     The closing of the transaction will be subject to, among other things, the following two conditions: (i) loan modification terms related to the $475 million mortgage loan in a form that is reasonably acceptable to Gaia, and (ii) a broad indemnification in favor of Gaia over all environmental issues that might have originated during the time of PJ Finance Parent's control of the Debtors' properties. Letter of Intent, pp. 3-4. The Motion is completely silent regarding whether the Debtors believe that they will be able modify the prepetition mortgage loan or what, if any, environmental issues currently exist at the Debtors' properties. Consequently, even though the transaction contemplates that Insider Newco will assume a significant portion of the secured debt and make a distribution to unsecured creditors, we are kept in the dark about those critical details.

11.     The Letter of Intent includes an "exclusivity" provision (the "Exclusivity Provision") that prohibits the Debtors from contacting any other potential investor until the *later* of (i) March 21, 2011 (*i.e.*, 14 days from the filing of the Debtors' cases) or (ii) approval of the Motion (the "Exclusivity Period"). Letter of Intent at 4.

12.     In the event that this Court approves a "new money investment" provided by an investor other than Gaia, PJ Finance Parent will be obligated to seek approval from this Court for a break-up fee to be paid to Gaia in the amount of $1 million (the "Break-Up Fee"). Letter of Intent at 5.

13.     Whether or not the transaction outlined in the Letter of Intent is later approved by this Court, PJ Finance Parent will be required to seek approval from this Court for up to $250,000 of reasonable and document fees and expenses incurred by Gaia with respect to the transaction. Letter of Intent at 5.

14.     Despite the general, non-binding nature of the Letter of Intent, it states that the Exclusivity Provision is binding. Letter of Intent at 5.

15.     Even though the Letter of Intent is non-binding (other than the Exclusivity Provision), the Proposed Order includes, among other things, the following broad provisions regarding the Debtors' obligations with respect to Gaia, and it also approves the Break-Up Fee and Expense Reimbursement as administrative expense claims: (i) the Debtors "are hereby authorized, but not directed, to enter into and perform all of their obligations" under the Letter of Intent "pursuant to Bankruptcy Code section 363(b)"; (ii) "all such obligations [of the Debtors] shall constitute legal, valid, and binding obligations of the Debtors enforceable against the Debtors in accordance with their respective terms"; (iii) the Debtors "are...authorized to take any and all actions necessary or appropriate in connection [with the Letter of Intent], including, without limitation, the payment, when due, of all fees, charges, expenses and indemnity claims required [by the Letter of Intent]; and (iv) the Debtors "obligations under the [Letter of Intent], including [the Break-up Fee and Expense Reimbursement], are actual and necessary costs of preserving the Debtors' estates and are hereby afforded administrative expense priority status under section 503(b)(1) of the Bankruptcy Code. Motion, Exh. A. ("Proposed Order"), ¶¶ 2, 3.

## ARGUMENT

16.     The Debtors seek approval of the Motion under the "sound business judgment" standard under section 363(b) of the Bankruptcy Code. Motion, ¶¶20-25. As a general rule, the sound business judgment standard requires the directors of a corporation to act on an informed basis, in good faith and in the honest belief that the action is in the best interest of the company. *See, e.g., In re Decora Indus. Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002). *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992). However, the "sound

business judgment" standard does not permit a court to simply rubber stamp a debtor's proposal. *In re Am. Reserve Corp.*, 841 F.2d 159, 162 (7th Cir. 1987) (a bankruptcy court judge should not simply "rubber stamp" proposals made by a trustee); *In re Key3Media Group, Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006) (although a bankruptcy court generally gives deference to a debtor's business judgment, it is not to rubber stamp a debtor's proposal).

17.     Rather, it is black letter law that debtors must act in a manner that maximizes the value of their estates for all parties-in-interest. *In re Reliant Energy Channelview LP*, 594 F.3d 200, 209-210 (3d Cir. 2010) (stating general rule and affirming bankruptcy decision denying request by debtor to provide break-up fee as court determined such fee was not necessary to preserve value of debtor's estate); *In re Northwest Airlines Corp.*, 349 B.R. 338, 369 (S.D.N.Y. 2006), *aff'd*, 483 F.3d 160 (2d Cir. 2007) (stating rule); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 54 (Bankr. D. Del. 2001) (stating rule). Here, the Debtors are not acting in a way that will maximize the value of their estates and distributions to their creditors through the Letter of Intent.

