# **EXHIBIT A**

## **Complaint**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| ALLIANCE HOLDINGS PJ II, LLC, a Delaware limited liability company, ALLIANCE HOLDINGS PJWE, LLC, a Delaware limited liability company, ALLIANCE HOLDINGS PJ LLC, a Delaware limited liability company, ALLIANCE PJ, LLC, a Delaware limited liability company, ALLIANCE PJ II MEZZ II, LLC, a Delaware limited liability company, and ALLIANCE PJ II MEZZ II, LLC, a Delaware limited liability company, HGA ALLIANCE HOLDINGS IV, LLC, a Delaware limited liability company, and ALLIANCE HC IV LIMITED PARTNERSHIP, a Delaware limited partnership, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No.  08 C H 475 84 |
| EQUIBASE MULTIFAMILY INVESTORS, LLC, a Delaware limited liability company, DAVID HUSMAN, MICHAEL HUSMAN, PJ FINANCE COMPANY, LLC, a Delaware limited liability company, WESTCORP MANAGEMENT GROUP, LLC, a Nevada limited liability company, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## VERIFIED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Alliance Holdings PJ II, LLC, Alliance Holdings PJWE, LLC, Alliance

Holdings PJ, LLC, Alliance PJ, LLC, Alliance PJ II Mezz II, LLC, Alliance PJ II Mezz, LLC,

HGA Alliance Holdings IV, LLC, and Alliance HC IV Limited Partnership,[1] by their undersigned

attorneys, for their complaint against Equibase Multifamily Investors, LLC, David Husman,

---

[1]     An organizational chart for the PJ and HC IV Portfolios is attached as Exhibit A.

Michael Husman, PJ Finance Company, LLC, and Westcorp Management Group, LLC, complain as follows:

## NATURE OF THE CASE

### Summary

1.      This case arises from a scheme by one partner group to deprive their business partners of their substantial interests in a $500 million real estate investment so that they can obtain all of the potential benefits of the investment for themselves to the exclusion of their deal partners.  More specifically, various "Equibase" entities and their principals, including David and Michael Husman, all collectively referred to as the "Equibase Parties", decided that they stood to benefit more from their investment in the "PJ Portfolio" of real estate properties by eliminating the interests of their partners, various Alliance entities and their principals (collectively, the "Alliance Parties").

2.      The PJ Portfolio consists of more than thirty commercial properties with a market value of approximately $500 million dollars.  The parties all believe that, with an infusion of approximately $20 million in capital, the total value of the PJ Portfolio will increase to $550 million or $575 million in a relatively short time.  Given a bit more time, the value of the portfolio could exceed $600 million.  The Equibase Parties know this.  Consequently, the Equibase Parties devised a scheme to eliminate the Alliance Parties' interests in the PJ Portfolio in breach of the fiduciary duties that they owe to their deal partners.

3.      To accomplish their improper end, the Equibase Parties surreptitiously purchased one of the loans used to finance the PJ Portfolio at a 30 percent discount without disclosing their loan purchase to the Alliance Parties.  According to the loan documents controlling the Senior Mezzanine Loan, Equibase's purchase of the Senior Mezzanine Loan was void – not voidable,

- 2 -

void. The Equibase Parties then improperly acquired control of the deal entities and the company which manages the properties without obtaining required lender consents under various governing loan documents. Then, acting as borrower, property manager, and lender, they used their control of the deal entities and their ownership and control of the property management company to orchestrate a default on the loan that they purportedly purchased.

4. The Equibase Parties are now seeking to use the loan default that they manufactured to non-judicially foreclose and wipe out the Alliance Parties' equity interests in the PJ Portfolio through an Article 9 UCC sale intentionally scheduled right between Christmas and New Year's Day. This scheduling of the UCC sale, of course, was no accident and was set on short notice of approximately five business days during the holidays to give the Alliance Parties little opportunity to try to stop the sale. The Equibase Parties have pursued this entire course of action without: 1) disclosing any of it to their deal partners, the Alliance Parties, and have done so in breach of the duties of loyalty, fidelity, and fairness that they owe their deal partners; and 2) and in willful violation of their contractual obligations.

5. This Court should intervene to stop this wrongful scheme in its tracks and enjoin the scheduled sale of the Alliance Parties' interests in the deal.

**Parties**

6. Plaintiff Alliance Holdings PJ II, LLC ("Alliance Holdings PJ II") is a Delaware limited liability company. Alliance Holdings PJ II is a member of Alliance PJ, LLC holding a 55.22 percent membership interest.

7. Plaintiff Alliance Holdings PJWE, LLC ("Alliance Holdings PJWE") is a Delaware limited liability company. Alliance Holdings PJWE is a member of Plaintiff Alliance PJ, LLC holding a 5.45 percent membership interest.

- 3 -

8.     Plaintiff Alliance Holdings PJ LLC ("Alliance Holdings PJ") is a Delaware limited liability company. Alliance Holdings PJ is a member of Alliance PJ, LLC holding a 29.30 percent membership interest.

9.     Plaintiff Alliance PJ, LLC ("Alliance PJ") is a Delaware limited liability company. Alliance PJ is a 100 percent owner of Alliance PJ II Mezz II, LLC.

10.     Plaintiff Alliance PJ II Mezz II, LLC ("Alliance PJ II Mezz II") is a Delaware limited liability company. Alliance PJ II Mezz II is the 100 percent owner of Alliance PJ II Mezz, LLC.

11.     Plaintiff Alliance PJ II Mezz, LLC ("Alliance PJ II Mezz") is a Delaware limited liability company.

12.     Plaintiff Alliance Holdings PJ II, Alliance Holdings PJWE, Alliance Holdings PJ are collectively referred to as the "Alliance Members".

13.     Alliance Holdings PJ II, Alliance Holdings PJWE, Alliance Holdings PJ, Alliance PJ, Alliance PJ II Mezz II, and Alliance PJ II Mezz are collectively referred to as the "Alliance Entities".

14.     Defendant Equibase Multifamily Investors, LLC is a Delaware limited liability company. Equibase is a purported assignee of Equibase PJ, LLC of a 10 percent membership interest in PJ Alliance. Based on this purported assignment, Equibase and the Alliance Members are all members of PJ Alliance. Equibase Multifamily Investors, LLC and its affiliated companies are collectively referred to as "Equibase".

15.     Defendant David Husman is a principal of Equibase.

16.     Defendant Michael Husman is a principal of Equibase.

- 4 -

17. Defendant PJ Finance Company, LLC ("PJ Finance") is a Delaware limited liability company.

18. Defendant Westcorp Management Group, LLC is a Nevada limited liability company. Westcorp Management Group, LLC and its affiliated companies are collective referred to herein as "Westcorp".

19. Equibase, Westcorp, David Husman and Michael Husman, are collectively referred to herein as the "Equibase Conspirators".

**Venue**

20. Venue is proper in Cook County pursuant to Section 2-101 of the Illinois Code of Civil Procedure on the grounds that one or more of the defendants resides in Cook County and on the grounds that the subject transaction or some part thereof out of which this cause of action arose occurred in Cook County.

**General Allegations**

21. This case arises from the ownership and management of several different residential real properties by Alliance PJRT Limited Partnership and Alliance PJWE Limited Partnership (the "PJ Portfolio").

22. The PJ Portfolio consists of 32 residential apartment buildings containing a total of 9,500 units. The buildings are located in Arizona, Florida, Georgia, Tennessee, and Texas.

23. Revenue from the PJ Portfolio exceeds $5 million a month.

24. The PJ Portfolio was financed in part by a $475 million mortgage loan. The loan is in year two of its ten-year term. The loan provides for low rate interest only payments for the term of the loan.

25. Two principals of the Alliance Members, Anthony and Steven Ivankovich have contributed in excess of $90 million to the PJ Portfolio.

26. The purchase and operation of the PJ Portfolio was also financed in part by a loan from Column Financial Inc. dated November 9, 2006 in the principal amount of $35 million (the "Senior Mezzanine Loan").

27. Sometime prior to February 2008, the Equibase Conspirators purchased the Senior Mezzanine Loan at a substantial discount. As is set forth more fully below, Equibase's purchase of the Senior Mezzanine Loan was void because the purchase by Equibase violated the loan documents. Nevertheless, the purchase price of this $35 million loan was approximately $24 million. The Senior Mezzanine Loan was purchased through PJ Finance. PJ Finance is owned and controlled by Equibase and/or its principals which own 75 percent of PJ Finance. Kenneth Woolley ("Woolley") or an entity owned or controlled by him owns the remaining 25% interest in PJ Finance. Woolley is a principal in Westcorp.

28. As is set forth more fully below, Equibase's indirect purchase of the Senior Mezzanine Loan through PJ Finance was a breach of Equibase's fiduciary duty to the Alliance Members because it was part of a scheme[2] by the Equibase Conspirators to foreclose the Alliance Members ownership interest in the PJ Portfolio.

29. At all relevant times prior to June 2008, the PJ Portfolio was managed by Alliance Residential Management, LLC ("ARM") through a written management agreement with Alliance PJRT Limited Partnership and Alliance PJWE Limited Partnership.

30. In or about June 2008, Equibase took control of ARM in a UCC Article 9 sale.

---

[2]    This scheme was hatched as early as the Fall of 2006.

31.     Since February 2008, Equibase has had effective control over the PJ Portfolio due to its improperly exercising a 90 percent voting control over the PJ Portfolio, Equibase's control over the Senior Mezzanine Loan, and its control of ARM and the day-to-day management of the PJ Portfolio.

32.     Prior to June 2008, revenue generated from the management and operation of the PJ Portfolio was sufficient to pay the mortgage loan and the Senior Mezzanine Financing.

33.     As is set forth below, sometime prior to January 2008, the Equibase Conspirators agreed to act together to create a default in the Senior Mezzanine Loan through their ownership and control of ARM in order to foreclose the Alliance Members' ownership interest in the PJ Portfolio.

34.     After acquiring ARM, Equibase and/or its principals and/or affiliates, in furtherance of their scheme to cause a default in the Senior Mezzanine Loan, drastically reduced ARM's staff. They cut staffing by approximately 70% such that effective management of the PJ Portfolio, including maximization of revenues from the properties, would decline.

35.     In addition, Equibase and its principals purported to transfer effective management of the PJ Portfolio to Westcorp through execution of a submanagement agreement. They did so despite needing lender approval under governing loan documents and did so without proper lender approval. One lender, in fact, expressly refused to grant approval for the change in management.

36.     Thereafter, Equibase and its principals, with the cooperation and assistance of Westcorp and some of its principles, manufactured monthly shortfalls and defaults on the Senior . Mezzanine Loan.

- 7 -

37. On November 21, 2008, PJ Finance Company sent a notice of default declaring the Senior Mezzanine Loan in default. (A copy of the Notice of Default is attached as Exhibit B)

38. On Wednesday, December 17, 2008, Equibase published its notice of sale intending to purchase the membership entities in the certain limited liability companies the effect of which is to eliminate the Alliance Members' interest in the PJ Portfolio. (A copy of the Notice of Sale is attached as Exhibit C)

39. The Equibase Conspirators have chosen Monday, December 29, 2008 to hold the Article 9 sale of the PJ Alliance Members' interest in the PJ Portfolio.

40. The proposed sale date is the first business day after the Hanukkah and Christmas holidays and provides the Alliance Entities with as little functional time to respond as possible.

41. Considering Equibase's fiduciary obligations to the Alliance Entities the notice provided by the Equibase Conspirators should be deemed unreasonable under Artilce 9 Section 9-612 of the Illinois Uniform Commercial Code.

42. In this action, Plaintiffs seek a declaration that no default exists under the Senior Mezzanine Loan because of: 1) Equibase's breaches of its fiduciary duties and Equibase Conspirators' actions in managing the PJ Porfolio in order to manufacture a default under the Senior Mezzanine Loan; and 2) because of Equibase's purported purchase of the Senior Mezzanine Loan is void. Because no legitimate default exists or can exist under the Senior Mezzanine Loan, Plaintiffs seek an injunction enjoining the Article 9 sale now set for Monday, December 29, 2008.

43. In addition, Plaintiffs seek declaration that a certain document – the Omnibus Amended Agreement ("Omnibus Agreement") – purporting to be an agreement between some of the Plaintiffs and Equibase is unenforceable and that Equibase's purported enforcement of the

- 8 -

Omnibus Agreement has both violated Omnibus Agreement and otherwise been wrongful under Illinois law.

## COUNT I
### (Declaratory Judgment and Injunctive Relief)

44.     Plaintiffs, Alliance Holdings PJ II, LLC, Alliance Holdings PJWE, LLC, Alliance Holdings PJ, LLC, Alliance PJ, LLC, Alliance PJ II Mezz II, LLC, and Alliance PJ II Mezz, LLC, reallege Paragraphs 1 through 43 as Paragraph 44 of Count I.

45.     On or about November 21, 2008, Defendant PJ Finance Company declared a default of the Senior Mezzanine Loan.  (Exhibit B)

46.     In reliance on the claimed default, Defendant PJ Finance has noticed a UCC Article 9 sale for Monday, December 29, 2008.  (See Notice of Sale attached as Exhibit C)

47.     The assets subject to the Article 9 sale include the assets owned by Alliance PJ II Mezz, LLC, namely certain entities known as Alliance PJRT GP, Inc., Alliance PJWE GP, LLC, Alliance PJRT Limited Partnership, and Alliance PJWE Limited Partnership.

48.     The effect of the sale will be to permanently and completely foreclose the Alliance Members interest in the PJ Portfolio.

49.     The noticed Article 9 sale should be enjoined because it is dependent on a void assignment of the Senior Mezzanine Loan and on a default of the Senior Mezzanine Loan that was created intentionally and negligently through Defendants' mismanagement of the PJ Portfolio.

50.     As noted, the PJ Portfolio consists of over 9,500 residential apartments in more than 30 properties located in 5 states.

51.     The properties generate over $5 million a month in revenue.

52.     The properties were financed by three separate loans totaling more than $500 million. Senior among these loans was November 9, 2006 loan from Column Financial, Inc. in the principal amount $475 million (the "Senior Loan"). Junior to the Senior loan was the Senior Mezzanine Loan. Junior to both the Senior Loan and the Senior Mezzanine Loan was a November 9, 2006 loan from LB Mezz Lender RTPJ, LLC (the "Junior Mezzanine Loan") in the principal amount of $35 million.

53.     Prior to June 2008, the properties were managed by ARM.

54.     ARM was an experienced residential management company with over 800 employees, and over 20,000 apartments units under management.

55.     ARM was approved by each of the lenders to the PJ Portfolio as the management company for the PJ Portfolio.

56.     In or about June 2008, Equibase assumed control of ARM through a UCC Article 9 sale. As a result of Equibase's assumed control of ARM, Equibase has at all times had complete and unfettered control of the PJ Portfolio.

