## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
|   |   |   |
|---|---|---|
| In re: | : | Chapter 11 |
|   | : |   |
| PJ Finance Company, LLC, et al.,[1] | : | Case No. 11-10688 (BLS) |
|   | : |   |
| Debtors. | : | Jointly Administered |
|   | : | **Docket No. 65** |
|   | : | **Hearing Date: June 1, 2011 at 1:30PM (ET)** |

------------------------------------------------------x

### TORCHLIGHT LOAN SERVICES, LLC'S (1) OBJECTION TO APPLICATION, PURSUANT TO SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 2014(a) AND LOCAL BANKRUPTCY RULE 2014-1, FOR AN ORDER AUTHORIZING THE DEBTORS AND DEBTORS IN POSSESSION TO EMPLOY AND RETAIN CBRE CAPITAL ADVISORS, INC. AS FINANCIAL ADVISORS AND INVESTMENT BANKERS *NUNC PRO TUNC* TO THE PETITION DATE AND TO WAIVE THE INFORMATION REQUIREMENTS OF LOCAL BANKRUPTCY RULE 2016-2(d) AND (2) MOTION FOR ENTRY OF AN ORDER EXCLUDING TESTIMONY OF ANY REPRESENTATIVE OF CBRE CAPITAL ADVISORS, INC.

Torchlight Loan Services, LLC, f/k/a ING Clarion Capital Loan Services, LLC, successor

by appointment to ING Clarion Partners, LLC ("Torchlight"), as Special Servicer for U.S. Bank

National Association, as successor trustee for the registered holders of Credit Suisse First Boston

Mortgage Securities Corp., Commercial Pass-Through Certificates, Series 2007-C2, hereby (i)

objects (this "Objection") to the application of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") for authority, pursuant to sections 327(a) and 328(a) of

chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 through 1532 (the "Bankruptcy

Code"), rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

---

[1] The Debtors are the following seven entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): PJ Finance Company, LLC (8895), PJ Holding Company Manager, LLC (8895), PJ Holding Company, LLC (8895), Alliance PJRT GP, Inc. (1787), Alliance PJWE GP L.L.C. (8133), Alliance PJRT Limited Partnership (1789) and Alliance PJWE Limited Partnership (8198). The mailing address of each of the Debtors, solely for purposes of notices and communications, is 1200 North Ashland Avenue, Suite 600, Chicago, Illinois 60602.

and rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to employ and retain CBRE Capital Advisors, Inc. ("CBRE") as financial advisors and investment bankers *nunc pro tunc* to the Petition Date (as defined below), pursuant to that certain letter of engagement dated March 3, 2011 (the "Engagement Letter"), and to waive the information requirements of Local Rule 2014-2(d) [Docket No. 65] (the "CBRE Application"),[2] and (ii) moves (this "Motion") for entry of an order excluding the expert testimony of any representative of CBRE at, or in connection with, the hearing to consider the (a) *Motion of the Debtors and Debtors in Possession for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 6004 Authorizing the Debtors' Entry Into a Financing Arrangement and Performance Thereunder in Connection with Their Plan of Reorganization* [Docket No. 8] (the "Financing Motion"), and/or (b) *Motion of the Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Authorizing the Use of Lenders' Cash Collateral, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [Docket No. 5] (the "Cash Collateral Motion" and, together with the Financing Motion, the "Motions"). In support of this Objection and Motion, Torchlight respectfully represents as follows:

## I. Preliminary Statement

1.　　　The Debtors allege that, over the past four and a half years, more than $350 million worth of the Debtors' assets have disappeared. In response to this alleged depreciation, the Debtors commenced these chapter 11 proceedings, in what looks like a blatant attempt to entrench themselves and their chosen property manager, WestCorp Management Group One,

---

[2] All terms not otherwise defined herein shall have the meaning ascribed such terms in the CBRE Application.

RLF1 4037436v. 3
DAL:801710.1

Inc. ("WestCorp"), at the expense of the Debtors' creditors. The CBRE Application appears to be the next step in this entrenchment strategy.

2. Through the discovery process, Torchlight has become aware of information that casts serious doubt about the propriety of CBRE's retention by the Debtors. This information clearly shows that CBRE has actual conflicts of interest that render CBRE unable to perform the services for which the Debtors' seek to retain them. Moreover, these conflicts of interest make it impossible for CBRE to provide reliable testimony in these cases. In addition, the terms on which the Debtors propose to retain CBRE are vastly out of line from the standard terms relating to similar engagements in this district and are completely unreasonable in these cases.