18.     As such, the Debtors have not, and cannot, meet the sound business judgment standard or demonstrate that the Motion is in the best interests of the creditors of the Debtors' estates because the Letter of Intent in its present form: (i) describes a proposed transaction which is illusory because Gaia has no obligations under it except with respect to general confidentiality terms; (ii) is opposed by virtually all of the Debtors' creditors; (iii) does not create any meaningful framework for the marketing and sale of the Debtors' business, and therefore, fails to maximize the value of the Debtors' business; and (iv) fails to impose the

rigorous safeguards needed to avoid potential self-dealing and other conflicts of interest on the part of the Debtors' management.

A.   The Debtors' Motion is Premature.

19.   Article III of the United States Constitution empowers the judiciary to adjudicate only actual cases or controversies, and not to issue advisory opinions. *Deakins v. Monaghan*, 484 U.S. 193, 199, 108 S.Ct. 523 (1988). At no stage of review may a federal court " 'give opinions upon ... abstract propositions..., or ... declare principles or rules of law which cannot affect the matter in issue in the case before it.' " *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). It is this requirement that has engendered the ripeness doctrine, an aspect of justiciability, which determines when an action may be brought. *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 410, 411 n.12-13 (3d Cir. 1992).

20.   The ripeness inquiry focuses on the timing of the request being made by a party. *Armstrong World Indus.*, 961 F.2d at 411. "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* (quoting *Abbott Labs., v. Gardner*, 387 U.S. 136,148, 87 S.Ct. 1507 (1967)). Ultimately, the case must involve "'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994) (citations omitted). The party invoking the court's jurisdiction bears the burden of demonstrating that the case is justiciable. *Renne v.Geary*, 501 U.S. 312, 316, 111 S.Ct. 2331 (1991). Thus, the Debtors bear the burden of demonstrating that the relief requested in the Motion is ripe for adjudication by this Court.

21.     Here, the Debtors impermissibly seek this Court to render an advisory opinion regarding the Motion because the transaction described in the Letter of Intent represents the very definition of a "hypothetical state of facts" that will lead this Court to have to entangle itself in "abstractions". Specifically, the Debtors are requesting authorization to enter into a "non-binding agreement" that is "merely an expression of interest of [Gaia] and [PJ Finance Parent] in consummating the transaction" Letter of Intent, pp. 1,5. As the Letter of Agreement contains only "the economic terms of [the] proposed investment" with an unknown legal structure, and "is subject, in all events, to the preparation, negotiation, execution and delivery by each of [Gaia] and [PJ Finance Parent] of a definitive contract," the Committee submits that it is nothing other than an unenforceable "agreement to agree". Id. at 1, 5.

22.     Rather than forcing this Court to entangle itself in a dispute between the Committee and the Debtors over a proposed transaction where most of the key terms have not even been negotiated, the Committee respectfully suggests that a better case management approach is for this Court to deny the Motion without prejudice or defer its consideration of the Motion until a later date. The Committee is hopeful that the short adjournment of the hearing on the Motion will permit the Debtors and Gaia, in consultation with the Committee, to work out many of the key terms of the proposed transaction that are absent from the Letter of Intent. The Committee also believes that the additional time will permit the Committee to engage, if necessary, in a meaningful investigation of the actions of the Debtors that led to the proposed transaction with Gaia. Furthermore, the Committee will use the time between now and the next hearing to begin contacting additional investors who may be interested in pursuing a purchase of the Debtors' business with the goal of locating a potential investor who is willing to offer in excess of the amount of consideration reflected in the Letter of Agreement.

B.    The Motion in Its Current Form is Universally
      Opposed by the Debtors' Creditors.

23.    While the Committee supports generally the Debtors efforts to reorganize and obtain new funds for necessary capital improvements to the properties, the Letter of Intent in its current form does not have the support of creditors holding substantially all of the claims in the Debtors' cases. Here, the fiduciaries representing approximately $480 million in claims are opposed to the Motion. The Committee estimates that together these two fiduciaries represent essentially all of the claims in the Debtors' cases.