57.     In addition to assuming control of ARM and controlling the management of the PJ Portfolio, Equibase has also purchased the Senior Mezzanine Loan.

58.     Paragraph 4(e)(ii) of the Intercreditor Agreement to which the Equibase parties are bound states:

> Subject to Section 4(a) and First Mezzanine Lender may, from time to in its sole discretion Transfer all or any of the First Mezzanine Loan or any interest therein without the consent of any of the Junior Mezzanine Lenders provided that the terms and provisions of this Agreement shall be binding on First Mezzanine Lender's successors and assigns, and, notwithstanding any such Transfer or subsequent Transfer, the First Mezzanine Loan and the First Mezzanine Loan Documents shalt be and remain a senior obligation in the respects set forth in this Agreement to the Second Mezzanine Loan and the Second Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement. First

Mezzanine Lender will give Senior Lender and each other Mezzanine Lender prompt notice of any Transfer of more than 49% of its beneficial interest in the First Mezzanine Loan. **Notwithstanding the foregoing except as set forth in Section 13, First Mezzanine Lender agrees that it shall in no event Transfer any portion of the First Mezzanine Loan or any interest therein to Borrower or any Person which is an Affiliate of Borrower or any successor to Borrower or any assignee of Borrower, and any such Transfer shall be void *ab initio*.**

(Intercreditor Agreement, ¶ 4(e)(ii)) (emphasis supplied)

59. Equibase and PJ Finance are both Affiliates of the Borrower under the Intercreditor Agreement.

60. Moreover, in the Omnibus Agreement, which Equibase has asserted is binding, Equibase agreed:

Column Financial, Inc., its successors and/or assigns and other various lenders (collectively, "Lender") have loaned funds to certain Affiliates of Alliance ("Loans"), which Loans have a payment priority that is senior to Equibase's interest created by this Agreement (which loans are evidenced and secured by the "Loan Documents"). Alliance's and Equibase's rights, obligations and remedies under this Agreement are contingent upon and subject to the rights of the Lenders under, and the terms and conditions of, the Loan Documents.

(A copy of the Omnibus Agreement is attached as Exhibit D, ¶ 11.18)

61. Thus, Equibase agreed not to violate the Loan Documents which includes the Intercreditor Agreement. Purporting to purchase the Senior Mezzanine Loan violates the Intercreditor Agreement.

62. Accordingly, the assignment of the Senior Mezzanine Loan to the Equibase Parties was void from the beginning and cannot be enforced by the Equibase Parties because they lack standing to enforce the Senior Mezzanine Loan agreements.

63. Even if the Equibase Parties did have standing, their conduct including the purchase of the Senior Mezzanine Loan and the management of the PJ Portfolio violated the Equibase's Parties fiduciary duties to the Alliance Entities.

64. The purchase of the Senior Mezzanine Loan occurred sometime prior to February 2008.

65. The Senior Mezzanine was purchased by Defendant PJ Finance Company for a $9 to $10 million dollar discount.

66. Equibase, directly or indirectly through a controlled entity, is the majority member of PJ Finance. Westcorp, directly or indirectly through a controlled entity, is the minority member of PJ Finance Company.

67. Equibase never offered this corporate opportunity to its fellow members in the Alliance Entities.

68. Michael Husman, a principal of Equibase, and Robert J. Weidauer, the CEO of Westcorp, have expressly admitted that the purchase of ARM and the purchase of the Senior Mezzanine Loan was for the purpose of foreclosing on the Alliance Entities interests in the PJ Portfolio and eliminating Equibase's fellow members in the Alliance Entities.

69. Prior to Equibase's purchase of ARM, no technical or monetary defaults existed in the Senior Mezzanine Loan.

70. Following Equibase's purchase of ARM, Equibase turned over management of the PJ Portfolio to Defendant Westcorp. Defendant Westcorp had or was provided insufficient resources to properly manage the PJ Portfolio.

71. Following Equibase's assuming control of ARM and the purchase of the Senior Mezzanine Loan, Equibase, Westcorp, and PJ Finance Company set out to manage the PJ Portfolio in such a manner as to create a technical and/or monetary default in the Senior Mezzanine Loan.

72.     Once a technical and/or monetary default in the Senior Mezzanine Loan occurred, Equibase, Westcorp, and PJ Finance Company, intended as part of their scheme to purchase the Alliance Entities through the summary proceedings of a UCC Article 9 sale with the affect of freezing out Equibase's fellow members in the Alliance Entities and obtain the benefits of the PJ Portfolio for themselves and to the exclusion of Equibase's fellow members in the Alliance Entities.

73.     As noted, this scheme included the purchase of the Senior Mezzanine Loan and ARM.

74.     In addition, and as part of their scheme, Equibase, Westcorp, and PJ Finance Company intentionally or through their resulting negligence:

a.      Replaced ARM as the functional manager of the PJ Portfolio;

b.      Fired certain key members of ARM's management team;

c.      Reduced the overall management staff of ARM by 70 percent with the resulting effect that PJ Portfolio expenses went up and the revenues from the PJ Portfolio went down;

d.      Closed ARM's Houston office which left thousands of residences without a hands on management team with the resulting effect that PJ Portfolio expenses went up and the revenues from the PJ Portfolio went down;

e.      Mismanaged the lock box accounts through which rent receipts were received such that rent amounts were not timely received;

f.      Increased expenses of the PJ Portfolio by spending in ways that increased PJ Portfolio expenses without commensurate benefits to the PJ Portfolio;

g.      Created an inability of the accountants for PJ Portfolio to conduct and complete a necessary audit of the PJ Portfolio finances;

h.   Failed to inform the Alliance Entities of material issues arising in the PJ Portfolio so that the Alliance Entities could have a role in making PJ Portfolio profitable.

75.   As a further part of Defendants' scheme, Equibase has exercised a 90 percent voting control over the Alliance Entities for its sole benefit and to the exclusion of the Equibase's fellow members in the Alliance Entities.

76.   As further part of the scheme, Equibase has failed to provide information to its fellow members in the Alliance Entities.

77.   As a member in the Alliance Entities, Equibase owed a fiduciary duty to the Alliance Members.

78.   Based on the above conduct, Equibase has breached its fiduciary duty.

79.   As a result of Equibase's breaches and the concerted efforts by Westcorp, and PJ Finance Company, the claimed default in the Senior Mezzanine Loan were caused by Defendants' wrongful conduct.

80.   As a result, a material dispute exists as to PJ Finance Company's rights to conduct the summary Article 9 sale now scheduled for December 29, 2008.

81.   Plaintiffs' interest in the Alliance Entities and through these entities the PJ Portfolio are a legitimate protectable interest.

82.   If Defendants are allowed to wrongfully foreclose Plaintiffs' interest in the Alliance Entities and through these entities the PJ Portfolio, Plaintiffs' will suffer irreparable harm.

83.   Plaintiffs have no adequate remedy at law in that Plaintiff's interest in the PJ Portfolio is an interest in real property and a unique legal right.

84.     Equibase and the other Defendants will not suffer any harm by enjoining the Article 9 sale because with or without the membership interest in the Alliance Entities, Equibase and the other Defendants will suffer no change in their ability to manage the PJ Portfolio, receive revenues, and apply those revenues.

WHEREFORE, Plaintiffs, Alliance Holdings PJ II, LLC, Alliance Holdings PJWE, LLC, Alliance Holdings PJ, LLC, Alliance PJ, LLC, Alliance PJ II Mezz II, LLC, and Alliance PJ II Mezz, LLC, request that this Court enter a judgment in their favor and against Equibase Multifamily Investors, LLC, Westcorp Management Group, LLC awarding Plaintiffs the following relief:

a.     enjoining PJ Finance Company, LLC from conducting the Article 9 sale now scheduled for December 29, 2008;

b.     requiring Defendants to provide a full accounting of ARM's and the PJ Portfolio's finances while under Defendants' control;

c.     punitive damages;

d.     all other rights and remedies Plaintiffs are entitled to at law or equity and such further relief as the Court deems just and proper.

## COUNT II
### (Declaratory Judgment)

85.     Plaintiffs, Alliance PJ, HGA Alliance Holdings IV, LLC and Alliance HC IV Limited Partnership, reallege Paragraphs 6 through 20 as Paragraph 85 of Count II.

86.     Plaintiff HGA Alliance Holdings IV, LLC ("HGA Alliance Holdings IV") is a Delaware limited liability company.

87.     Plaintiff Alliance HC IV Limited Partnership ("Alliance HC IV") is a Delaware limited partnership.

- 15 -

88. In or about November 2006, Alliance PJ, HGA Alliance Holdings IV (collectively the "Alliance Omnibus Parties"), and Equibase purportedly entered the Omnibus Agreement. (Exhibit D)

89. As set for more fully below, the Omnibus Agreement is void and unenforceable because the Omnibus Agreement:

    a.    Was entered into without the proper authorization of many of the limited liability companies purportedly subject its terms;

    b.    Violates the operating agreements of Plaintiff Alliance PJ, LLC as well as the operating agreements of numerous other limited liability companies purportedly subject to its terms; and

    c.    Has caused the HC IV Portfolio lender, the same lender as the lender for the PJ Portfolio, to declare a default of Plaintiff Alliance HC IV's agreements with its lenders which is a result prohibited by the Omnibus Agreement itself.

90. Moreover, Equibase's actions under cover of the Omnibus Agreement have been wrongful, have grossly violated Equibase's duties of loyalty to various Plaintiffs, and have tortuously interfered with the Alliance Parties' ability to conduct their business.

91. For instance, since Equibase assumed control of ARM, Equibase has managed the HC IV and PJ portfolios to its benefit and to the detriment of the Alliance entities.

92. In addition, as noted, Equibase purportedly purchased the Senior Mezzanine Loan and is using ARM to manage the portfolio in such a fashion as to ensure default under the Senior Mezzanine Loan with the intended result that Equibase will be able to squeeze the Alliance entities out of the venture.

93. As noted, the Omnibus Agreement is unenforceable because its execution and/or the rights purportedly given to Equibase by the Omnibus Agreement have caused or threaten to cause material breaches of one or more of Plaintiffs' operating agreements and because it

- 16 -

threatens a material violation of certain loans obtained by Plaintiffs or their affiliated companies to fund Plaintiffs' businesses.

94. For example, Equibase's rights under the Omnibus Agreement were specifically restricted such that they could not violate, cause to violate, or conflict with the rights of the Portfolio lenders.

95. Specifically, Paragraph 11.18 of the Omnibus Agreement states:

Column Financial, Inc., its successors and/or assigns and other various lenders (collectively, "Lender") have loaned funds to certain Affiliates of Alliance ("Loans"), which Loans have a payment priority that is senior to Equibase's interest created by this Agreement (which loans are evidenced and secured by the "Loan Documents"). Alliance's and Equibase's rights, obligations and remedies under this Agreement are contingent upon and subject to the rights of the Lenders under, and the terms and conditions of, the Loan Documents.

(Exhibit D, ¶ 11.18)

96. The Omnibus Agreement itself and Equibase's action under the Omnibus Agreement have violated Paragraph 11.18 in numerous ways.

97. In particular, the HC IV[3] lender has cited Equibase HGA I, LLC's ("Equibase HGA") assumption of control of and/or replacement of the managing member of HGA Alliance IV, LLC and/or the general partner of Alliance HC IV Mezz Limited Partnership without the lender's consent and a change of management control in HG IV Limited Partnership and HGA Alliance IV, LLC to Equibase HGA. (The Notice of Default from the HC IV Portfolio's lender is attached as Exhibit E) According to the HC IV lender, each of these events constitute violations of Section 5.2.10(d) of the subject loan agreements.

---

[3.] Similar to the PJ Portfolio, Plaintiff's HGA Alliance Holdings IV and Alliance HC Limited Partnership owns and controlled several residential properties in Florida and Texas (the "HC IV Portfolio").

98.     Following Equibase's assuming control of ARM, Equibase replaced ARM with Westcorp. By assuming control of the PJ and HC IV Portfolios through ARM, replacing ARM as the manager, and assuming voting control of the Alliance entities, Equibase has violated Paragraph 11.18 of the Omnibus Agreement because such conduct violates the PJ and HC IV loan agreements.

99.     The Omnibus Agreement also violates certain provisions of the Alliance PJ LLC Operating Agreement.

100.    In particular:

    a.    The Omnibus Agreement threatens to violate the Single Purpose Entity provisions of Exhibit C to the Operating Agreement of Alliance PJ, LLC. (Relevant portions of the PJ Alliance Operating Agreement is attached as Exhibit F);

    b.    The assignment of various membership interest to Equibase as set forth in 2.02 of the Omnibus Agreement violates Paragraph 11.1 of the Operating Agreement of Alliance PJ, LLC;

    c.    Paragraph 2.01 of the Omnibus Agreement violates Paragraph 18.1 of the Operating Agreement of PJ Alliance LLC, in that the called for amendment was material, the proposed amendment did not receive the approval of the required entities including, but not limited to, all of PJ Alliance, LLC's members as well as the Lender as defined in the Operating Agreement of PJ Alliance, LLC.

101.    Equibase was fully aware of the limitations imposed by the PJ Alliance LLC Operating Agreement.

102.    In fact, Equibase's predecessor and purported assignee, Equibase PJ LLC, signed the Alliance PJ LLC Operating Agreement and agreed to be bound by its terms.

103.    Accordingly, for the foregoing reason, the Omnibus Agreement is unenforceable.

WHEREFORE, Plaintiffs, HGA Alliance Holdings IV, LLC, Alliance PJ, LLC, and Alliance HC IV Limited Partnership, request that this Court enter a judgment in their favor and

against Equibase Multifamily Investors, LLC, declaring the Omnibus Amendment Agreement unenforceable, award Plaintiffs their costs of suit and such other and further relief as this Court deems just and proper.

## COUNT III
### (Breach of Contract)

104. Plaintiffs, Alliance PJ and HGA Alliance Holdings IV, reallege Paragraphs 85 through 103 Paragraph 104 of Count III.

105. Equibase's actions outlined above amount to a breach of Paragraph 11.18 of the Omnibus Agreement.

106. Plaintiffs have been damaged to date through having to defend against claims that they are in breach of various loan agreements. These damages are likely to increase if any of the lenders ever succeed on a default claim based on Equibase's conduct.

107. Plaintiffs have performed all conditions on their part to be performed.

108. Plaintiffs are entitled to their attorneys fees under Paragraph 11.14 of the Omnibus Agreement.

WHEREFORE, Plaintiffs, HGA Alliance Holdings II, LLC and Alliance PJ, LLC, request that this Court enter a judgment in their favor and against Equibase Multifamily Investors, LLC on Count III, award Plaintiffs their damages, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

## COUNT IV
### (Tortious Interference)

109. Plaintiff Alliance HC IV Limited Partnership realleges Paragraphs 85 through 103 as Paragraph 109 of Count IV.

110. By engaging in the activities described above, Equibase has tortuously interfered with Alliance HC IV's loan agreement with its lender.