3. It is clear that CBRE is hopelessly conflicted in this case. Before the Debtors commenced this bankruptcy case, Equibase Capital Group, LLC ("Equibase"), holder of a controlling interest in the Debtors' equity, engaged CBRE to provide substantially the same, if not identical, services to Equibase that the Debtors are now asking this Court to approve with respect to the Debtors.[3] Communications between CBRE and Equibase confirm that CBRE had (and continues to have) interests adverse to the Debtors' estates and that Equibase has continued to direct CBRE's actions even after the Debtors and CBRE entered into the Engagement Letter.

4. Finally, it is evident that CBRE's capacity to provide independent and unbiased professional advice and assistance to the Debtors and their estates has been fundamentally compromised by CBRE's pre-existing business relationship with Equibase and CBRE's lingering loyalty to Equibase. Indeed, prior to being retained by Debtors, CBRE and Equibase heavily

---

[3] In fact, Carlin testified that CBRE received no compensation from Equibase for the prior retention, and CBRE expects to receive all of its compensation for the work done since the first retention through the Engagement Letter. *See* Transcript of the Carlin Deposition May 13, 2011, 150:3-6.

RLF1 4037436v. 3

DAL:801710.1

negotiated CBRE's potential compensation from Debtors' proposed financing arrangement with Gaia. As CBRE had no role with regard to the Gaia transaction, Equibase argued that CBRE should not receive any compensation from that transaction. While CBRE acknowledges that it was not responsible for or involved with the Gaia transaction, CBRE also wanted to get paid from that insider-proposed transaction and therefore assured Equibase that Equibase would be better served by agreeing to CBRE's demand for compensation from the Gaia-transaction:

> **My second point is that we think you should really want us incented to get a deal done with GAIA (from dollar one) as opposed to being outside of those negotiations and, potentially, pushing for an alternate investor. We prefer the dynamic of working with you/for you and not potentially against you.**

2/9/11 Email from G. Carlin (CBRE) to M. Husman (Equibase) (PJ Supplemental 661-666 (copy attached as Exhibit E)). Accordingly, CBRE and Equibase, at the least, have fatally undermined CBRE and its ability to provide disinterested services to the Debtors and their estates. Moreover, the facts of the parties' business relationship and discussions fully-support Torchlight's grave concern that CBRE is purposefully skewing its services to achieve a specific purpose - - consummating the Gaia transaction - - a result that serves to benefit Equibase to the detriment of the rest of the Debtors' stakeholders.

5. In addition, the terms on which the Debtors seek to retain and employ CBRE are nonstandard for services of this kind and unreasonable in the context of these cases. In particular, the Engagement Letter provides for CBRE to receive substantial compensation even in circumstances where CBRE has provided no benefit to the estates. Even if retention of CBRE by the Debtors were appropriate here - - which it is not - - the Engagement Letter could not be approved.

6. Finally, the CBRE Application requests that CBRE's fees and expenses be approved under section 328(a), rather than section 330, of the Bankruptcy Code. Torchlight

4

submits that award of compensation to CBRE, if any, in these Chapter 11 cases should be subject to review for reasonableness under section 330. Blanket pre-approval of the various fees and expenses requested by CBRE and the Debtors - - as with all other professional fees - - should be tested for reasonableness in hindsight. Approval under section 328(a) would leave this Court and other parties-in-interest with almost no ability to later review all of CBRE's fees and expenses for reasonableness and is inappropriate under the circumstances.

7.      Torchlight does not seek to deny the Debtors the benefit of a financial advisor's services. Any financial advisor, however, must be disinterested and must be engaged on reasonable terms. Accordingly, the CBRE Application must be denied. Similarly, while Torchlight does not seek to deny the Debtors the benefit of having an expert testify in these cases, for the same reasons that CBRE may not serve as a financial advisor to the Debtors, CBRE may not testify as an expert on the Debtors' behalf. Accordingly, Torchlight requests that this Court enter an order excluding the testimony of any representative of CBRE in support of the Motions.