24.    Given the existence of almost universal opposition to the Motion in its current form by the real economic stakeholders in the Debtors' cases, the Committee submits that the Debtors have failed to satisfy their burden that the Motion is in the best interests of the creditors of the estate under the business judgment test. *See, e.g., In re G.S. Distrib., Inc.*, 331 B.R. 552, 560 (Bankr. S.D.N.Y. 2005) (denying motion to sell assets, in part, where debtor's largest creditor opposed proposed sale and stating that such creditor's opposition "is an important factor in determining whether the [proposed sale] is in the best interests of the estate"); *see also In re Foster Mortgage Corp.*, 68 F.3d 914, 917-918 (5th Cir. 1995) (noting that a court should carefully consider the wishes of the majority of the creditors when considering whether or not to approve a settlement).

C.    The Debtors' Insiders are the Primary Beneficiaries
      of the Transactions Contemplated by the Letter of
      Intent.

25.    The business judgment rule should not apply to the Letter of Intent because it is the product of an insider driven deal without the essential safeguard to insure that values are maximized. *See, e.g., Paramount Communications, Inc., v. QVC Network, Inc.*, 637 A.2d 34, 42

n.9 (Del. 1994) (business judgment rule does not apply to self-dealing transactions absent approval of such transaction by a majority of disinterested directors); *Pereira v. Cogan*, 2001 WL 243537, at *16 (S.D.N.Y. Mar. 8, 2001) (same) (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1375-76 (Del. 1993)); *cf. In re Biderman Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (transactions with fiduciaries in a chapter 11 case "necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (citation omitted); *In re Summit Global Logistics,* 2008 WL 819934, at *9 (Bankr. D.N.J. March 26, 2008) (citing cases) (debtors bear burden of satisfying requirements of Section 363(f), the good faith finding under Section 363(m), and the heightened scrutiny required by non-bankruptcy law for insider transactions); *In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *6 (Bankr. D. Del. July 28, 2008) (*citing In re Summit Global Logistics,* 2008 WL 819934, *9 (Bankr. D.N.J. 2008) (citations omitted) ("[w]hen a pre-confirmation section 363(b) sale is of all … of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be 'closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization").

26.     Due to the interlocking ownership and control relationships between and among the Debtors, Gaia, WestCorp and Woolley, the primary beneficiaries of the Letter of Intent appear to be the Debtors' insiders.  This process does not appear to maximize the value of the sale of the Debtors' assets for their creditors, and therefore, the Letter of Intent does not represent sound business judgment and the Motion warrants rigorous scrutiny by this Court. *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 498-500 (S.D.N.Y. 1994) (citation omitted) ("[w]here the allegedly inequitable conduct was committed by an 'insider' of the debtor, that conduct will be 'rigorously scrutinized' by the courts").

D.  The Debtors Should Agree That the Letter of Intent
    Needs to be Revised.

27.     It is black letter law that debtors must act in a manner that maximizes the value of

their estates for all parties-in-interest. *Northwest Airlines Corp.*, 349 B.R. at 369 (noting that

debtor-in-possession is a fiduciary obligated to maximize the value of the estate and treat all

parties of the case fairly); *Penick Pharm., Inc.*, 227 B.R. at 232 (stating that there is a duty to

maximize value of the estate); *see also CFTC v. Weintraub*, 471 U.S. 343, 353, 105 S.Ct. 1986

(1985) (noting that a trustee or debtor in possession owes a fiduciary duty to all creditors and

interest holders to maximize the value of the bankruptcy estate).  Here, it is the Debtors'

obligation "to realize from the estate all that is possible for distribution among the creditors." *In

re Martin*, 91 F.3d 389, 394 (3d Cir. 1996) (citing 4 COLLIER ON BANKRUPTCY ¶ 704.01 (15th

ed.1993)).

28.     The proposed sale framework established by the Motion and Letter of Intent

reinforces the Committee's well-founded belief that this case requires rigorous procedures in

place with significant oversight powers by the Committee in order to insure a post-petition

marketing process that may result in a higher or better bid than the one submitted by Gaia.

Consequently, the Motion should only be granted if the parties agree to significant modifications

to the current form of Letter of Intent.