111. Alliance HC IV has been damaged to date through having to defend against claims that it is in breach of various loan agreements. These damages are likely to increase if any of the lenders ever succeed on a default claim based on Equibase's conduct.

WHEREFORE, Plaintiff Alliance HC IV Limited Partnership requests that this Court enter a judgment in its favor and against Equibase Multifamily Investors, LLC, award Plaintiff its damages, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

ALLIANCE HOLDINGS PJ II, LLC,
ALLIANCE HOLDINGS PJWE, LLC
ALLIANCE HOLDINGS, PJ LLC,
ALLIANCE PJ, LLC, ALLIANCE PJ II
MEZZ II, LLC, ALLIANCE PJ II MEZZ,
LLC, HGA ALLIANCE HOLDINGS IV,
LLC, and ALLIANCE HC IV LIMITED
PARTNERSHIP,

By: _____
    One of Their Attorneys

Brad S. Grayson
Strauss & Malk LLP
135 Revere Drive
Northbrook, Illinois 60062
(847) 562-1400
Atty No. 32031

David H. Latham
Latham Law Offices
Suite 1400
150 North Wacker Drive
Chicago, Illinois 60606
(312) 782-1910
Atty No.: 34878

## DECLARATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

STEVEN IVANKOVICH

Exhibit A

# ALLIANCE PJ REFINANCE ORGANIZATION CHART

November 9, 2006



# ALLIANCE HC IV ORGANIZATION CHART

November 9, 2006



Anthony D. Ivankovich M.D. — 50%
Lisa Curt Scher — 50%

Alliance HC IV Mezz GP, Inc. (DE) General Partner

Alliance HC IV Mezz Limited Partnership (DE) Lehman Borrower — 0.1%

Alliance HC IV Mezz II, L.L.C. (DE) Limited Partner/Nomura Borrower — 100%

Alliance HC IV GP, L.L.C. (DE) General Partner Qualified in Florida and Texas — 100%

Alliance HC IV Limited Partnership (DE) Qualified in Florida and Texas — .1%

Anthony D. Ivankovich M.D. — 50%
Lisa Curt Scher — 50%

Alliance Holdings Investments II, L.L.C. (DE)

HGA Alliance Holdings IV, L.L.C. (DE) — 71.74%

Anthony D. Ivankovich M.D. — 7.06%
Steven Ivankovich — 5.30%
Deerfield Irrevocable Trust — 15.90%

HGA Alliance IV, L.L.C. (DE) LIMITED PARTNER — 39%

51%

Equilease HGA I, LLC — 10%

99.9%

9 Texas Properties
Cascades Apartments, West Palm Beach, Florida

Exhibit B



**DLA Piper LLP (US)**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
www.dlapiper.com

William A. Rudnick, P.C.
william.rudnick@dlapiper.com
T  312.368.7078
F  312.630.5328

November 21, 2008

**_VIA MESSENGER AND VIA EMAIL_**
Alliance PJ II Mezz, L.L.C.
c/o Alliance Holdings, L.L.C.
221 North LaSalle Street, Suite 3700
Chicago, IL  60601
Attn: Andrew W. Schor and Steven V. Ivankovich
Email: awschor@aol.com and sivankovic@aol.com

**_VIA OVERNIGHT MAIL_**
Alliance PJ II Mezz, L.L.C.
c/o Alliance Holdings, L.L.C.
2400 Augusta, Suite 450
Houston, TX  77057
Attn: Andrew W. Schor and Steven V. Ivankovich

Re: **Default by Alliance PJ II Mezz, L.L.C. ("Senior Mezzanine Borrower") under the Senior Mezzanine Loan Documents**

Ladies and Gentlemen:

This firm represents PJ Finance Company, LLC ("Senior Mezzanine Lender"). Reference is made to that certain Promissory Note dated November 9, 2006 (the "Note"), in the original principal amount of $35,000,000.00 executed by Senior Mezzanine Borrower, that certain Loan Agreement dated November 9, 2006 (the "Senior Mezzanine Loan Agreement"), by and between Senior Mezzanine Borrower and Column Financial, Inc. ("Column"), predecessor-in-interest to Senior Mezzanine Lender, and any and all other documents dated on or about such date and executed contemporaneously therewith by Senior Mezzanine Borrower, or such other documents which amend, extend or modify such documents, collectively hereinafter referred to as the "Senior Mezzanine Loan Documents". Reference also is made to that certain Loan Agreement dated November 9, 2006 (the "Senior Loan Agreement"), by and between Alliance PJRT Limited Partnership and Alliance PJWE Limited Partnership, as borrowers, and Column, as lender. Any capitalized terms not defined herein shall have the meaning ascribed to such terms in the Senior Mezzanine Loan Agreement.

Senior Mezzanine Borrower is in default under the Senior Mezzanine Loan Documents. The defaults under the Senior Mezzanine Loan Documents include, without limitation, the following:

A shortfall of $289,333.33 with regard to payment of the Monthly Debt Service Payment Amount, the full balance of which was due at 3:00 P.M., New York City time, on November 11, 2008.

Payment to cure the default identified above should be remitted in accordance with the wiring instructions attached hereto as Exhibit "A".


**DLA PIPER**

In the event Senior Mezzanine Borrower fails to cure the defaults identified above within the applicable default cure periods provided for in the Senior Mezzanine Loan Agreement, Senior Mezzanine Lender has the right to pursue its rights and remedies under the Senior Mezzanine Loan Documents. Such rights that Senior Mezzanine Lender may pursue include, but are not limited to, acceleration of the full amount of the Note and foreclosure upon the Collateral which secures the Note.

In addition, by providing notice hereby to Senior Mezzanine Borrower of the above-referenced defaults, Senior Mezzanine Lender reserves the right, pursuant to the Senior Mezzanine Loan Agreement, to impose any late fee or charge permitted by the Senior Mezzanine Loan Documents.

This notice is without waiver of any rights or remedies that Senior Mezzanine Lender has or may have, all of which are hereby expressly reserved and preserved.

Sincerely,

DLA Piper LLP (US)

William A. Rudnick, P.C.

cc:

Schain, Burney, Ross & Citron, Ltd.
222 North LaSalle Street, Suite 1910
Chicago, Illinois 60601
Attention: Michael Ross, Esq.
(via messenger and overnight mail)

Strauss & Malk LLP
135 Revere Drive
Northbrook, Illinois 60062
Attention: Arnold B. Malk
(via messenger and overnight mail)

Wells Fargo Bank, N.A., as trustee for the registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C2
c/o Wachovia Securities
Commercial Real Estate Services
8739 Research Drive-URP4
Charlotte, NC 28288-1075
Attn: Portfolio Manager
Facsimile: 704-715-0036
(via fax)

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention: Julian Wise, Esq.
Facsimile: (212) 593-5955
(via fax)

Exhibit C



**DLA Piper LLP (US)**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
www.dlapiper.com

William A. Rudnick, P.C.
william.rudnick@dlapiper.com
**T** 312.368.7078
**F** 312.630.5328

December 17, 2008

### *VIA OVERNIGHT DELIVERY*

Alliance PJ II Mezz, L.L.C.
c/o Arnold Malk, Ltd.
Strauss & Malk LLP
135 Revere Drive
Northbrook, IL 60062

Alliance Holdings Investments, L.L.C.
c/o Arnold Malk, Ltd.
Strauss & Malk LLP
135 Revere Drive
Northbrook, IL 60062

Alliance Holdings Investments II, L.L.C.
c/o Arnold Malk, Ltd.
Strauss & Malk LLP
135 Revere Drive
Northbrook, IL 60062

Alliance Holdings Investments III, L.L.C.
c/o Arnold Malk, Ltd.
Strauss & Malk LLP
135 Revere Drive
Northbrook, IL 60062

**Re:** **Notice of UCC Article 9 Sale of Pledged Interests of Alliance PJ II Mezz, L.L.C. ("Debtor")**

Ladies and Gentlemen:

This firm represents PJ Finance Company, LLC ("Senior Mezzanine Lender"). Reference is made to that certain Pledge and Security Agreement dated November 9, 2006 (the "Pledge Agreement"), by and between Debtor and Column Financial, Inc. ("Column"), predecessor-in-interest to Senior Mezzanine Lender, whereby Debtor pledged the following property to Column:

1. Debtor's 99.9% partnership interest in Alliance PJWE Limited Partnership, a Delaware limited partnership;

2. Debtor's 99.9% partnership interest in Alliance PJRT Limited Partnership, a Delaware limited partnership;

3. Debtor's 100% membership interest in Alliance PJWE GP, L.L.C., a Delaware limited liability company; and

4. Debtor's 100% ownership interest in Alliance PJRT GP, Inc., a Delaware corporation.

Reference is also made to any and all other documents dated on or about such date and executed contemporaneously with the Pledge Agreement by Debtor, or such other documents which amend, extend or modify such documents, collectively hereinafter referred to as the "Senior Mezzanine Loan Documents".

By letter dated November 26, 2008, you were notified of a default by Debtor under the Loan Documents. Due to the failure of Debtor to cure such default, Senior Mezzanine Lender has elected to



**DLA PIPER**

pursue certain of its remedies under the Pledge Agreement. Enclosed please find a Notice of Public Sale of Collateral by Order of Secured Party.

This notice is without waiver of any rights or remedies that Senior Mezzanine Lender has or may have, all of which are hereby expressly reserved and preserved.

Best regards,

**DLA Piper LLP (US)**

William A. Rudnick, P.C., on behalf
of PJ Finance Company, LLC

cc:

Schain, Burney, Ross & Citron, Ltd.
222 North LaSalle Street, Suite 1910
Chicago, Illinois 60601
Attention: Michael Ross, Esq.
(via messenger)

Strauss & Malk LLP
135 Revere Drive
Northbrook, Illinois 60062
Attention: Arnold B. Malk
(via overnight delivery)

Wells Fargo Bank, N.A., as trustee for the registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C2
c/o Wachovia Securities
Commercial Real Estate Services
8739 Research Drive-URP4
Charlotte, NC 28288-1075
Attn: Portfolio Manager
Facsimile: 704-715-0036
(via fax)

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention: Julian Wise, Esq.
Facsimile: (212) 593-5955
(via fax)

LB Mezz Lender RTPJ LLC
399 Park Avenue, 8th Floor
New York, New York 10022
Attention: David Broderick
Facsimile: (646) 758-3103
(via fax)

McKenna Long & Aldridge LLP
303 Peachtree Street, N.E. Suite 5300
Atlanta, Georgia 30308
Attention: Patrick M. McGeehan, Esq.
Facsimile: (404) 527-4198
(via fax)


**DLA PIPER**

TriMont Real Estate Advisors, Inc.  Equibase Multifamily Investors, LLC
Monarch Tower Suite 2200   Attn: Michael W. Husman (via email)
3424 Peachtree Road, N.E.
Atlanta, Georgia 30326
Attention: Gregory Winchester
Facsimile: (404) 582-8761
(via fax)

CENTRAL\31169692.1

# NOTICE OF PUBLIC SALE OF COLLATERAL BY ORDER OF SECURED PARTY

Pursuant to Sections 9-601, 9-610, 9-611, 9-612 and 9-613 of the Illinois Uniform Commercial Code (810 ILCS 5/9-601, 610 – 613) and by order of PJ Finance Company, LLC, a Delaware limited liability company ("Secured Party"), notice is hereby given that on Monday, December 29, 2008, at 10:00 a.m., CDT, at the offices of DLA Piper LLP (US), 203 North LaSalle Street, Suite 1900, Chicago, Illinois 60601, Secured Party will offer for public sale to the highest qualified bidder the following property (collectively, the "Collateral"):

All right, title and interest of Alliance PJ II Mezz, L.L.C., a Delaware limited liability company ("Pledgor"), in, to and under the 99.9% partnership interest of Pledgor in Alliance PJWE Limited Partnership, a Delaware limited partnership ("PJWE LP"), the 99.9% partnership interest of Pledgor in Alliance PJRT Limited Partnership, a Delaware limited partnership ("PJRT LP"), the 100% membership interest of Pledgor in Alliance PJWE GP, L.L.C., a Delaware limited liability company (the "LLC"), and the 100% ownership interest of Pledgor in Alliance PJRT GP, Inc., a Delaware corporation (the "Corporation"), together with all rights, title and interest, now existing or hereinafter arising or acquired, in and to all membership, equity, ownership, proceeds, income, payments, distributions of every kind whatsoever, certificated interests, shares of stock, convertible securities, all other economic rights and interests of any nature, management, voting rights and specific property of Pledgor of, in, or with respect to PJWE LP, PJRT LP, the LLC and the Corporation.

With each bid, interested bidders shall deposit 25% of the purchase price with Secured Party. The deposit of the highest bidder shall be non-refundable, with the balance of the bid payable by cashier's or certified check by the close of regular business hours on January 7, 2009. The Collateral shall be sold AS-IS and WHERE-IS, and without recourse, representation or warranty of any kind or nature whatsoever.

Secured Party reserves the right to accept or reject any bid and shall not be obligated to make any sale pursuant to this notice. The sale may be continued from time to time by Secured Party, without further notice other than as given at the scheduled sale.

You are entitled to an accounting of the unpaid indebtedness secured by the Collateral. For further information, contact William A. Rudnick, DLA Piper LLP (US), 203 North LaSalle Street, Suite 1900, Chicago, Illinois 60601, (312) 368-7078.

Exhibit D

# OMNIBUS AMENDMENT AGREEMENT

THIS OMNIBUS AMENDMENT AGREEMENT (this "**Agreement**") is entered into and effective as of November 8, 2006 (the "**Effective Date**"), by and between (i) **EQUIBASE MULTIFAMILY INVESTORS, LLC**, a Delaware limited liability company ("**Equibase**"), (ii) **ALLIANCE HOLDINGS INVESTMENTS, L.L.C.**, (iii) **ALLIANCE HOLDINGS INVESTMENTS II, L.L.C.**, (iv) **ALLIANCE HOLDINGS INVESTMENTS III, L.L.C.**, (v) **HGA ALLIANCE HOLDINGS II, L.L.C.**, (vi) **ALLIANCE HOLDINGS ES, L.L.C.**, (vii) **ALLIANCE HOLDINGS RTTN, L.L.C.**, (viii) **HGA ALLIANCE HOLDINGS IV, L.L.C.**, (ix) **ALLIANCE PJ, L.L.C.**, (x) **ALLIANCE HOLDINGS KINGSLEY, L.L.C.**, (xi) **ALLIANCE HOLDINGS TELEGRAPH HILL, L.L.C.**, (xii) **ALLIANCE HOLDINGS PP, L.L.C.**, and (xiii) **HGA ALLIANCE HOLDINGS III, L.L.C.**

## R E C I T A L S:

A. Equibase owns debt or equity interests in one or more of the Companies (as defined below), and Alliance owns equity interests in each of the Companies.