## II. Background

8.      On November 9, 2006, the Debtors entered into a $475 million Prepetition Loan Agreement with Column Financial Inc. (the "Originating Lender").[4] The Originating Lender then sold the loans thereunder to Credit Suisse First Boston Mortgage Securities Corp. ("Credit Suisse"), which then securitized the loan by issuance of commercial mortgage-backed securities pursuant to that certain Pooling and Servicing Agreement, dated May 1, 2007 (the

---

[4] Alliance PJRT Limited Partnership and Alliance PJWE Limited Partnerships have borrowed $475 million (plus accrued and unpaid interest, legal fees, and other fees and charges, the "Indebtedness") pursuant to that certain Amended and Restated Loan Agreement, dated November 9, 2006, which is secured by 32 apartment complexes comprised of 9,501 units in Arizona, Florida, Georgia, Tennessee, and Texas (the "Properties"). The Properties are currently managed by WestCorp through that certain Sub-Management Agreement, dated July 1, 2008. Torchlight acts as the special servicer with respect to this Indebtedness.

RLF1 4037436v. 3
DAL:801710.1

"Pooling and Servicing Agreement") with U.S. Bank National Association, as the successor trustee. Pursuant to the Pooling and Servicing Agreement, Wells Fargo Bank, N.A. acts as the master servicer and Torchlight acts as the special servicer.

9.      On June 22, 2010, Equibase and CBRE executed an engagement letter, pursuant to which CBRE would "act as financial advisor in connection with sourcing new capital for and/or restructuring the Debtors' outstanding $475 million first mortgage loan."[5] Immediately prior to the Petition Date, Equibase "terminated" CBRE's engagement.[6] On March 7, 2011 (the "Petition Date"), the Debtors filed for relief under Chapter 11 of the Bankruptcy Code. Later on the Petition Date, the Debtors filed the Financing Motion and the Cash Collateral Motion seeking, among other things, this Court's approval of (i) a stalking horse agreement, whereby certain non-Debtor affiliates would provide a new money investment for allegedly necessary repairs on the Properties, and (ii) the Debtor's use of cash collateral subject to Torchlight's priority lien. On March 22, 2011, the Debtors filed the CBRE Application. The Debtors have indicated that they intend to call Glenn Carlin ("Carlin"), Senior Managing Director and Co-Head of CBRE's Investment Banking Group for the Americas, as an expert at the hearing on the Financing Motion and the Cash Collateral Motion.

10.      On March 31, 2011, Torchlight served ten (10) targeted, narrowly tailored document requests on the Debtors seeking, among other things, communications relating to CBRE's prepetition engagement. *See* Exhibit C attached hereto. On May 12, 2011, Torchlight

---

[5] *See* Declaration of Glenn A. Carlin in Support of the Application of Debtors and Debtors in Possession, Pursuant to Sections 372(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1, For an Order Authorizing Them to Employ and Retain CBRE Capital Advisors, Inc. as Financial Advisors and Investment Bankers Nunc Pro Tunc to the Petition Date and to Waive the Informational Requirements of Local Bankruptcy Rule 2016-2(d) (the "Carlin Declaration"), ¶ 8, Exhibit [A] attached hereto; Transcript of the Carlin Deposition at 16:12-15; 20:17-25; 21:1-15; 31:19-25; 74-78; 120-121; 155 Exhibit [B] attached hereto.

[6] *See* Transcript of Carlin Deposition at 77:7-11 (stating that the Equibase engagement terminated "[a]bout the same time that the PJ Finance letter was executed. Within days. I'm sure."); *see also* CBRE Application.

RLF1 4037436v. 3

DAL:801710.1

deposed Carlin. The Debtors responded to Torchlight's discovery requests by producing thousands of communications and documents from before and after the Petition Date. Only two of CBRE's documents, however, were provided and no e-mails were produced from CBRE's custodians.[7] The Debtors have also not provided a privilege log (to the extent that any documents have been withheld on the basis of privilege).

## III. Argument

A.  **The CBRE Application Should Be Denied Because (i) CBRE is Not a Disinterested Person as Required Under Section 327(a) and (ii) the Terms of CBRE's Retention Are Unreasonable.**

   *1.     CBRE is Not a Disinterested Person as Required under Section 327(a)*

11.     Section 327(a) of the Bankruptcy Code prohibits the retention of professionals that hold or represent an interest adverse to the estate or are not "disinterested," as defined under the Bankruptcy Code. *See* 11 U.S.C. § 327(a). A person is not "disinterested" for purposes of the Bankruptcy Code unless that person "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14). A professional can be disqualified under section 327(a) based on potential, as well as actual, conflicts of interest. *See In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir. 1998). Further, this Court has held that a financial advisor had a "direct and actual" conflict of interest barring it from being retained by the debtor when it had briefly represented a debtor's primary equity holder two years prior to the debtor's petition date. *See In re Zenith Elec. Corp.*, 241 B.R. 92, 101 (Bankr. D. Del. 1999).