E.  The Motion Violates the Letter and the Spirit of the
    Local Rule 6004-1 Governing Asset Sales.

29.     The Motion violates the letter and spirit of Rule 6004-1 ("Sale and Sale

Procedures Motions") of the Local Rules of this Court, effective as of February 1, 2011,

prescribing the rules for the conduct of assets sales under section 363(b) of the Bankruptcy Code

(the "Local Rule 6004-1").  Importantly, Local Rule 6004-1 requires that the Debtors attach a

number of documents to a sale motion under section 363(b) of the Bankruptcy Code, including "a copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonable believes it will execute in connection with the proposed sale," and a copy of the proposed form of sale order. Local Rule 6004-1(b)(i) and (ii). Here, the Debtors have done neither. Rather, the Debtors attached to the Motion only the non-binding Letter of Intent.

30.     Moreover, Local Rule 6004-1 requires the Debtors to highlight certain material terms with respect to any proposed sale. In particular, where the sale involves an insider, the sale motion must (i) identify the insider, (ii) describe the insider's relationship to the debtor, and (iii) set forth any measures taken to ensure the fairness of the sale process and the proposed transaction. Local Rule 6004-1(iv)(A). Other than briefly identifying Woolley as an insider of the Debtors and Gaia in a footnote in each of the Motion and the Letter of Intent, the Motion makes no effort to disclose, with any meaningful transparency, Woolley's relationships with Debtors, Gaia and WestCorp or the measures the Debtors took to ensure the fairness related to the proposed transaction with Gaia.

31.     Even though the Debtors imply that the Letter of Intent may result in an informal auction of the Debtors' assets because "the Debtors will be prepared to conduct a marketing process to determine whether 'higher and otherwise better'' financing is available from other potential investors," the Committee questions the wisdom of permitting the Debtors by themselves to conduct a post-petition marketing process because the Debtors make no effort in the Motion to describe the manner in which they will conduct the post-petition marketing process. Motion, ¶ 12. In any event, the Debtors have failed to detail in the Motion the specific

actions they took pre-petition to market the company, other than to state that they contacted 17 potential investors.  Motion, ¶ 14.

32.     The Committee believes that a detailed marketing and bidding process to locate a plan sponsor with the highest offer for the properties similar to the process described by the Local Rule 6004-1 is needed here.  Such a public process is based upon the collective wisdom of significant prior experience related to assets sales and envisions: (i) an organized and thorough marketing period; (ii) clear guidelines governing bid protections for a *committed* "stalking horse" bidder and the conditions that must be met for other investors to become qualified bidders; (iii) an auction; and (iv) a hearing to approve the successful bidder at the auction.  As such, the Debtors should adopt a similar approach to locating the best possible plan sponsor.

F.     The $ 1 Million "Break-Up Fee" Is Unwarranted and Unreasonable.

33.     The Letter of Intent provides for a break-up fee in the amount of $1.0 million. The amount and current circumstances under which the $1.0 million fee becomes payable to Gaia is unwarranted and unreasonable.  The protections afforded by break-up fees exist solely to encourage competitive bidding in an effort to maximize the value of a debtor's estate.  *See U.S. Trustee* v. *Bethlehem Steel Corp. (In re Bethlehem Steel Corp.),* Case. No. 02-Civ-2854, 2003 U.S. Dist. LEXIS 12909, at *30 (S.D.N.Y. July 23, 2003) (citing various courts refusing to approve breakup fee and expense reimbursement agreements because they were not in the best interest of the estate).  In particular, courts have considered "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders."  *The Official Committee of Subordinated Bondholders* v. *Integrated Resources, Inc. (In*

*re Integrated Resources, Inc.),* 147 B.R. 650, 662 (S.D.N.Y. 1992).[11] In determining whether the fee was appropriate, a court should consider "whether the proposed acquirer attracted other bidders or simply received a potential windfall." *Id.* at 660.

34.     In the instant case, the $1.0 million fee is not warranted for the simple reason that it was not necessary to attract Gaia, and therefore, represents a potential million windfall to it at the expense of the Debtors' creditors. *Integrated Resources,* 147 B.R. at 660-662. As described above, Woolley is an insider of the Debtors, Gaia and WestCorp. Accordingly, the Committee submits that the Debtors have not satisfied their burden to show that the $1.0 million fee has been necessary to attract Gaia.

35.     Despite the Debtors' suggestion otherwise in the Motion, it is also hard to fathom how the $1.0 million fee helps establishes a bid standard or "minimum floor" for other bidders to follow. *Integrated Resources,* 147 B.R. at 660-662. First, as the Letter of Intent sets forth only certain general contours of a proposed transaction, the Debtors have failed to disclose so many aspects of what may be the ultimate deal that makes it literally impossible to determine the terms of either a "standard" or "minimum" bid for other potential investors to follow, and therefore, it is difficult to imagine that the Letter of Intent will attract any competing investors.