B. The parties desire to enter into this Agreement to memorialize their agreements regarding certain aspects of the ownership and operation of the Companies.

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the undersigned mutually agree as follows:

## ARTICLE 1: DEFINITIONS

1.01    **Defined Terms.** The terms used in this Agreement shall have the following meanings:

**Affiliate** means, with respect to any Person, (i) any other Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any other Person owning or controlling interests in such Person possessing the right to cast ten percent (10%) or more of the total votes entitled to be cast for the election of management of such Person or to be cast with respect to management decisions of such Person, (iii) any officer, director, manager, or general partner of such Person, or (iv) any other Person who is an Affiliate of any other Person described in clauses (i) through (iii) of this sentence.

**Alliance** means (i) Alliance Holdings Investments, L.L.C., (ii) Alliance Holdings Investments II, L.L.C., (iii) Alliance Holdings Investments III, L.L.C., (iv) HGA Alliance Holdings II, L.L.C., (v) Alliance Holdings ES, L.L.C., (vi) Alliance Holdings RTTN, L.L.C., (vii) HGA Alliance Holdings IV, L.L.C., (viii) Alliance PJ, L.L.C., (ix) Alliance Holdings Kingsley, L.L.C., (x) Alliance Holdings Telegraph Hill, L.L.C., (xi) Alliance Holdings PP, L.L.C., and (xii) HGA Alliance Holdings III, L.L.C., or such one or more of them as the context may require. Any and all obligations of any Person included in the

definition of Alliance shall be the joint and several obligation of each Person included in the definition of Alliance. Any rights attributed by this Agreement to Alliance, without further specification, shall be rights of all Persons included in the definition of Alliance in the aggregate, and not of each of them. Alliance Holdings Investments, L.L.C. is hereby authorized to act on behalf of Alliance and all persons included in the definition of Alliance for all purposes of this Agreement, including receiving and giving notices and giving any consents or approvals.

**Bankruptcy** means, with respect to any Person, a "**Voluntary Bankruptcy**" or an "**Involuntary Bankruptcy**." A "**Voluntary Bankruptcy**" means, with respect to any Person, the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person or for any substantial part of its property; or corporate action taken by such Person to authorize any of the actions set forth above. An "**Involuntary Bankruptcy**" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

**Companies** means (i) HGA Alliance II, L.L.C., (ii) Alliance ES, L.L.C., (iii) Alliance RTTN, L.L.C., (iv) HGA Alliance IV, L.L.C., (v) Alliance PJ, L.L.C., (vi) Alliance Kingsley, L.L.C., (vii) Alliance Telegraph Hill, L.L.C., (viii) Alliance Group PP, L.L.C., (ix) Alliance Holdings Lighthouse, L.L.C., and (x) Alliance HC III Limited Partnership.

**Effective Date** has the meaning set forth in the Preamble to this Agreement.

**Equibase Net Preference Amount** means, from time to time, the Equibase Preference Amount less the sum of all distributions to Equibase pursuant to Section 3.01(b).

**Equibase Preference Amount** means $108,000,000.

**Equibase Priority Return** means an amount equal to a cumulative, annually compounded return at the Equibase Priority Return Rate on the Equibase Net Preference Amount from time to time, computed from the Effective Date. The Equibase Priority Return shall be calculated on the basis of a year consisting of 360 days and accrue for the actual number of days within the period for with it is being calculated.

**Equibase Priority Return Rate** means (i) from the Effective Date through May 15, 2007, twenty percent (20%) per year and (ii) from May 16, 2007 and thereafter, twenty-five percent (25%) per year.

**Interest or Member's Interest** means a Member's share of the capital, assets, profits, surplus or losses of the Companies, and all rights of a member of a limited liability company under applicable law and all rights of such Member under the Operating Agreements; or, as the context may require, such rights of a Member with respect to one or more specified Companies.

**Involuntary Bankruptcy** has the meaning set forth in the definition of "Bankruptcy" above.

**Loan Agreements** has the meaning set forth in Section 4.02.

**Major Decisions** shall have the meaning set forth in Section 4.03.

**Management Agreements** has the meaning set forth in Section 4.05.

**Management Termination Event** means:

(1)     The failure of Alliance to perform any of its duties in its capacity as the Manager of any Company, provided such failure continues for a period of thirty (30) days after Equibase gives Alliance written notice of such failure;

(2)     The failure of Alliance to provide any of the reports or information specified in Section 6.01 or Section 6.02, provided such failure continues for a period of fifteen (15) days after Equibase gives Alliance written notice of such failure;

(3)     The failure of Alliance to provide a copy of any of the written notices described in Section 6.03, where such failure continues for a period of ten (10) days after Alliance's actual receipt of such written notice;

(4)     Alliance commits an act that (i) constitutes fraud, a felony, gross negligence in the management of any Company, or a willful breach of a fiduciary duty arising under this Agreement and (ii) in the reasonable judgment of Equibase, such act clearly reflects an unfitness to serve in a management capacity with regard to any Company;

CHGO1\308633I2.7 11/9/06 03:25 PM

(5)  The Bankruptcy of any Person included in the definition of Alliance, any Subsidiary, Andrew W. Schor, Lisa Cutt Schor or Steven V. Ivankovich;

(6)  A default by Alliance described in Section 8.04(b); or

(7)  A determination by Equibase, in its reasonable discretion, that either (A) there has been a material adverse change in the value of the Project Properties or (B) there has been a material adverse change in the senior management personnel of Alliance.

**Management Termination Event Adjustment Notice** has the meaning set forth in Section 4.02.

**Manager** means the current Manager of each Company, or any replacement manager of any Company pursuant to this Agreement or the Operating Agreement governing such Company.

**Members** means Equibase and those Persons included in the definition of Alliance that hold membership interests in any Company, and their respective successors and assigns. As applied to any particular Company, "Members" shall mean the Persons that are then members of such Company.

**Operating Agreements** means the operating agreements governing the Companies, as in effect from time to time.

**Person** means any individual, partnership, limited liability company, corporation, trust, or other entity.

**Project Budget** means the budget for operation and management of each Project Property, as approved by the Members in accordance with Section 4.04.

**Project Property** or **Project Properties** shall mean that certain real property owned directly or indirectly by the Companies.

**Subsidiaries** means the entities owned, either directly or indirectly, in whole or in part, by the Company.

**Transfer** means, as a noun, any voluntary or involuntary transfer, sale, or other disposition of all or any portion of an Interest or any interest therein, and, as a verb, voluntarily or involuntarily to transfer, sell, or otherwise dispose of all or any portion of an Interest or any interest therein.

**Voluntary Bankruptcy** has the meaning set forth in the definition of "Bankruptcy" above.

4

**Voting Interest** means, subject to Section 4.02, the Voting Interest in each Company of each Member set forth opposite its name below:

| | |
|---|---|
| Equibase | 50% |
| Alliance | 50% |

1.02    **Interpretation**.  The definitions in Section 1.02 shall apply equally to both the singular and plural forms of the terms defined.  Wherever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine and neuter forms.  For all purposes of this Agreement, the term "control" and variations thereof shall mean the direct or indirect possession of the power to direct or cause the direction of the management and policies of the specified entity, through the ownership of equity interests therein, by contract or otherwise.  As used in this Agreement, the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  As used in this Agreement, the terms "herein", "hereof" and "hereunder" shall refer to this Agreement in its entirety.  Any references in this Agreement to "Sections," "Articles" or "Exhibits" shall, unless otherwise specified, refer to Sections, Articles or Exhibits, respectively, in or attached to this Agreement.  All Exhibits attached to this Agreement are incorporated herein.

## ARTICLE 2:  AMENDMENT OF OPERATING AGREEMENTS

2.01    **Operating Agreements Amended**.  In the case of any inconsistency between this Agreement and any provision of any Operating Agreement, the provisions of this Agreement shall control.  Each Operating Agreement is hereby amended to the extent necessary to cause it to be consistent with all of the provisions of this Agreement.  The provisions of this Agreement providing for payments to Equibase shall supersede any provisions providing for payments to Equibase, Equibase PJ, LLC, Equibase HGA I, LLC, Geronimo Associates, Mammoth Associates, Everest Real Estate Fund, LLC, EREF Mezzanine Fund, LLC, Equibase FQ Associates, LLC, Choctaw Associates, Equibase CP Associates, LLC, Equibase BP Associates, LLC and Everest PP2 FL2 Limited Partnership in the Operating Agreements and in any notes issued by any Company or Alliance or an Affiliate of either of them.

2.02    **Admission of Equibase**.  Prior to the execution of this Agreement, certain Affiliates of Equibase have assigned their respective membership interests, if any, in each of the Companies to Equibase.  Equibase is hereby admitted as a Member of each such Company with respect to such assigned Interest.  In addition, Equibase is hereby admitted as an additional Member of each other Company having the rights with respect to such Company as are set forth in this Agreement, in addition to all rights attributable to all members of such Company under the Operating Agreement governing such Company and under applicable law.

## ARTICLE 3:  DISTRIBUTIONS

3.01    **Distributions**.  All cash flow of each Company from all sources, after the payment of all third-party costs and expenses of such Company, shall be distributed at such times as agreed to by the Members as a Major Decision, but not less often than quarterly, in the following order of priority:

5

(a)     First, to Equibase in the amount of the accrued and unpaid Equibase Priority Return.

(b)     Second, to Equibase in the amount of the Equibase Net Preference Amount.

(c)     Third, to Alliance.

## ARTICLE 4: MANAGEMENT

4.01    **Management**.    Subject to the provisions of this Agreement (including Section 4.03), the business, operations and properties of each Company shall be managed by one or more Managers, as determined from time to time by the Members.   Initially, an entity designated by Alliance shall serve as the Manager of each Company until the dissolution of such Company, or until otherwise replaced as set forth in this Agreement.  During those periods when more than one Manager is serving, every action, determination, vote, consent, or approval of the Managers shall require the concurrence of a majority in number of such Managers and if a majority of such Managers cannot agree upon any particular matter, such matter shall be determined by the Members.  The Manager can be replaced upon a vote of the Members at a regular meeting of the Members or special meeting of the Members called for that purpose.  If a Manager should fail or cease to serve then a replacement Manager shall be elected by a vote of the Members at a regular or special meeting of the Members called for that purpose.

4.02    **Management Termination Event**.    At any time after the occurrence of a Management Termination Event, Equibase shall have the right to give Alliance a "**Management Termination Event Adjustment Notice**".   Any Management Termination Event Adjustment Notice shall state that (i) a Management Termination Event has occurred, (ii) Alliance has failed to cure such Management Termination Event after the giving of notice by Equibase (if applicable), (iii) Equibase has elected to have the Voting Interests of the Members adjusted in the manner specified in this Section 4.02, and (iv) if Equibase so elects, that Equibase shall replace the Manager in accordance with this Section 4.02.  Effective for all periods from and after the giving of a Management Termination Event Adjustment Notice, the Voting Interests of the Members shall be adjusted to equal the following:

| Name of Member | Voting Interest |
| --- | --- |
| Alliance | 10% |
| Equibase | 90% |

If Equibase delivers a Management Termination Event Adjustment Notice in which Equibase sets forth its election to replace the Manager, then effective as of the delivery of such Management Termination Event Adjustment Notice, Alliance and/or any other Person or Persons that are then Managers shall immediately and automatically cease to be Managers of each and every Company, and Equibase or such other Person or Persons as Equibase may designate, in its sole discretion, shall become and shall thereafter be the Manager or Managers of each Company. Notwithstanding the immediately preceding sentence, the right of Equibase to replace the

6

Manager of any Company by delivering a Management Termination Event Adjustment Notice shall be subject to the provisions of any loan agreements ("**Loan Agreements**") then in effect to which such Company or any Subsidiary owned by such Company is a party or to which any assets of any such entity are subject, including obtaining any required consents from the lenders under any Loan Agreements. If Equibase delivers a Management Termination Event Adjustment Notice in which Equibase elects to replace the Manager, Alliance shall use its best efforts to cooperate with Equibase to obtain any and all required consents from lenders under Loan Agreements as soon as is reasonably practical. Alliance agrees to fund all costs and expenses of Equibase, the Companies and any other party in connection with obtaining or attempting to obtain the consents and waivers of lenders under Loan Agreements in connection with the replacement of the Manager of each Company.

4.03    **Major Decisions.**  No act shall be taken, sum expended, decision made or obligation incurred by any Company, any Subsidiary, any Manager or any of the Members with respect to a matter within the scope of any of the Major Decisions enumerated below, unless and until the same has been approved by Members owning more than fifty percent (50%) of the Voting Interests then outstanding (except as otherwise provided in Section 8.04). Any Member shall have the right to bring a Major Decision to a vote. The Major Decisions shall include:

(a)    Subject to the provisions of Section 4.04, approval of annual budgets for operations, leasing, construction and capital improvements of each Subsidiary and each Company, and any material amendment or modification of any budget approved by the Members.

(b)    Except as provided otherwise in Section 4.04, making any expenditure or incurring any obligation which, when added to any other expenditure for the fiscal year of any Company exceeds the budget approved by the Members for such year or exceeds any line item in said budget.

(c)    Acquisition of any land or other real property or interest therein by any Company or any Subsidiary.

(d)    The sale, lease, ground lease or other transfer, or mortgaging or the placing or suffering of any financial encumbrance on any Project Property or any part thereof; provided, however, notwithstanding the foregoing, the following shall not be considered a Major Decision event requiring a majority vote of the Members and the Manager shall be authorized, without the further approval of the Members, to (i) cause each Subsidiary to enter into leases of space in the Project Property owned by such Subsidiary in accordance with guidelines approved as part of the budget for such Project Property, and (ii) cause a sale of all or any portion of the Project Property provided that the net proceeds from such sale distributable to Equibase are not less than the sum of the Equibase Net Preference Amount and the accrued and unpaid Equibase Priority Return as of the date of Equibase's receipt of such proceeds.

(e)   The form, substance, amount, provider and documentation of all debt, financings and/or refinancings with respect to any Project Property or of any Company or any Subsidiary.

(f)   Subject to the provisions of Section 3.01, determining whether any Company shall make distributions to the Members and the amounts thereof.

(g)   Determining the amount of reserves to be established and maintained by any Company or any Subsidiary.

(h)   Compromising, arbitrating, or otherwise adjusting any claim in favor of or against any Company or any Subsidiary, and commencing or defending litigation with respect to any such entity or any assets thereof.

(i)   Except (1) in the ordinary course of the business of any Company, (2) as may be approved as part of any budget for a Project Property, or (3) as provided in this Agreement, engagement of any attorney, accountant, mortgage banker, investment banker, real estate broker or any other consultant, advisor or service-provider for any Company or any Subsidiary, the terms of any such engagement and the termination of such engagement.