---

[7] The Debtors failed to produce any such e-mails notwithstanding that Carlin testified such e-mails were collected and sent to Debtors' counsel for their review. *See* Transcript of Carlin Deposition at 15:12 - 21:14.

RLF1 4037436v. 3
DAL:801710.1

12.     CBRE, by its own admission, has an actual conflict of interest with the Debtors. In the Carlin Declaration, CBRE disclosed that, less than a year prior to the Petition Date, Equibase engaged CBRE "to act as financial advisor in connection with sourcing new capital for and/or restructuring the Debtors' outstanding $475 million first mortgage loan."[8] CBRE worked for Equibase pursuant to this engagement for 7-10 months immediately prior to the Petition Date.[9] Indeed, Equibase only terminated CBRE a few days prior of the commencement of these cases.[10] It appears, however, that, although Equibase technically terminated CBRE's engagement, CBRE has continued to work for Equibase's benefit throughout these cases, as the services contemplated in the Debtors' engagement of CBRE are effectively identical to those CBRE performed under the Equibase engagement letter. In fact, CBRE has made it clear that it does not view the work it did for Equibase to be any different from the work it plans to do for the Debtors.[11] Indeed, the same people with the same goals are conducting the same work.[12]

13.     Although the Debtors seek to retain CBRE to purportedly work to maximize the value of the Debtors' estates on behalf of the Debtors' creditors, it appears more likely that CBRE has an ulterior motive in being retained. CBRE has yet to be compensated for the work it performed for Equibase prior to the Petition Date.[13] The CBRE Application appears to be nothing more than an attempt by CBRE to use Section 327 of the Bankruptcy Code to finally be

---

[8] Carlin Declaration, Exhibit [A], at ¶ 8

[9] *See* Transcript of the Carlin Deposition at 18:12-17.

[10] *See* Transcript of the Carlin Deposition at 75:18-21.

[11] *See* Transcript of Carlin Deposition at 155:14-23 ("We don't really view that the work that we were doing for Equibase, prepetition, versus the work that we're doing for PJ Finance, post-petition."). Carlin stated that "To us, there's not a demarcation in the work." *Id.* at 155:17-18. Further, he hoped that the work this Court approves for the Debtors is the "same" as CBRE previously had been doing for Equibase. *See id.* at 155:21-23 ("But, the essence of what we're hired to do, or hope to be approved to be hired to do, is the same.").

[12] *See id.* at 8:18-20 (stating the CBRE team has not changed).

[13] *See* Transcript of Carlin Deposition at 34:14-18 (confirming CBRE has not been paid for any services to date).

RLF1 4037436v. 3

DAL:801710.1

compensated for its pre-petition services to Equibase. In light of all these facts, CBRE is not a disinterested person as required under the Bankruptcy Code and this Court should deny the CBRE Application accordingly.

   2.   *The Terms of CBRE's Retention are Unreasonable*

14.    Under section 328(a), the applicant bears the burden of proving that the terms and conditions of employment, and in particular the fees, are both standard *and* reasonable. *See United Artists Theater Co. v. Walton*, 315 F.3d 229 (3d Cir. 2003).

15.    The proposed terms and conditions of CBRE's compensation are neither standard nor reasonable in the context of these cases. The proposed Fee Structure set forth in the Engagement Letter (and detailed in the CBRE Application) is plagued with a number of unworkable provisions, nearly all of which must be paid regardless of whether any material benefit is provided to the Debtors' estates. For example, the proposed fee structure calls for a Sale Transaction Fee to be paid upon consummation of a Sale Transaction. The Debtors, however, have openly refused to pursue a Sale Transaction here.[14]

16.    The proposed Fee Structure also calls for significant fees to be paid in the event that CBRE raises new Debt Financing; however, the Engagement Letter does not require that any new Debt Financing take out the Debtors' existing secured lenders in full. Instead, under the proposed compensation structure, CBRE would be entitled to a Debt Financing Fee for any new Debt Financing raised. Any Debt Financing that does not pay the secured lenders in full would not provide sufficient value to the Debtors' estates to justify payment to CBRE of any fee (let alone the fee included in the Engagement Letter).