36.     Moreover, the Letter of Intent does not contemplate any defined post-petition marketing of the Debtors' assets or an auction process, but rather, very tight time deadlines for this Court to approve the Disclosure Statement (May 16, 2011) and confirm a reorganization plan (July 15, 2011). Letter of Intent at 3. The compressed time deadlines associated with the

---

[11]    The court also noted that "in assessing break-up fees, courts have considered: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" *Integrated Resources,* 147 B.R. at 657.

Letter of Intent are not standard for an acquisition of this immense size, and therefore, the Committee submits that approval of the Motion will actually deter potential investors, and therefore, serves to depress artificially the enterprise value of the Debtors' business in comparison to an appropriately run auction process. Under these circumstances, the $1 million fee is not designed to encourage bidding but instead to limit the Debtors' options and compel the approval of the sale of the Debtors' business to Gaia even if it is not warranted. Instead, Gaia should, at best under these circumstances, be limited to recovering their actual reasonable out-of-pocket expenses.

37.     In the Motion, the Debtors also seek Court approval of the $1.0 million fee and $250,000 of expense reimbursements as administrative expenses under section 503(b) of the Bankruptcy Code. Proposed Order, ¶ 3. The "allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Calpine Corp.* v. *O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). As the *O'Brien* court noted, "[n]ot all of the purposes that break-up fees serve in corporate transactions are permissible in bankruptcy." *Id.* The court explained that:

> Although the assurance of a break-up fee may serve to induce an initial bid (a permissible purpose), it may also serve to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to the other bidders (an impermissible purpose).

*Id.* The *O'Brien* court also cautioned that a break-up fee may not even be necessary to satisfy its intended purpose when it stated:

> [E]ven if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose. For example, in some cases a potential purchaser will bid whether or not break-up fees are offered. This can be expected to occur whenever a potential purchaser determines that the cost of acquiring the debtor,

> including the cost of making the bid, is less than the estimated value the purchaser expects to gain from acquiring the company. In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.

*Id.*

38.     While a break-up fee may be appropriately used to "ensure that a bidder does not retract its bid" *(Integrated Resources,* 147 B.R. at 661), that rationale is not present in the instant case. Here, the Committee believes that Gaia has committed itself to bidding on the assets comprising the Debtors' business whether or not the $1 million fee is provided. *O'Brien Envtl. Energy, Inc.,* 181 F 3d at 535. Indeed, upon information and belief, Woolley is an insider of the Debtors, Gaia and WestCorp and he has likely expressed an interest in the Debtors' assets from long before the outset of these cases. Thus, there is simply no basis for any concern that Gaia will walk away without a being entitled to a fee totaling $1.0 million. *Cf. Integrated Resources,* 147 B.R. at 661 (break-up fee appropriate to ensure bidder would not withdraw because bidder had "spent a substantial portion of its available funds on the investigation" of the debtor and had requested the break-up fee before reaching a definitive agreement with the debtor because doing so would require substantial additional time and effort).

39.     Similarly, there has been no showing that Gaia is undertaking some risk, thereby justifying a break-up fee, particularly in instances where the transaction does not close and the Debtors propose to reimburse Gaia its actual, potentially unlimited reasonable out-of-pocket expenses associated with this transaction. *See Integrated Resources*, 147 B.R. at 660 ("[b]reak-up fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") *(internal quotations and citations omitted).*

40.     Here, Gaia's motivation is patently obvious. "[I]t [is] the prospect of purchasing [the assets] cheaply, rather than the prospect of break-up fees or expenses" (*O'Brien Envtl. Energy,* 181 F.3d at 537), that has caused Gaia to seek to acquire the Debtors' business. It is that same prospect that will keep Gaia involved with or without the $1 million fee. Thus, that interest is what has motivated Gaia to engage in this transaction.