(j)   If any Management Agreement is no longer in effect, engagement of a property manager for the Project Property owned by such Subsidiary, the terms of any such engagement and the termination of such engagement.

(k)   Any elections under the tax laws of the United States, the State of Illinois and any other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit of any Company or any Subsidiary, and as to all other relevant tax matters, including, tax returns.

(l)   Any decision by any Company to accept or request additional capital contributions from any Member.

(m)   Acquisition by any Company or any Subsidiary of an ownership interest in any other entity, or any merger, consolidation, joint venture or other combination between any Company or any Subsidiary, on the one hand, and any other entity on the other hand.

(n)   Any other decision or action which by any provision of this Agreement is required to be approved by the Members or which materially and substantially affects any Company or any Subsidiary or any assets of any Company or any Subsidiary.

If a Major Decision must be made, the Manager or Member requesting the Major Decision shall give to the Members notice (a "**Decision Notice**") of the nature of the Major Decision, together with a statement of the proposal as to the Major Decision and all documentation, agreements and other information necessary to enable the Members to make the Major Decision. The Decision Notice shall specify the date (the "**Response Date**") by which the Members' response to the

8

Decision Notice shall be reasonably required under the circumstances (it being agreed that except as otherwise provided herein the Response Date shall not be less than five (5) days after the date of the Decision Notice, unless an emergency exists, in which case said five-day period shall be shortened to the extent reasonably necessary and practicable). The Manager shall promptly deliver to the Members such additional information as the Members shall reasonably request in order to respond to a Decision Notice. The Members shall give written notice of their decision regarding the Major Decision to the Manager as promptly as reasonably practicable (but not later than the Response Date). If any Member has not provided such written notice of its decision to the Manager on or before the Response Date, such Member shall be deemed to have approved of such Major Decision. Approval of a Major Decision must be evidenced by a written instrument executed by all of the Members (or deemed executed pursuant to the prior sentence) who must approve such Major Decision.

4.04 **Budgets**. Each Company, each Subsidiary and each Project Property shall operate under annual operating budgets which shall be prepared and submitted by the Manager to the Members for approval. After an annual operating budget has been approved with respect to any Company, any Subsidiary or any Project Property, the Manager shall implement such Budget on behalf of such Company or such Subsidiary, as applicable, and is authorized, without the need for further approval of the Members, to cause such Company or such Subsidiary, as applicable, to make the expenditures and incur obligations therein provided. The Manager shall deliver to the Members for approval a proposed operating budget for each calendar year by November 1 of the preceding calendar year. Provided that the Members receive the proposed operating budget for each calendar year by November 1 of the preceding calendar year, the Members will approve, reject, or provide changes to the operating budget by December 31 of the year in which the proposed operating budget was submitted to the Members. If an operating budget for any Company, any Subsidiary or any Project Property for any calendar year has not been approved by January 1 of that year, the most recently approved operating budget for such Company, such Subsidiary or such Project Property (as may apply) shall be deemed to have been approved as the operating budget for such Company, such Subsidiary or such Project Property until a new operating budget for such Company, such Subsidiary or such Project Property is approved by the Members.

4.05 **Property Management Agreements**. Each Subsidiary that owns a Project Property has entered into a Property Management Agreement with Alliance Residential Management, L.L.C., which Agreements are listed on Exhibit A (the "**Management Agreements**"). The Members hereby consent to the Management Agreements and to each such Subsidiary's performance of its duties and obligations under the Management Agreement to which it is a party. Notwithstanding any other provision of this Agreement, but subject to the provisions of any Loan Documents, Equibase shall have the exclusive authority to make decisions and act on behalf of each Company and each Subsidiary in connection with the enforcement or exercise by the company of any rights, elections or remedies such Company or such Subsidiary may have under the Management Agreements or in connection therewith, and the approval of any amendment to the Management Agreements.

4.06 **Confidentiality, Press Releases**. All information obtained pursuant to this Agreement by any party hereto from the other parties hereto and the matters and provisions

9

hereof shall be and remain confidential (subject to the necessity of divulging to third parties, including, without limitation, attorneys, accountants, engineers, architects and prospective equity partners and lenders, such information as either party may require in order to perform its obligations hereunder and subject to disclosure of all information required by governmental authorities (including disclosures required under state or federal securities laws or the rules of a party's principal securities exchange) and any actual or prospective lender to any Company or any Subsidiary). No party will issue or cause the issuance of, and each will prevent its employees or agents from issuing or causing the issuance of, any press or media release or other information in the nature of a press release relating to either this Agreement or the transaction contemplated hereby except upon the prior written approval of Alliance and Equibase as to the exact text of such press release.

## ARTICLE 5: MEETINGS OF MEMBERS

5.01 **Regular Meetings**. Each Company shall hold regular meetings of its Members and its Manager in person or by conference call at least once each calendar month and as from time to time designated by Members holding over 20% of the then issued and outstanding Voting Interests, or by such Manager. Such regular meetings shall be held at such time and place as designated by the Member or by the Manager designating such meetings, as the case may be. An agenda for each meeting shall be prepared in advance by the Members in consultation with each other. If requested by a Member, the Members shall cause written minutes to be prepared of all actions taken by the Members at meetings and shall deliver a copy thereof to each of the Members within seven (7) days after any meeting.

5.02 **Notice of Members Meetings**. The Manager shall, and any Member may, give written notice stating the place, day, and hour of both regular and special meetings, and in the case of a special meeting, the purpose or purposes for which the meeting is called, which shall be delivered not less than ten (10) nor more than thirty (30) days before the date of the meeting, either personally, by facsimile transmission or by first class mail (postage prepaid) to each Member of record entitled to vote at such meeting. Notice of any meeting of Members, annual or special, shall be given addressed to the Member at the telephone number, facsimile number or address of such Member set forth in this Agreement or given by the Member to the applicable Company for the purpose of notice. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at its address as described above, with postage thereon prepaid. If transmitted by facsimile transmission, the notice shall be considered delivered upon completion of the transmission by the sender. A certificate or an affidavit of the mailing, transmission or other means of giving any notice of any Members' meeting shall be executed by the Manager, and shall be filed and maintained in the minute book of the applicable Company.

5.03 **Waiver of Notice**. If, under the provisions of the Act or this Agreement, notice is required to be given to a Member or a Manager, a waiver in writing signed by the Person or Persons entitled to the notice, whether made before or after the time for notice to be given, is equivalent to giving notice.

10

5.04　**Quorum**.　Members owning more than 60% of the Voting Interests represented in person or by proxy, shall constitute a quorum at a meeting of Members.  If Members holding less than 60% of the Voting Interests are represented at a meeting, Members holding a majority of the Voting Interests so represented may adjourn the meeting from time to time without further notice.  At a meeting resumed after any such adjournment at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of Members in such number that less than a quorum remain.

5.05　**Voting**.　A holder of a Voting Interest, entitled to vote at a meeting, may vote at such meeting in person or by proxy.  Every Member shall be entitled to a vote equal to the Voting Interest of such Member.  Except as otherwise specifically provided in this Agreement, all matters which call for a vote, consent, approval or determination of the Members shall be determined by the concurrence of Members owning more than fifty percent (50%) of the Voting Interests then outstanding.

5.06　**Proxies/Power of Attorney**.　At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney in fact.  Such proxy shall be filed with the applicable Company before or at the time of the meeting.  No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

5.07　**Action by Written Consent**.　Any action which may be taken by the Members at a meeting held pursuant to this Article 5 or as provided elsewhere in this Agreement may be taken without a meeting, upon the written consent to such action of Members holding the amount of Voting Interests as is required to take such action.

## ARTICLE 6:  ACCOUNTING, BOOKS AND RECORDS

6.01　**Company Reports and Other Documents**.

(a)　Within forty-five (45) days after the end of the fiscal year of each Company and within thirty (30) days after the end of each calendar month, the applicable Manager shall cause each Member to be furnished with a copy of the internally generated balance sheet of each Company, each Subsidiary and each Project Property as of the last day of the applicable period, an internally generated statement of income or loss for each Company, each Subsidiary and each Project Property for such period and an internally generated statement of cash flow for each Company, each Subsidiary and each Project Property for such period (including a comparison of actual expenses for such period as compared to budgeted expenses for such period), all to be prepared on the **[cash/accrual]** method of accounting.  The internally generated annual statements shall also include a statement of the Members' capital accounts, and changes therein for each fiscal year.  The Manager of each Company shall certify that to its knowledge all of the reports described in this Section 6.02(a) with respect to such Company and the Subsidiaries and

11

Project Properties in which such Company owns a direct or indirect interest, are true, correct and complete in all material respects.

(b) Each Company, each Subsidiary and each Project Property shall have certified annual statements for each fiscal year prepared by an independent certified public accountant acceptable to both Equibase and Alliance, and prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and the cost of such certified annual statements shall be a Company expense. Copies of such certified annual statements shall be delivered to the Members within ninety (90) days after the end of each fiscal year.

(c) The Manager shall also deliver to Equibase, internally generated monthly operation, leasing and occupancy activity summaries and occupancy dates, in a form reasonably requested by Equibase.

(d) Alliance shall furnish Equibase, within twenty-one (21) days after the end of each calendar quarter and at such other times as Equibase reasonably requests, internally prepared financial statements of each Company, Alliance Residential Management, L.L.C., and each Person included in the definition of "Alliance" in Section 1.01 showing all of such Person's assets and liabilities, in form and substance reasonably satisfactory to Equibase and certified as true, complete, and correct by the chief financial officer of such Person. Alliance shall furnish Equibase, within ninety (90) days after the end of each calendar year, with copies of audited financial statements for each Person described above certified by such Person's independent certified public accountants.

(e) All third-party accounting expenses for each Project Property shall be an expense of the Company that directly or indirectly owns such Project Property.

6.02 **Tax Returns; Information**. The Manager of each Company shall cause such Company to prepare all income and other tax returns of such Company and each Subsidiary controlled by such Company, and shall cause such returns to be filed in a timely manner. Unless otherwise determined by the unanimous consent of Equibase and Alliance, such tax returns shall be prepared by independent certified public accountants (acceptable to both Equibase and Alliance) who shall sign such returns as preparers, and the cost of such tax return preparation shall be a Company expense of the applicable Company. The Manager shall cause such returns to be submitted to each Member for review and approval no later than February 28th of each year. Each Company shall furnish to each Member a copy of each such return, together with any schedules or other information which each Member may require in connection with such Member's own tax affairs. Alliance hereby acknowledges and agrees that: (i) time is of the essence with respect to the document/information delivery requirements contained in Sections 6.01 and 6.02 and that any delay in such delivery shall cause material and irreparable harm to Equibase and its investors; and (ii) in the event that any such information is not delivered to Equibase on or before the dates specified in Sections 6.01 and 6.02, and thirty (30) days have expired after Equibase has delivered written notice to Alliance advising Alliance of the applicable deadline, then Equibase shall have the absolute right (but not the obligation) to

12

immediately hire additional accounting and/or tax consultants/professionals for the applicable Company and the Subsidiaries controlled by such Company, as applicable, in order to assist such Company and its Subsidiaries in generating and delivering such documents/information as quickly as possible thereafter, and the cost of any such additional accounting and/or tax service shall be paid directly by such Company.

6.03  **Notices of Default**.  Within two (2) business days after receipt by Alliance, Alliance will provide Equibase with true, accurate and complete copies of any written notice of (a) a monetary default by Alliance under any documents executed or delivered by any Company or any Subsidiary and evidencing financing for any Project Property, (b) the election by the holder of any financing for any Project Property to accelerate such indebtedness, or (c) a violation or threatened violation of any law or regulation applicable to any Project Property, including without limitation any building, health, safety environmental code, or restrictive covenant where such violation or threatened violation either has a material and adverse affect on the ability to operate any Project Property in the ordinary course of its business or will result in substantial damage to any Project Property.

## ARTICLE 7: TRANSFER OF INTERESTS

7.01  **Restrictions on Transfers of Interests**.  Equibase shall have the unfettered right to Transfer all or any portion of its Interest or any interest therein, provided that (a) such Transfer does not violate the terms of or result in the acceleration of (or right to accelerate) any payment under any indebtedness of any Company or any Subsidiary or secured by all or any portion of the Project Property, and (b) the conditions set forth in Section 7.02 have been satisfied. Alliance shall not Transfer, pledge or hypothecate all or any portion of its Interest or any interest therein without the prior written consent of Equibase, which consent Equibase may give or withhold in its sole and absolute discretion. Any Transfer or attempted Transfer by any Member in violation of the preceding sentence shall be null and void and of no force or effect whatever. Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company purposes and the relationship of the Members. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable. Each Member hereby further agrees to hold each Company and each Member (and each Member's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes and costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a Transfer or an attempted Transfer in violation of this Agreement.

7.02  **Conditions to Transfers**.  The following conditions shall apply to any proposed Transfer:

(a)  The transferor and transferee shall execute such documents and instruments of conveyance and assumption as may be necessary or appropriate in the opinion of counsel to each applicable Company to effect such Transfer, to confirm the Transferee's agreement to be bound by the provisions of this Agreement and the applicable Operating Agreements and assume all monetary obligations of the transferor Member with respect to the Interest being transferred and the transferor Member's

13

agreement to guarantee the prompt payment and performance of such assumed obligations.

(b)     Either (i) each applicable Company shall receive, prior to any Transfer, an opinion of counsel satisfactory to such Company confirming that such Transfer will not terminate such Company for federal income tax purposes, or (ii) the transferor and transferee, in a form reasonably acceptable to the other Members, shall jointly and severally indemnify and hold harmless each other Member of such Company and such Company from any and all losses, damages, or costs, including increased or accelerated taxes payable as a result of such termination.

(c)     The transferor and transferee shall furnish each applicable Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the interest transferred, and any other information reasonably necessary to permit such Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, no Company shall be required to make any distribution otherwise provided for in this Agreement or any Operating Agreement with respect to any transferred interest until it has received such information.

(d)     A Member making a Transfer of all or a portion of its Interest and the transferee thereof shall pay all reasonable costs and expenses incurred by each Company in connection with such Transfer.

(e)     The transferor shall deliver to each applicable Company an opinion of counsel, in form acceptable to counsel to such Company, that:

(1)     the proposed Transfer complies with all federal and state laws and regulations, including the Securities Act of 1933, and

(2)     the proposed Transfer will not affect the availability to such Company of the exemption from registration of the Interests provided by the Securities Act of 1933 or any Rule or Regulation promulgated by the Securities and Exchange Commission or the similar exemption from registration under the securities laws of any applicable state.