---

[14] If the Debtors were to pursue a Sale Transaction, one of the most probable outcomes of that process would be a credit bid by Torchlight. In such an event, the Sale Transaction Fee would still payable to CBRE, notwithstanding that CBRE would have provided no material benefit to the estate or the sale process.

RLF1 4037436v. 3
DAL:801710.1

17.     The Debtors cannot satisfy their burden and demonstrate that the Fee Structure is reasonable and, therefore, Torchlight requests that the Court deny the Debtors' request to approve the Fee Structure.

**B.      If the Debtors Are Permitted to Retain CBRE, CBRE's Retention Should Be Subject to Review Under Section 330 of the Bankruptcy Code.**

18.     The Debtors seeks to retain CBRE subject to the standards of Section 328(a), rather than Section 330, of the Bankruptcy Code.  Section 328(a) of the Bankruptcy Code provides, in relevant part, that:

> The trustee, or a committee ... with the court's approval, may employ or authorize the employment of a professional person under section 327 ... of this title ... on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

19.     If CBRE's fees and expenses are approved under section 328(a) of the Bankruptcy Code, the Court's ability to subsequently review those fees and expenses would be extraordinarily limited, regardless of whether such compensation is ultimately revealed to be entirely inappropriate. *See Comm. of Equity Sec. Holders of Federal-Mogul Corp. v. Official Comm. of Unsecured Creditors (In re Fed. Mogul-Global, Inc.)*, 348 F.3d 390, 397 (3d. Cir. 2003) (in order to review previously approved fees, subsequent developments must have been incapable of being foreseen); *Lazard Freres & Co. LLC v. NorthWestern Corp. (In re NorthWestern Corp.)*, 344 B.R. 40, 43 (D. Del. 2006) (same); *In re Argose, Inc.*, 372 B.R. 705,710 (Bankr. D. Del 2007); *See also Daniels v. Barron (In re Barron)*, 325 F.3d 690, 693 (5th

10

Cir. 2003) (legal standard under section 328(a) is "whether developments, which made the approved fee plan improvident, had been incapable of anticipation at the time the award was approved").

20.     Because of the hotly contested and unpredictable nature of these cases, approving CBRE's fees and expenses pursuant to section 328(a) is not appropriate. At this stage, these cases could proceed along any number of divergent routes, including a protracted and costly valuation fight. As a result, approving CBRE's fees and expenses under section 328(a), which, as noted above, effectively precludes future review of fees and expenses, would be unreasonable and could result in a waste of estate resources (in the event that circumstances unfold showing that a grant of CBRE's fees as set forth in the CBRE Application was improvident). Instead, CBRE's fees and expenses should be subject to review under the reasonableness standard set forth in section 330(a) of the Bankruptcy Code. Hindsight review under section 330(a) would ensure that any fees and expenses awarded to CBRE would be awarded in the context of what actually occurs in these cases. Accordingly, if this Court approves CBRE's retention, notwithstanding the conflicts of interest noted above, the fees and expenses awarded to CBRE should be subject to Section 330 review (as are the fees and expenses of all of the other estate professionals in these cases).

C.     **CBRE's Testimony in Support of the Motions Should be Excluded Because (i) CBRE is Not a Disinterested Person, (ii) CBRE's Testimony is Not Reliable and (iii) the Debtors' Actions Have Prejudiced Torchlight.**

    *1.     CBRE's Testimony Should Be Excluded Because CBRE Is Not a Disinterested Party*

21.     In addition to denying the CBRE Application, this Court should prohibit CBRE from testifying in these cases with respect to the Motions. *See In re Zenith*, 241 B.R. at 102.

RLF1 4037436v. 3
DAL:801710.1

CBRE cannot testify as an expert on behalf of the Debtors because any testimony it gives would be inescapably "tainted" by CBRE's relationship with Equibase.

22.     The circumstances surrounding CBRE's involvement in the Gaia transaction are troublesome.  CBRE's Initial Investor Short-List Tracking (the "Contact Sheet") outlines comments received from potential third party investors.  *See* Exhibit D attached hereto.  A number of potential third party investors commented that they would be interested in pursuing a deal with the Debtors if the Debtors acquired new management and the investors had the ability to negotiate with the special servicer.  *See id.*  Here, CBRE has committed itself to a process that ignores actual market feedback and unfairly favors Equibase's insider-proposed deal with Gaia.