41.     In addition, when coupled with the many aspects of the transaction proposed by the Letter of Intent that are unknown, the $1.0 million and $250,000 in potential expense reimbursements together work to stifle competitive bidding. *See Integrated Resources, Inc.,* 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) ("[T]he dominant issue that faces a court when determining the propriety of a break-up fee is whether the offer made by the party seeking the fee will enhance or hinder the bidding process. . .. [I]f it stifles bidding, it will not be approved."); *In re 995 Fifth Avenue Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (while approving a $500,000 fee on a $76 million sale, court held that "if such a [breakup] fee is too large, it may chill the bidding to the detriment of ... [the debtor's] creditors.").

42.     In any event, the amount of the $1.0 million fee is unreasonable in relation to the "at risk" cash component to be provided by Gaia. *Integrated Resources,* 147 B.R. at 662. Although the Debtors repeatedly state in the Motion that the $1.0 million fee represents merely three (3%) percent of the $42 million in so-called "funding commitment" offered by Gaia, in reality, there is no cash commitment at all because the Letter of Intent is not "binding" at all with respect to the $42 million cash that may ultimately form a part of the consideration. Rather, the issue of how much cash will comprise the ultimate transaction will not be known until the parties finish their negotiations and finalize the terms of an investor agreement.

43.     Thus, the $1.0 million fee is not reasonable because it is based upon an illusory transaction. Simply stated, Gaia has many potential ways to terminate the potential transaction and still pocket the $1.0 million and expense reimbursements. First, there are the unreasonably tight time deadlines being demanded by Gaia, including a hearing on the Disclosure Statement by May 16, 2011 and a plan confirmation hearing by July 15, 2011. There are also so many incomplete parts of the potential transaction requiring the negotiation of the investment agreement and other documents, that together, bestow on Gaia still more ways to extract themselves from the Letter of Intent but keep the $1.0 million fee and expense reimbursements.

44.     From the Committee's standpoint, there exists no exigency requiring the Debtors to rush into the Letter of Intent and the transactions it contemplates. Rather, the Debtors reveal in the Motion that they contacted just 17 parties during the prepetition period that they marketed the Debtors' 32 properties comprising in excess of 9,500 apartments. Moreover, the Committee is unaware of any pending issue that requires the Debtors to rush headlong into the Letter of Intent transaction, particularly where all of the relevant facts remain unknown and the Committee believes that it will not maximize the distributions to the Debtors' creditors.

G.      The Debtors Are Acting to Prevent the Committee from Fulfilling Its
        Statutory Roles to Police the Debtors and Negotiate a Plan of Reorganization.

45.     An official committee of creditors plays a pivotal role in the bankruptcy process. *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 717, 722 (Bankr. S.D.N.Y.), *aff'd,* 140 B.R. 347 (S.D.N.Y. 1992) (stating rule); *Retail Mktg. Co. v. Northwest Nat'l Bank (In re Mako, Inc.),* 120 B.R. 203, 212 (Bankr. E.D. Okla. 1990) (stating rule); *In re J.E. Jennings, Inc.,* 96 B.R. 500, 503 n.4 (E.D. Pa. 1989) (stating rule). In the Motion, the Debtors provide absolutely no meaningful role of the Committee in the post-petition marketing process of the

Debtors' business nor in determining which entity offers the highest or otherwise best stalking-horse (or ultimate) bid for the Debtors' properties.

46.     Accordingly, the Committee submits that the Court should not countenance the Debtors' actions and should deny or adjourn the Motion to provide the Committee additional time to negotiate an acceptable form of Letter of Intent.

### CONCLUSION

**WHEREFORE**, the Committee requests that the Court enter an order: (i) sustaining the Committee's objection and denying the relief sought in the Motion, or, alternatively, adjourning the Motion without prejudice to request further extensions; and (ii) granting such other relief as is just, proper and equitable

Dated:  Wilmington, Delaware
        April 1, 2011

**LANDIS RATH & COBB LLP**

_____
William E. Chipman, Jr. (No. 3818)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, DE 19801
Phone:  (302) 467-4400
Fax:      (302) 467-4450
Email:  chipman@lrclaw.com
            brown@lrclaw.com

- and -

HAHN & HESSEN LLP
488 Madison Avenue
15th Floor
New York, New York 10022
Phone:  (212) 478-7200
Fax:      (212) 478-7400
Attn:  Mark T. Power, Esq.
          Christopher A. Jarvinen, Esq.

_Proposed Co-Counsel for the Official Committee of Unsecured Creditors of PJ Finance Company, LLC, et al._