7.03    **Admission of Transferee as a Member**.  Provided a Transfer is permitted under Section 7.01, the transferee of such Interest shall be admitted as a Member in the applicable Companies.  The rights of a transferee who is not admitted as a Member shall be limited to the right to receive allocations and distributions from the applicable Companies with respect to the Interest transferred, as provided by this Agreement and the relevant Operating Agreements.  The transferee of such Interest shall not be a Member with respect to such Interest, and, without limiting the foregoing, shall not have the right to vote as a Member, inspect such Company's books, act for or bind such Company, or otherwise interfere in its operations.

14

7.04 **Effect of Transfer on Company**. The Members intend that the Transfer of an Interest shall not cause the dissolution of any Company.

7.05 **Conversion Right**. Notwithstanding any limitation in Section 7.01 or Section 7.02, if at any time any Person included in the definition of Alliance in this Agreement or any Affiliate thereof undertakes a public offering of its ownership interests, then Equibase shall have the right, exercisable in its sole discretion, to exchange all or any portion of Equibase's Interest for either shares in such publicly-traded entity or units in any "operating partnership" (if applicable) controlled by such publicly-traded entity. Any such exchange shall be on terms no less favorable than those available to any other investor in such entity at the time of the initial public offering of ownership interests in such entity.

## ARTICLE 8: PUT, CALL AND DRAG RIGHTS

8.01 **Right to Call Equibase's Interest**. Provided that a Management Termination Event has not occurred, Alliance shall have the right (the "**Call Right**"), exercisable at any time, to elect to purchase the entire Interest of Equibase in exchange for an amount (the "**Call Price**") equal to the sum of (i) the Equibase Net Preference Amount and (ii) the accrued and unpaid Equibase Priority Return as of the later of May 15, 2007, or the date of the closing of such purchase. Alliance shall exercise the Call Right, if at all, by delivering written notice (the "**Call Notice**") of such exercise to Equibase. A Call Notice shall be valid only if Alliance concurrently pledges to Equibase, as security for the performance by Alliance of its obligations under this Section 8.01, any rights Alliance may have to any earnest money or other deposits from third parties in connection with any transaction or proposed transaction that would provide all or any portion of the funds used to pay the Call Price. The delivery of a Call Notice shall not limit or otherwise modify any of the rights of Equibase under this Agreement or under the Operating Agreements unless and until the sale of Equibase's entire Interest closes as described below. The sale of Equibase's Interest pursuant to an exercise of the Call Right shall close at the principal office of Alliance, at a date and time mutually acceptable to the Members but not more than thirty (30) days after the delivery of the Call Notice. At such closing, Alliance shall transmit immediately available funds to Equibase in the amount of the Call Price, plus the amount of all legal and other transaction costs incurred by Equibase in connection with the sale of its Interest; Equibase shall execute and deliver to Alliance an assignment of Equibase's entire Interest, free and clear of any lien or encumbrances; and Equibase shall be released with respect to any and all obligations under this Agreement and each Operating Agreement, and any and all obligations of each Company and each Subsidiary.

8.02 **Right to Put Equibase's Interest**. At any time after the earlier of (i) the occurrence of a Management Termination Event, or (ii) April 15, 2007 (the "**Put Exercise Date**"), Equibase shall have the right (the "**Put Right**"), but shall not be obligated, to require Alliance to purchase Equibase's entire Interest in exchange for an amount (the "**Put Price**") equal to the sum of the Equibase Net Preference Amount and the accrued and unpaid Equibase Priority Return as of the date of the closing of such redemption. Notwithstanding the immediately preceding sentence, the Put Exercise Date shall be delayed to a date specified by Alliance, but not later than June 15, 2007, if, prior to April 15, 2007, Alliance furnishes to Equibase a written plan that is satisfactory to Equibase, in its sole and absolute discretion,

15

pursuant to which Equibase shall receive an amount not less than the Put Price in exchange for its Interest not later than June 15, 2007. Equibase shall exercise the Put Right, if at all, by delivering written notice (the "**Put Notice**") of such exercise to Alliance at any time after the Put Exercise Date. The delivery of a Put Notice shall not limit or otherwise modify any of the rights of Equibase under this Agreement or the Operating Agreements unless and until the sale of Equibase's entire Interest closes as described below. The sale of Equibase's Interest pursuant to an exercise of the Put Right shall close at the principal office of Alliance, at a date and time mutually acceptable to the Members but not more than thirty (30) days after the delivery of the Put Notice. At the closing, Alliance shall transmit immediately available funds to Equibase in the amount of the Put Price, plus the amount of all legal and other transaction costs incurred by Equibase in connection with the sale of its Interest; Equibase shall execute and deliver to Alliance an assignment of Equibase's entire Interest free and clear of any liens or encumbrances; and Equibase shall be released from all obligations under this Agreement and each Operating Agreement, and any and all obligations of each Company and each Subsidiary.

8.03   **Drag Rights**.   If Equibase proposes to Transfer its entire Interest to an unaffiliated third-party at any time after a Management Termination Event has occurred, Equibase shall have the right to elect (by delivering written notice (a "**Drag Along Notice**") of such election to Alliance at least thirty (30) days prior to the scheduled closing of such transaction) to require Alliance to sell its entire Interest to the prospective buyer together and concurrently with the sale of Equibase's Interest to such buyer. If Equibase delivers a Drag Along Notice to Alliance in accordance with this Section 8.03, then (a) Alliance shall not, thereafter, be entitled to deliver a Call Notice, and (b) Alliance must enter into an agreement to sell its entire Interest on substantially the same terms and conditions that Equibase will sell to such buyer, including a purchase price that is no less than the amount that Alliance would receive if the aggregate price being paid for all of the Interests were distributed to the Members pursuant to Section 3.01 and providing for a closing concurrently with the sale of Equibase's Interest.

8.04   **Remedies**.

(a)    If Equibase defaults in the performance of its obligation to assign its Interest to Alliance pursuant to Section 8.01 or Section 8.02, (i) Alliance shall have the right to enforce the specific performance of Equibase's obligation to sell its Interest in accordance with Section 8.01 or Section 8.02 (as may apply), provided such action for specific performance is commenced within ninety (90) days after the occurrence of such default; (ii) Alliance shall be entitled to the return of any pledge issued by Alliance in connection with the delivery of a Call Notice under Section 8.01 (if applicable); and (iii) Equibase shall no longer have the right to initiate the provisions of Section 8.02 or Section 8.03.

(b)    If Alliance defaults in the performance of its obligation to purchase the Interest of Equibase pursuant to either Section 8.01 or Section 8.02, or in its obligation to sell its Interest pursuant to Section 8.03, then (i) Equibase shall be entitled to foreclosure upon the pledge issued in connection with the delivery of a Call Notice pursuant to Section 8.01 (if applicable) as liquidated damages from a default under Section 8.01;

16

(ii) Equibase shall thereafter have the right to cause a sale of the Project Properties or to sell its Interest or cause a sale of the Interests of both Equibase and Alliance without complying with any of the provisions of this Article 8 and without the consent of the Manager, Alliance or any other party; (iii) such default shall constitute a Management Termination Event; and (iv) in the case of a default under Section 8.02, the Investment Banking Fee shall be increased by replacing "two percent (2%)" in Section 9.01 with "twelve percent (12%)."

## ARTICLE 9:  INVESTMENT BANKING FEE

9.01  **Investment Banking Fee**.  Concurrently with (i) any purchase of all or any portion of Equibase's Interest (pursuant to Article 8 or otherwise), or (ii) any distribution by any Company to Equibase of any cash arising from a sale, disposition or refinancing of all or any portion of any Project Property or any direct or indirect interest therein, Alliance shall pay to Equibase Capital Group, LLC, as a fee for its investment banking services, an amount equal to two percent (2%) (or twelve percent (12%) if Section 8.04(b)(iv) applies) of the amount of cash then being paid to Equibase in connection with the event described above (the "**Investment Banking Fee**").  The payment of the Investment Banking Fee by Alliance shall not constitute a capital contribution or loan to any Company.  Any Investment Banking Fee paid pursuant to this Section 9.01 shall not be deemed a distribution to Equibase pursuant to Article 3 of this Agreement, and therefore shall not be treated as a return of the Equibase Preference Amount or a payment of the Equibase Priority Return.

## ARTICLE 10:  INDEPENDENT ACTIVITIES

10.01  **Right to Engage in Other Activities**.  Except as provided in Section 10.02, any Member, any Manager and their respective Affiliates may engage in whatever activities they choose, whether the same are competitive with any Company or any Subsidiary or otherwise, without having or incurring any obligation to offer any interest in such activities to any other party, any Company, any Subsidiary or any Member, and neither this Agreement nor any activity undertaken pursuant hereto shall prevent any party, any Member, any Manager or any Affiliate of any of them from engaging in such activities, or require any party, any Member or any Manager to permit any Company, any Subsidiary or any other party, any Member, any Manager or any Affiliate of any of them to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each party, each party hereby waives, relinquishes, and renounces any such right or claim of participation.  This provision shall not be construed to be in derogation of any obligation which any Person may have to any Company or any Subsidiary arising out of such Person's employment by, or position as an officer of, any Company or any Subsidiary, or any contract or agreement such Person may have with any Company or any Subsidiary.

10.02  **Limitation**.  Alliance hereby represents and warrants to Equibase that, except for the Excluded Properties (as defined in Section 11.20), neither Alliance nor any Affiliate thereof has any direct or indirect equity interest or interest as a creditor in any multi-family residential property other than through its Interest in the Companies.  Alliance hereby covenants that neither Alliance nor any Affiliate of Alliance shall acquire any direct or indirect debt or equity interest in

17

any multi-family residential property after the Effective Date, unless the entire interest of Alliance and its Affiliates in such property is acquired and held through one or more of the Companies. If at any time during the term of this Agreement Alliance or any Affiliate thereof desires to acquire any direct or indirect equity or debt interest in any multi-family residential property, prior to acquiring any such interest (through a Company, as provided above), Alliance shall deliver to Equibase copies of all written materials available to Alliance with respect to such property and the interest Alliance proposes to acquire, and shall provide Equibase with all other relevant information available to Alliance relating thereto. Equibase shall have the right to invest with Alliance in any such property on terms substantially equivalent to the provisions of this Agreement or on such other terms as Alliance and Equibase may agree upon. Equibase shall exercise such right, if at all, by delivering written notice to Alliance setting forth its election to participate within forty-five (45) days after Equibase has received all of the information described above with respect to such investment. If Equibase does not elect to participate in such investment, Alliance and its Affiliates may acquire any interest in any such multi-family residential property only through a Company.

## ARTICLE 11: MISCELLANEOUS

11.01 **Notices**. Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and sent by overnight courier, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a hard copy of the telephone conversation or facsimile communication sent by first class mail, postage prepaid, addressed as follows or to such other address as such Person may from time to time specify by notice to the other parties to this Agreement:

if to Alliance:

Alliance Holdings Investments, L.L.C.
221 North LaSalle Street
Suite 3700
Chicago, Illinois 60601
Attention: Andrew W. Schor

if to Equibase:

Equibase Multi-Family Fund, LLC
1200 North Ashland Avenue
Suite 600
Chicago, Illinois 60622
Attention: Michael W. Husman

Any such notice shall be deemed to be delivered, given, and received as of the date so delivered.

11.02 **Insurance**. Alliance shall obtain and maintain in effect until Equibase has received the Equibase Net Preference Amount and the Equibase Priority Return, in addition to any other insurance policies otherwise required either for the benefit of any lender or otherwise, one or more life insurance policies on the life of Andrew W. Schor (i) in the amount of Eight Million Dollars ($8,000,000), which life insurance policies shall designate Equibase as the sole beneficiary thereof, and (ii) in the amount of Two Million Dollars ($2,000,000), which life insurance policies shall designate any of the Persons included in the definition of Alliance in

Section 1.01 as the sole beneficiary thereof, and the proceeds of which shall be available to fund the obligations of Alliance to Equibase under this Agreement, and in each case such policies shall be of such type as Equibase shall deem appropriate.

11.03 **Cooperation in Equibase Offering.** Alliance acknowledges that Equibase may offer direct or indirect interests in Equibase or in its Interest to one or more third parties, subject to the provisions of this Agreement. Alliance agrees to cooperate with, and to cause its Affiliates, the Companies and the Subsidiaries to cooperate with, Equibase in connection with any such offerings, including providing information to Equibase or such Persons as Equibase may designate regarding Alliance, the direct and indirect owners and senior management of Alliance, the Companies, the Subsidiaries and the Project Properties; reviewing for accuracy any materials prepared by Equibase for use in connection with any such offerings; and making senior management personnel available for meetings, conference calls and property tours.

11.04 **Estoppel Certificates.** Each party to this Agreement shall at any time and from time to time, upon not less than twenty (20) days' prior notice from any other party, execute, acknowledge, and send to such other party a statement in writing certifying that this Agreement and each Operating Agreement is unmodified and in full force and effect (or if there have been modifications, that this Agreement and the Operating Agreements are in full force and effect as modified and stating the modifications) and stating whether or not as to both Alliance and Equibase either is in default in keeping, observing, or performing any of the terms containing in this Agreement and the Operating Agreements, and if in default, specifying each such default (limited, as regards to the other of Equibase or Alliance's defaults, to those defaults of which the certifying party has knowledge).

11.05 **Equibase Expenses.** Alliance shall pay all costs and expenses incurred by Equibase and its Affiliates in connection with the negotiation and preparation of this Agreement, the negotiation and documentation of any subsequent "roll-up" transaction relating to the ownership of the Companies, and the negotiation and documentation of all related transactions, including all attorneys' and accountants' fees.

11.06 **Title and Captions.** Article and Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

11.07 **Number.** Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural.

11.08 **Counterparts.** This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties are not signatory to the original or the same counterpart. All parties that execute this Agreement shall be bound by all of the provisions of this Agreement, without regard to whether all of the named parties to this Agreement have executed this Agreement.

11.09 **Governing Law.** This Agreement and all amendments hereto shall be governed by the laws of the State of Delaware.

19

11.10 **Survival of Terms and Provisions**. The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective Members.

11.11 **Severability**. The invalidity or unenforceability of any part of this Agreement shall not invalidate or affect the validity or enforceability of any other provision of this Agreement, which shall continue to govern the rights and obligations of the parties hereto as though the invalid or unenforceable provisions(s) were not a part hereof.

11.12 **Preparation of Agreement**. The Members acknowledge that they have all participated in the preparation of this Agreement and, in the event that any question arises regarding its interpretation, no presumption shall be drawn in favor of or against any Member with respect to the drafting hereof.

11.13 **Entire Agreement**. Except as specifically provided herein, this Agreement constitutes and represents the entire agreement of the Members with respect to the subject matter hereof, and all other prior agreements, covenants, promises and conditions, verbal or written, between the Members are incorporated herein. No Member hereto has relied upon any other promise, representation or warranty, other than those contained herein, in executing this Agreement.