23.     CBRE's motivations in throwing its support behind Equibase and the Gaia transaction are clear.  Simply put, CBRE understood that in order to get paid, it had to support the Gaia transaction.[15]  As such, CBRE chose to negotiate with the Debtors to get paid for the Gaia transaction in exchange for its support,[16] rather than advocating for or pursuing a truly competitive bidding process with third party investors.[17]  CBRE's decision not to pursue traditional avenues for seeking value for the Debtors, for the sole benefit of the Debtors' primary equity holder, renders any testimony or evidence provided by CBRE in these cases highly suspect.

24.     CBRE's actions did not change after the petition date. CBRE has continued to pursue the Gaia transaction, at Equibase's direction, to the exclusion of other, potentially more

---

[15] *See* Transcript of Carlin Deposition at 119:15-25 ("I do not get paid, you know, is that a normal situation . . . I mean human behavior could get in the way.").

[16] *See* Transcript of Carlin Deposition, at 117:6-9 ("He was creating a scenario in which we would have wanted anybody other than Gaia to win the process.").

[17] *See* Exhibit E ("We understand your feelings that this is someone you have identified (and are somewhat related to), however, neither of us know that we couldn't have arranged identical terms from a third party investor.")

RLF1 4037436v. 3

DAL:801710.1

valuable transactions with other third parties. In a March 15, 2011 email discussing changes to the term sheet, Danny Fishman at Gaia tells Michael Husman at Equibase ("Husman") and Ken Woolley that Gaia "just had lunch with CBRE guys and we understood its now in this process time to ask the changes after it will be too late." *See* Exhibit F attached hereto. Further, Equibase continues to direct CBRE to take certain actions for its sole benefit. For example, in a March 17, 2011 email, Husman tells Carlin that Equibase and Woolley would like CBRE "to start running an analysis to see what the maximum amount of debt proceeds we could generate if we wanted to offer the lender to take them out completely now." *See* Exhibit G attached hereto.

25.      Finally, CBRE's valuation and the basis of its testimony is intended to produce a specific result--to accomplish the goals of the equity holders. CBRE stated that the purpose of the projections for valuation of the properties was "for reducing value for the cram down." *See* Exhibit H attached hereto. CBRE, by its own admission, pursued the stated goal of reducing value for the purpose of a "cramdown" plan when conducting its valuation.

26.      In light of these facts, Torchlight submits that there exists the specter of undue influence from Equibase. Equibase's interest in the Gaia transaction and CBRE's prior relationship with Equibase combine to pressure CBRE to continue to support the Gaia transaction. If this Court allows CBRE to testify in support of the Motions, Torchlight is concerned that this Court and Torchlight will receive an opinion that is potentially altered by outside influences. Thus, Torchlight requests that this Court should exclude CBRE's testimony.

     2.    *CBRE's Testimony is Not Reliable as Required Under Section 702 of the Federal Rules of Evidence.*

27.      Even if this Court finds that CBRE is not precluded from being an estate representative, this Court should exclude CRBE's expert testimony because it is not reliable as

required by the Federal Rules of Evidence. See Fed. R. Evid. 702. Three criteria must be met before a court can admit expert testimony: qualification, reliability and fit. *Schnieder v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). Pursuant to Rule 702 of the Federal Rules of Evidence, testimony is reliable if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable principals and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. *Daubert* has charged the court with the duty to "ensure that the courtroom door remains closed to junk science." *Amorgianos v. Nat'l Railroad Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Accordingly, the bankruptcy court is the gatekeeper and has the duty to "undertake a rigorous examination *of the facts on which the expert relies*, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* (emphasis added); *see also In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 377-78 (Bankr. D. Del. 2006).

28.    An expert opinion does not assist the bankruptcy court if the valuations are flawed, the facts are altered or the assumptions are invalid. *See In re Nellson Nutraceutical, Inc.*, 356 B.R. at 367 ("Where an expert relies on altered facts, speculation, and volatile projections or fails to consider relevant facts in reaching a conclusion the expert's opinion can offer no assistance to the trier of fact and is excluded as irrelevant."); *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, (Bankr. D. Del. 2002) (holding that the expert report by a reputable accounting firm was not sufficient to rebut a presumption of insolvency because the valuations were flawed and there was serious doubt as to the validity of assumptions); *See e.g. In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Texas 2005) (finding that a business plan was acceptable when it was "prepared in a reasonable manner, using