11.14 **Litigation**. In the event any party finds it necessary to bring an action at law or other proceeding against any Member to enforce any of the terms, covenants or conditions hereof, or by reason of any breach or difficulty hereunder, the party prevailing in any such action or other proceeding shall be entitled to recover against the other party a reasonable attorney's fee. In the event any judgment is secured by such prevailing party, all such attorneys' fees shall be determined by the court and not a jury and shall be included in any judgment.

11.15 **Binding Effect**. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legatees, legal representatives, successors, transferees, and assigns.

11.16 **Time**. Time is of the essence with respect to this Agreement.

11.17 **Further Action**. Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

11.18 **Loan Documents**. Column Financial, Inc., its successors and/or assigns and other various lenders (collectively, "**Lender**") have loaned funds to certain Affiliates of Alliance ("**Loans**"), which Loans have a payment priority that is senior to Equibase's interest created by this Agreement (which loans are evidenced and secured by the "**Loan Documents**"). Alliance's and Equibase's rights, obligations and remedies under this Agreement are contingent upon and subject to the rights of the Lenders under, and the terms and conditions of, the Loan Documents.

CHGO1\30863312.7 11/9/06 03:25 PM

11.19  **Capital Partner Rights**.  Certain of the Companies or their subsidiaries are members of partners with Capital Partners (the "**Capital Partners**").  Notwithstanding anything to the contrary contained herein, Alliance's and Equibase's rights, obligations and remedies relating to the management of the Companies are contingent upon and subject to the rights of the Capital Partners and the restrictions of the Companies and/or their respective subsidiaries under any operating, partnership or other agreements between such parties.  Alliance covenants that it shall use its best efforts to obtain and deliver to Equibase a written consent from each Capital Partner to the management and voting rights of Equibase set forth herein with respect to each of the Companies other than Alliance HC III Limited Partnership.

11.20  **Other Portfolios**.  To the extent that Alliance or any Affiliates thereof (other than Anthony D. Ivankovich) receive any cash flow from the property portfolios referred to as "GJ-VL," "IJ," "SH2," "Ashland Hills" or "Enclave Reflections" (collectively, the "Excluded Properties"), the provisions of Section 3.01 shall control the distribution of such cash flow. Alliance shall have the right to remove the Excluded Properties from the ownership of Alliance Holdings Investments, L.L.C. and Alliance Holdings Investments II, L.L.C. provided that both (i) no indebtedness secured by all or any portion of the Excluded Properties is further cross-collateralized with any other Project Properties, and (ii) all guarantees, indemnities and other forms of credit enhancements issued by Alliance Holdings Investments, L.L.C. or Alliance Holdings Investments II, L.L.C. with respect to the Excluded Properties shall be released.

*[SIGNATURES ON FOLLOWING PAGE]*

CHGO1\30863312.7 11/9/06 03:25 PM

**DATED** effective as of the Effective Date.

EQUIBASE:

**EQUIBASE MULTIFAMILY INVESTORS, LLC**, a Delaware limited liability company

By: **EVEREST GPM, LLC**, a Delaware limited liability company, its Manager

    By: _____
        Michael W. Husman,
        Authorized Signatory

ALLIANCE:

**ALLIANCE HOLDINGS INVESTMENTS, L.L.C.**, an Illinois limited liability company

By: _____
    Name: Steven Ivankovich
    Title: Executive Vice President

**ALLIANCE HOLDINGS INVESTMENTS II, L.L.C.**, a Delaware limited liability company

By: _____
    Name: Steven Ivankovich
    Title: Executive Vice President

**ALLIANCE HOLDINGS INVESTMENTS III, L.L.C.**, a Delaware limited liability company

By: _____
    Name: Steven Ivankovich
    Title: Executive Vice President

HGA ALLIANCE HOLDINGS II,
L.L.C., a Delaware limited liability
company

By: _____
    Name: Steven Ivankovich
    Title: Executive Vice President

ALLIANCE HOLDINGS ES, L.L.C., a
Delaware limited liability company

By: _____
    Name: Steven Ivankovich
    Title: Executive Vice President

ALLIANCE HOLDINGS RTTN,
L.L.C., a Delaware limited liability
company

By: _____
    Name: Steven Ivankovich
    Title: Executive Vice President

HGA ALLIANCE HOLDINGS IV,
L.L.C., a Delaware limited liability
company

By: _____
    Name: Steven Ivankovich
    Title: Executive Vice President

ALLIANCE PJ, L.L.C., a Delaware
limited liability company

By: _____
    Name: Steven Ivankovich
    Title: Executive Vice President

**ALLIANCE HOLDINGS KINGSLEY, L.L.C.**, a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Executive Vice President

**ALLIANCE HOLDINGS TELEGRAPH HILL, L.L.C.**, a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Executive Vice President

**ALLIANCE HOLDINGS PP, L.L.C.**, a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Executive Vice President

**HGA ALLIANCE HOLDINGS III, L.L.C.**, a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Executive Vice President

# EXHIBIT A

## LIST OF PROPERTY MANAGEMENT AGREEMENTS

CHGO1\30863312.7 11/9/06 03:25 PM


Exhibit E



1717 Main Street, Suite 3700
Dallas, Texas 75201
214.659.4400 Phone
214.659.4401 Fax
andrewskurth.com

Kathleen J. Wu
214.659.4448 Phone
214.659.4802 Fax
kwu@akllp.com

November 5, 2008

**VIA FEDEX, CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Alliance HC IV Limited Partnership
2400 Augusta
Suite 450
Houston, TX 77057

**VIA FEDEX, CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Alliance HC IV Limited Partnership
c/o Alliance Holdings, L.L.C.
221 North LaSalle Street, 37th Floor
Chicago, IL 60601
Attention: Andrew W. Schor

**VIA FEDEX, CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Alliance HC IV Mezz II, L.L.C.
c/o Alliance Holdings, L.L.C.
221 North LaSalle Street, 37th Floor
Chicago, IL 60601
Attention: Andrew W. Schor

**VIA FEDEX, CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Alliance HC IV Mezz Limited Partnership
c/o Alliance Holdings, L.L.C.
221 North LaSalle Street, 37th Floor
Chicago, IL 60601
Attention: Andrew W. Schor

**VIA FEDEX, CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Alliance Holdings Investments II, L.L.C.
221 North LaSalle Street, 37th Floor
Chicago, IL 60601
Attention: Andrew W. Schor

**VIA FEDEX, CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Alliance Holdings Investments III, L.L.C.
221 North LaSalle Street, 37th Floor
Chicago, IL 60601
Attention: Andrew W. Schor

**VIA FEDEX, CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Alliance Holdings Investments, L.L.C.
221 North LaSalle Street, 37th Floor
Chicago, IL 60601
Attention: Andrew W. Schor

**VIA FEDEX, CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Alliance Residential Management, L.L.C.
2400 Augusta, Suite 450
Houston, TX 77057
Attention: Laura Krupala

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

Alliance Residential Management, LLC
15301 Spectrum, Suite 100
Addison, TX 75001
Attention: Scott Seegmiller

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

LB Mezz Lender RTPJ LLC
399 Park Avenue, 8th Floor
New York, NY 10022
Attention: David Broderick

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

Strauss & Malk
c/o Arnold B. Malk
104 Wilmot Road, Suite 350
Deerfield, IL 60015
Attention: Anthony D. Ivankovich

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

McKenna Long & Aldridge LLP
303 Peachtree Street, N.E. Suite 5300
Atlanta, GA 30308
Attention: Patrick M. McGeehan

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

Nomura Credit & Capital, Inc.
2 World Financial Center
New York, NY 10281
Attention: Jeremy Stoler

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

Schain, Burney, Ross & Citron, Ltd.
222 North LaSalle Street, Suite 1910
Chicago, IL 60601
Attention: Michael Ross, Esq.

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Attention: Michael Peskowitz, Esq.

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

Strauss & Malk LLP
135 Revere Drive
Northbrook, IL 60062
Attention: Arnold B. Malk, Esq.

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

TriMont Real Estate Advisors, Inc.
Monarch Tower, Suite 2200
3424 Peachtree Road, N.E.
Atlanta, GA 30326
Attention: Gregory Winchester

**VIA FEDEX, CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND
REGULAR MAIL**

Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, NY 10019
Attention: Robert D. Mercurio, Esq.

<u>**VIA FEDEX, CERTIFIED MAIL, RETURN
RECEIPT REQUESTED AND
REGULAR MAIL**</u>

Alliance HC IV GP, L.L.C.
221 North LaSalle Street, 37th Floor
Chicago, IL 60601
Attention: Andrew W. Schor

Re:     **NOTICE OF DEFAULT**

Promissory Note (the "*Note*") dated effective as of November 9, 2006, in the original principal sum of $93,000,000.00, executed by Alliance HC IV Limited Partnership, a Delaware limited partnership ("*Borrower*") payable to the order of Column Financial, Inc., a Delaware corporation ("*Original Lender*") secured by certain liens, assignments and security interests evidenced by, among other things, (i) that certain Loan Agreement (as amended, modified or supplemented from time to time with the approval and consent of Lender (as herein-after defined), collectively, the "*Loan Agreement*") dated of even date with Note, executed by Borrower and Original Lender, (ii) that certain Deed of Trust and Security Agreement (as amended, modified or supplemented from time to time with the approval and consent of Lender, collectively, the "*Deed of Trust*") dated of even date with the Note from Borrower to William Z. Fairbanks, Jr., as Trustee for the benefit of Lender, recorded in the Official Public Records of Harris County, Texas and in the Official Public Records of Jefferson County, Texas; (iii) that certain Mortgage, Assignment of Leases and Rents and Security Agreement (as amended, modified or supplemented from time to time with the approval and consent of Lender), collectively, the "*Mortgage*" and together with the Deed of Trust, the "*Security Instrument*"), dated of even date with the Note from Borrower to Lender, recorded in the Official Public Records of Palm Beach County, Florida; (iv) that certain Assignment of Leases and Rents (as amended, modified or supplemented from time to time with the approval and consent of Lender, collectively, the "*Texas ALR*") dated of even date with the Note from Borrower to Original Lender, recorded in the Official Public Records of Harris County, Texas in the Official Public Records of Jefferson County, Texas; and (v) that certain Assignment of Leases and Rents (as amended, modified or supplemented from time to time with the approval and consent of Lender, collectively, the "*Florida ALR*" and together with the Texas ALR, the "*Assignment of Rents*") dated of even date with the Note from Borrower to Original Lender, recorded in the Official Public Records of Palm Beach County, Florida covering certain real property together with all improvements located thereon in Harris and Jefferson Counties, Texas and Palm Beach County, Florida, as more particularly described therein (the "*Property*"); the Note, the Loan Agreement, Security Instrument, Assignment of Rents and all other documents, agreements or instruments securing, guaranteeing, evidencing or in any way relating to any part of the loan evidenced by the Note ("*Loan*"), all as amended, supplemented, restated, renewed, reaffirmed, consolidated or otherwise modified at any time, and from time to time, and with the consent of Lender (herein defined), shall be collectively referred to as the "*Loan Documents*"; all other capitalized terms used herein but not defined herein shall have the same meanings as set forth in the Loan Documents.

Ladies and Gentlemen:

We represent and write to you on behalf of ING Clarion Capital Loan Services LLC (f/k/a ING Clarion Partners, LLC), as Special Servicer for Wells Fargo Bank, N.A., as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C2, current holder of the Loan Documents ("*Lender*"). On behalf of Lender, please be advised that, and you are hereby formally notified that, Borrower is in default by breaching a number of its representations, warranties, covenants and agreements under the terms of the Note and the other Loan Documents and as a result an Event of Default has occurred thereunder.

Specifically (but not exclusively), Lender has recently become aware that (i) Equibase HGA I, L.L.C. ("*Equibase*") has taken control of and/or replaced the managing member of HGA Alliance IV, L.L.C. and/or the general partner of Alliance HC IV Mezz Limited Partnership without Lender's consent, and (ii) there has been a change of management control in Borrower and HGA Alliance IV, L.L.C. to Equibase, each such transfer being in violation of Section 5.2.10(d) of the Loan Agreement. Pursuant to Section 8.1.1(iv) of the Loan Agreement, such unauthorized transfers constitute an Event of Default. As such, Lender is entitled to and shall immediately exercise any one of or all rights, remedies, benefits and recourses to which Lender is entitled, at law or in equity, including without limitation those set forth in the Loan Documents. Further, Lender has instructed us to take all proceedings as are authorized by law to protect our client's interest, including without limitation, foreclosure of all liens and security interests securing the Note and/or the initiation of legal proceedings against Borrower (and all others who may be obligated under any of the Loan Documents) for all sums due and owing under the Note and any and all other Loan Documents executed in connection with or as security for the Note, plus all interest, court costs and attorneys' fees to which our client is entitled.

The exercise by Lender of its rights, remedies, benefits and recourses as a result of Borrower's defaults under the Loan Agreement and the other Loan Documents may result in additional expenses being incurred by Lender for, among other things, inspection, environmental study, title examination and similar services, as well as additional legal and collection expenses, all of which may be added to the amounts owed by Borrower to Lender as set forth in the Loan Documents.

A copy of this letter is being sent to Alliance Holdings Investments, L.L.C., an Illinois limited liability company, Alliance Holdings Investments II, L.L.C., a Delaware limited liability company, and Alliance Holdings Investments III, L.L.C., a Delaware limited liability company, as indemnitors of the obligations and liabilities arising under any or all of the Loan Documents, pursuant to the terms of the Indemnity and Guaranty Agreement, executed simultaneously with the Loan Documents by each of Alliance Holdings Investments, L.L.C., Alliance Holdings Investments II, L.L.C., and Alliance Holdings Investments III, L.L.C. (collectively, "*Indemnitor*") to notify Indemnitor of the default of Borrower as described above.

Nothing in this letter is intended to nor should it be construed as a waiver, modification, diminution or limitation of any rights, remedies, benefits or recourses which Lender may have available to it under any of the Loan Documents or otherwise at law or in equity, or as a waiver, modification, diminution or limitation of any obligation owed by Borrower or others to Lender. Lender continues to reserve the right to seek recovery of any and all costs, expenses, damages and other recoverable amounts, whether or not demanded hereunder, including, without limitation, any actual, punitive or other damages.

If any party who receives this letter is a debtor in a bankruptcy subject to the provisions of the United States Bankruptcy Code (Title 11 of the United States Code) (the "*Code*"), this letter is merely intended to be written notice that formal demand has been made in compliance with the Security Instrument and applicable state law. This letter is not an act to collect, assess or recover a claim against you, nor is this letter intended to violate any provisions of the Code. Any and all claims that Lender asserts against Borrower or Indemnitor will be properly asserted in compliance with the Code in your respective bankruptcy proceedings.

Thank you for your immediate attention to this important matter.