supportable assumptions and logically consistent computations"). In addition, a court will reject an expert's evidence when the assumptions made are "abusive" of the known facts. *See In re Aircrash Disaster at New Orleans, Louisiana*, 795 F.2d 1230, 1235 (5th Cir. 1986) (reversing a jury verdict where it found "the assumptions of the plaintiffs' economist so abusive of the known facts, and so removed from any area of demonstrated expertise, as to provide no reasonable basis [for the damages calculation]"); *In re Carmania Corp.*, 156 B.R. 119, 121 (Bankr. S.D.N.Y. 1993) (rejecting an experts testimony because the assumptions were so "implausible on [their] face that a reasonable fact finder would not credit them."). Further, a court must be cautious to take into account the possibility of any biases in valuation when relying on experts retained by parties. *See e.g. In re Mirant Corp.*, 795 F.2d at 814-15 (recognizing that retainer needs may influence experts in valuation); *In re Coram Healthcare Corp.*, 315 B.R. 321, 339 (Bankr. D. Del. 2004) ("[W]e recognize each side's incentives to . . . over-value or undervalue the Debtors.").

29.     CBRE's valuation will not assist this Court in determining the value of the Debtors because there are indications of invalid assumptions that produced flawed valuations. As previously discussed, CBRE has stated that the valuation is intended to produce a specific result - - *to reduce the value of the Debtors* in order to drive down the value of Torchlight's loan. *See* Exhibit H attached hereto. CBRE's goal in arriving at a valuation is to support Equibase's position. It is logical to assume that in order to reach this intended result, CBRE altered and changed its "as is" projections. Discussions between the Debtors and Westcorp clearly show that CBRE's valuation had a specific goal in mind. In a March 23, 2011 email chain, the Debtors and Westcorp discuss CBRE's "as is projection." *See* Exhibit I attached hereto. In the discussion, Westcorp states that it can adjust the occupancy numbers a little, but Westcorp thinks its

15

numbers are correct. *See id.* The Debtors respond and, in referring to CBRE's calculation of the projections, state that "I think you may be right, but I think they are thinking they want to tell a different story with this sheet." *Id.* CBRE's valuation and testimony is intended to tell a "story" based on carefully manipulated assumptions and projections. In light of these facts, the basis of CBRE's testimony is unreliable and this Court should exclude the testimony.

        3.     *The Debtors' Actions Have Prejudiced Torchlight*

    30.     Further, the Debtors' actions are egregious and prejudicial to Torchlight. Indeed, the Debtors' actions have prejudiced Torchlight so severely that the only remedy that can appropriately correct that prejudice is exclusion of CBRE's testimony.

    31.     On the basis of privilege, the Debtors have withheld any documents regarding CBRE's valuation, including valuations prepared prepetition for Equibase (the "Valuation Documents"). The Debtors reasoning for withholding the Valuation Documents is that CBRE's valuation is unfinished or incomplete. If CBRE's valuation is incomplete, then it is premature for the Debtors to be relying on the information in support of the Motions.

    32.     The Valuation Documents are not privileged. The work product doctrine protects materials prepared by an attorney for a client in anticipation of litigation, absent a showing of necessity or other justification for disclosure by the party seeking the documents. *See* Fed. R. Civ. P. 26(b)(3). *See also Joy Global, Inc. v. Wisconsin Dep't of Workforce Dev. (In re Joy Global, Inc.)*, 2008 U.S. Dist. LEXIS 46495, *12 (D. Del. June 16, 2008). Here, the documentation supporting valuation was not prepared by an attorney in anticipation of litigation.

    33.     In assessing whether to afford protection under the attorney work product doctrine, Delaware courts apply the "because of" test and "attempt to determine whether the document would have been produced but for the anticipated litigation." *See Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 959 A.2d 47, 52 (Del. Ch. 2008). Under this test, the

appropriate question for a reviewing court is, "[u]nder the totality of the circumstances, why was the document prepared?" *See Pfizer v. Advanced Monobloc Corp.*, 1999 WL 743868, at *5 (Del. Super. Sept. 20, 1999); *see also Rohm & Haas Co. v. Dow Chem. Co.*, 2009 WL 537195, at *2 (Del. Ch. Feb. 26, 2009) (stating that the "key question the Court must ask when evaluating a claim of work product protection is whether the material at issue was 'prepared in anticipation of litigation or for trial.'"). As with the attorney-client privilege, communications must be of a legal rather than business nature in order to merit work product protection. *See Hexion Specialty Chems.*, 959 A.2d at 52 (distinguishing between advice that relates to business issues rather than the conduct or defense of litigation). Although the fact that a document may serve a business function does not necessarily preclude the application of the work product protection, it still must have been prepared because of anticipated litigation in order to warrant such protection. *See Rohm & Haas*, 2009 WL 537195, at *2.