Very truly yours,

Kathleen J. Wu

cc:

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Wachovia Bank N.A.
P.O. Box 563988
Charlotte, NC 28256-3966
Attention: David Morris and Kirk Young

| | |
|---|---|
| Mr. Steve Altman | **VIA EMAIL** |
| Mr. William Pepe | **VIA EMAIL** |
| Charles L. Perry, Esq. | **VIA EMAIL** |
| Karen J. Wade, Esq. | **VIA EMAIL** |



Exhibit F

# OPERATING AGREEMENT

## OF

## ALLIANCE PJ, L.L.C.,
### a Delaware limited liability company

**PARTIES AND MEMBERS:**             **Alliance Holdings PJ, L.L.C.**
**Alliance Holdings PJWE, L.L.C.**
**Alliance Holdings PJ II, L.L.C.**
**Equibase PJ, L.L.C.**

**PRINCIPAL BUSINESS ADDRESS:**     **221 N. LaSalle St.**
**Suite 3700**
**Chicago, Illinois  60601**

**May 26, 2005**

# OPERATING AGREEMENT
## OF
## ALLIANCE PJ, L.L.C.

**THIS OPERATING AGREEMENT** (this "**Agreement**") of **Alliance PJ, L.L.C.** (the "**Company**"), is effective as of May 26, 2005, by and among **Alliance Holdings PJ, L.L.C.**, a Delaware limited liability company, whose address is 221 North LaSalle Street, Suite 3700, Chicago, Illinois 60601 ("**Holdings L.L.C.**"); **Alliance Holdings PJWE, L.L.C.**, a Delaware limited liability company, whose address is 221 North LaSalle Street, Suite 3700, Chicago, Illinois 60601 (**PJWE L.L.C.**); **Alliance Holdings PJ II, L.L.C.**, a Delaware limited liability company, whose address is 221 North LaSalle Street, Suite 3700, Chicago, Illinois 60601 ("**Investments L.L.C.**"); and **Equibase PJ, L.L.C.**, a Delaware limited liability company, whose address is 1200 N. Ashland Avenue, Chicago, Illinois, 60622 ("**Equibase**") (collectively, the "**Members**" and separately, each a "**Member**").

## RECITALS

**WHEREAS**, the Company is a party to a refinancing of loans by Wachovia Bank, National Association and LB MEZZ LENDER RTPJ, LLC, a Delaware limited liability company (the "**Refinancing**"), which includes the transfer of assets from certain entities owned, directly or indirectly, by the Members to the Company, its affiliates and subsidiaries (the "**Merger**"); and

**WHEREAS**, the Lenders are requiring, as a condition precedent to the refinancing, that the Members make contributions to the capital of the Company in the form of ownership interests held by the Members in certain entities that, directly or indirectly, own certain real properties and apartment buildings located thereon, as stated on the attached Exhibit "E" (the "**Properties**"); and

**WHEREAS**, the Lenders are also requiring, as a condition precedent to the refinancing, that the Members take such actions as are necessary to liquidate and dissolve the entities that had previously owned, directly or indirectly, the Properties immediately after the consummation and closing of the Refinancing, including but not limited to the liquidation and dissolution of the FQ Entities, RT Entities, WE Entities and GJ Entities (the "**Dissolution**"); and

**WHEREAS**, the Members of the Company have agreed with the Lender to take such actions as they deem necessary or desirable to complete the Refinancing, Merger and Dissolution in order for the Lender to fund and close the Loan.

## ARTICLE XI
## Assignment Restrictions

**11.1** **Assignment of Interests.** Subject to the following sentence, a Member shall have the unfettered right to sell, transfer or assign its Interest, or any portion thereof. For so long as any Loan is outstanding, a Member may not assign its Interest except in compliance with the Loan Documents; however the venturers of a Member may transfer their venture interests to each other or to any third party, provided such transfers do not violate the terms of any Loan Document and do not result in and could not result in any Person who is a partner or member of the transferring Member owning twenty percent (20%) or more of the Interests. Any sale, transfer or assignment made in violation of the foregoing sentences shall be null, void and of no force or effect. Such right shall not be subject to the requirements of Section 11.3 below. No Member shall have the right to sell, transfer, assign, pledge, mortgage or otherwise dispose of its respective Interests, or any portion thereof, in violation of the Loan Documents. Any such transfer shall be subject to Article XII and the terms of Exhibit "C." Any assignee of a Member pursuant to Article XII shall not be admitted as a substitute voting Member (with voting rights based upon their respective Interests) without the consent of all of the other Members.

**11.2** **General Restriction.** No Member shall transfer or assign its Interest if such assignment would contravene any agreement to which the Company or the transferring Member is a party.

**11.3** **Right of First Refusal.** After the Loans have been paid in full, in the event any Member (hereinafter referred to as "Selling Member") receives a bona fide offer (hereinafter referred to as "Offer") to purchase any part of its Interest from a prospective purchaser, the Selling Member shall, prior to transferring such Interest pursuant to the Offer, give written notice of the Offer to the other Members, individually, which notice shall constitute, to the extent herein set forth, an offer to sell the Interest proposed to be sold to the other Members, individually, at the same price and upon the same terms as are contained in the Offer (hereinafter referred to as "Company Offer"). The Company Offer shall be accompanied by a copy of the Offer and evidence of the payment of at least ten percent (10%) earnest money (which may be evidenced by a promissory note). Any of the other Members, individually, shall have the right to accept the Company Offer, provided the service of a notice of acceptance is made on all other parties thereto within forty-five (45) days after the receipt of the Company Offer. If more than one (1) Member elects to accept the Company Offer, they shall acquire the Interest stated under the Offer on a pro-rata basis (based upon their respective Percentage Interests). Each elector's pro-rata share shall be determined by multiplying the entire interest to be acquired by a fraction, the numerator of which is the elector's Percentage Interest and the denominator of which is the sum of the Percentage Interests of all electors. If and to the extent that the other Members, individually, fail to accept the entire Company Offer, the Selling Member shall then be free to transfer his entire Interest which was subject to the Offer to the proposed purchaser subject to all terms, covenants and other conditions contained in this Agreement. If the Selling Member shall fail to consummate such sale within ninety (90) days following the first delivery of the Company Offer, such Interest shall again be subject to this Section. There will be no commissions due to any broker on account of any sale pursuant to this Section 11.3. This Section 11.3 shall not apply to any of the Pledges

## ARTICLE XVIII
## General Provisions

**18.1    Amendment, Modification or Alteration of Agreement**. This Agreement and the terms thereof shall not be modified, amended or altered, unless agreed to in writing by the Managers and a majority in interest of the Members (and Preferred Member until Preferred Member has received the Preferred Member Payoff Amount). The Percentage Interest of any Member (or any priority distribution due a Member) may not be modified without that Member's written consent. Notwithstanding the foregoing, for so long as the Loan remains outstanding, no material amendment to this Agreement or the Certificate may be made without first obtaining approval of all of the Members and the Lender, or, after the securitization of the Loan only if the Company receives (i) confirmation from each of the applicable rating agencies that such amendment would not result in the qualification, withdrawal or downgrade of any securities rating; and (ii) written approval of any such amendment by the Lender or its assigns. As used in this paragraph, "material" means having the potential to materially adversely affect the interests of the Lender.

**18.2    Notices**. All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given or made if mailed from within the United States by certified mail, return receipt requested, postage prepaid, and addressed to the address of the Company set forth in Section 2.5, if to the Company, and to the address beneath a Member's signature, if to a Member. Notice may also be given by overnight delivery service or other means of direct delivery, such as a messenger service. Any Member may change such Member's address by giving notice in writing stating such Member's new address to the Company. Commencing with the giving of such notice, such newly designated address shall be such Member's address for purposes of all notices or other communications required or permitted to be given pursuant to this Agreement.

**18.3    Successors**. This Agreement and all the terms and provisions hereof shall be binding upon and shall inure solely to the benefit of all Members and their legal representatives, heirs, successors and assigns, except as expressly herein otherwise provided.

**18.4    Governing Law**. This Agreement shall be regarded for all purposes as a Delaware document, and its validity and construction shall be determined and governed by the laws of the State of Delaware. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held illegal, invalid, or unenforceable, or in conflict with the Act or other applicable law, the remainder of this Agreement, or the application of any such provision to persons or circumstances other than those to which it is held illegal, invalid, unenforceable, or in conflict, shall not be affected thereby.

**18.5    Counterparts**. This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

**18.6    Members and Managers Not Agents**. Nothing contained herein shall be construed to constitute any Member or Manager the agent of another Member or Manager, except as

36

# LIMITED LIABILITY COMPANY AGREEMENT
## ALLIANCE PJ, L.L.C.

### Exhibit "C"

Single Purpose Entity Provisions

Notwithstanding anything contained to the contrary contained in the Agreement, until such time as the Loans are repaid in full and all of the obligations of the Partnership and the Mezzanine Borrowers, as applicable, with respect thereto are satisfied: (a) the provisions of this Exhibit "C" shall apply to this Agreement; (b) the Company shall at all times be a Special Purpose Entity (as defined below) and shall comply with all of the requirements set forth within the definition of such term; and (c) in the event of a conflict between the provisions of this Exhibit "C" and any other provisions of this Agreement, the provisions of this Exhibit "C" shall control. Upon the repayment in full of the Loans and the satisfaction of the obligations of the Partnership and the Mezzanine Borrowers, as applicable, with respect thereto, the provisions of this Exhibit "C" shall terminate and be of no further force and effect.

Until such time as the Loans are repaid in full and the obligations of the Partnership and the Mezzanine Borrowers, as applicable, with respect thereto are satisfied, unless the Lenders otherwise agree(s), "Special Purpose Entity" shall mean a limited liability company which at all times on and after the date hereof, shall comply with the following requirements:

1.  is organized solely for the purposes set forth in Section 2.3 of the Agreement;

2.  is not engaged and will not engage in any business unrelated to the purposes set forth in Section 2.3 of the Agreement;

3.  does not have and will not have any assets other than those related to the Equity Interests;

4.  has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of limited liability company interests or amendment of its certificate of formation or limited liability company agreement;

5.  is organized under the laws of the State of Delaware;

6.  Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, Manager, any Officer or any other Person, neither the Member, Manager nor any Officer nor any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Member and all Mangers, to take any Material Action;

7.  will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due provided the entity has sufficient cash flow available to do so and will take all steps a reasonable business of its size and character would take to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

8.  has not failed and will not fail to correct any known material misunderstanding regarding the separate identity of such entity;

9.  has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns, except to the extent that it is required to file consolidated tax returns by law or if otherwise permitted to file a consolidated tax return, its assets and liabilities are clearly and distinctly denoted as separate from those of all other Persons of such consolidated tax return;

10. has maintained and will maintain its own records, books, resolutions and agreements;

11. other than as provided in the cash management agreements in connection with the Loan Documents, (a) has not commingled and will not commingle its funds or assets with those of any other Person and (b) has not participated and will not participate in any cash management system with any other Person;

12. has held and will hold its assets in its own name;

13. has conducted and will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of the Company, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in Subsection 27 below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Company;

14. has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

15. has paid and will pay its own liabilities and expenses, including the salaries of its own employees, if any, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations;

16. has observed and will observe all limited liability company formalities;

17. has and will have no indebtedness except the Mezz Loan;

18. has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

19. has not (except as permitted under this Agreement) and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

20. has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

21. maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name. The stationery, invoices, and checks utilized by the Company or utilized to collect its funds or pay its expenses shall bear its own name and shall not bear the name of any other entity unless such entity is clearly designated as being the Company's agent;

22. except as permitted under the Loan Documents, has not pledged and will not pledge its assets to secure the obligations of any other Person;

23. has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of the Company and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in Subsection 27 below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Borrower;

24. has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

25. has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than as permitted under the Mezzanine Loan Documents);

26. has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

27. has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (A) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (B) in connection with this Agreement;

28. has not and will not have any obligation to, and will not, indemnify its partners, officers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Loans and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Loans is insufficient to pay such obligation;

29. the Company shall consider the interests of its creditors in connection with all company actions;

30. does not and will not have any of its obligations guaranteed by any Affiliate except to Lender as required under this Agreement and the other Loan Documents;

31. has complied and will comply with all of the terms and provisions contained in its organizational documents;

32. Pledge of Membership Interest. Notwithstanding anything appearing in this Agreement to the contrary, the Members shall be permitted to pledge their interest in the Company in accordance with the Pledge and Security Agreements, dated in August of 2005, between such Members, as pledgors, and LB Mezz Lender RTPJ LLC, as Lender and pledgee, as security for the Mezz IV Loans ("Pledge Agreements"), which includes, without limitation, the membership interests of Alliance Holdings PJ II, L.L.C., Alliance Holdings PJWE, L.L.C. and Alliance Holdings PJ, L.L.C. in the Company;

33. Transfer of Interest. Notwithstanding anything appearing in this Agreement to the contrary, subject to the Loan Documents, the Member shall have the right to transfer all or any portion of its interest in connection with a foreclosure of such interest effected pursuant to the Mezzanine Loan Documents including, but not limited to, the Pledge Agreement;

34. Exercise of Rights of Mezzanine Lender. Subject to the Loan Documents and the Intercreditor Agreement between the Lender and the Mezzanine Lenders, notwithstanding anything appearing in this Agreement to the contrary, in the event a Lender exercises its rights under the Mezzanine Loan Documents including, but not limited to, the Pledge Agreement to become a Member of the Company, the Lender shall automatically become a Member of the Company without further authorization, consent or other action from any Member or Lender and without complying with any

requirement relating to the admission of a new Member or assignment or transfer of interests of any Member under this Agreement;

35. Fiduciary Duties of Mezzanine Lender as Partner. In the event a Lender exercises its rights under the Mezzanine Loan Documents including, but not limited to, the Pledge Agreement, to become a Member of the Company, the Lender, in its capacity as a Member of the Company, shall have no fiduciary duty, to the extent permissible under the applicable jurisdiction's law to any remaining Member who hinders Lender from exercising its rights to acquire the interest pursuant to the Mezzanine Loan Documents including, but not limited to, the Pledge Agreement;

36. Distributions in Accordance with Loan Documents. Notwithstanding anything to the contrary contained in this Agreement, no distributions shall be made to any Member except in accordance with the Mortgage Loan Documents and the Mezzanine Loan Documents; and

37. Position of Obligation to Indemnify Managing Member. The Company's obligation, if any, to indemnify any Covered Person shall not constitute a claim against the Company so long as the Loans are outstanding and, if such obligation is permitted as a claim against the Company, it shall be fully subordinated to the Loans.

38. Notwithstanding any other provision of this Agreement, the Bankruptcy of a Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

39. Notwithstanding any other provision of this Agreement, each Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or upon the occurrence of an event that causes the Member to cease to be a member of the Company.

40. The Members hereby acknowledge and consent to the pledges being given to LB Mezz Lender RTPJ LLC pursuant to the Mezz IV Loan Documents.