34.     Courts will not afford work product protection to materials prepared by financial advisors if they did not relate to pending or anticipated litigation. *See Hexion Specialty Chems.*, 959 A.2d at 52. For example, in *Hexion*, the client employed its financial advisor, Merrill Lynch, in two capacities: first, as a financial advisor to assist with a merger; and later, as a litigation consultant to assist with litigation that subsequently arose from the merger. *See id.* at 49. In a privilege dispute that arose in connection with the litigation, the Delaware Court of Chancery found that documents prepared by Merrill Lynch in its capacity as financial advisor were not entitled to protection under either the work product doctrine or attorney-client privilege. *See id.* at 52-53. Merrill Lynch had prepared the communications for purely business reasons and not for purposes of the litigation, which at the time of their preparation had yet to arise. *See id.* Accordingly, there was no basis for withholding such documents from production.

RLF1 4037436v. 3
DAL:801710.1

35.     Here, the Debtors cannot establish any basis for an assertion of attorney work product privilege because (i) the Valuation Documents were not prepared by an attorney or someone working under the direction of an attorney, and (ii) the subject matter of the Valuation Documents is entirely business-oriented and non-legal in nature. The Valuation Documents were produced by representatives or non-legal advisors of Equibase, not the Debtors, far in advance of, and without contemplation of, the Debtors' bankruptcy filing. Additionally, and as stated above, the Valuation Documents relate exclusively to business matters. The mere fact that the Valuation Documents have now become relevant in the instant dispute does not render them legal in nature, as the proper inquiry under the work product doctrine is, "why was the document *prepared?*" *See Pfizer*, 1999 WL 743868, at *5 (emphasis added). The Valuation Documents were prepared solely for business purposes.

36.     Moreover, as the Debtors have affirmatively and offensively used CBRE's valuation in support of the Motions, they cannot hide behind the attorney-client privilege. *See, e.g., Tracinda Corp. v. DaimlerChrysler AG*, 362 F.Supp.2d 487, 513 (D. Del. 2005) ("The attorney client privilege should not be used as both a sword and a shield. . . . a party should not be permitted to use the privilege to shield information which it has deliberately chosen to use offensively."); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 301 (Del. Ch. 2000) (discovery is appropriate from party who relies upon advice of counsel or other professionals in connection with substantive response to relief at issue).

37.     Further, even if the prepetition documents are privileged, that privilege was destroyed when CBRE's work was shared with the Debtors for use in this Bankruptcy Case. *See Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'n Corp.)*, 493 F.3d 345, 361 (3d Cir. 2007) ("[I]f a client subsequently shares a privileged communication with a third party, then it is

RLF1 4037436v. 3
DAL:801710.1

no longer confidential and privileged."). Thus, the Valuation Documents prepared prepetition are not privileged and should be produced.

38.     The Debtors withholding of the Valuation Documents has deprived Torchlight from any meaningful ability to evaluate CBRE's testimony. Given the Debtors' actions, allowing them to now use and rely on the Valuation Documents would substantially and unfairly prejudice Torchlight. Under these circumstances and, given the egregious nature of the Debtors' actions, excluding the CBRE testimony is the only remedy that can cure the prejudice to Torchlight.

RLF1 4037436v. 3
DAL:801710.1

## IV. Conclusion

WHEREFORE, Torchlight respectfully requests that the Court (i) deny the CBRE Application (ii) enter an order, substantially in the form attached hereto as Exhibit J precluding any representative of CBRE from testifying as an expert witness at the hearing on the Motions and (iii) grant such other and further relief as is just.

Dated: May 24, 2011
    Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

_____

Paul N. Heath (No. 3704)
Marcos A. Ramos (No. 4450)
Chun I. Jang (No. 4790)
Robert C. Maddox (No. 5356)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
heath@rlf.com
jang@rlf.com
mcroberts@rlf.com

- and -

ANDREWS KURTH LLP
Monica S. Blacker
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401

COUNSEL FOR TORCHLIGHT LOAN SERVICES LLC