# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>**PJ Financing Company, LLC,** *et al*.<br>                 Debtors. | Chapter 11<br><br>Case No. 11-10688 (BLS)<br><br>(Jointly Administered)<br><br>Related to Dkt. Nos. 1121, 1153 & 1175 |

| | |
|---|---|
| COUSINS CHIPMAN & BROWN, LLP<br>Scott D. Cousins<br>Ann M. Kashishian<br>1007 North Orange Street<br>Suite 1110<br>Wilmington, Delaware 19801<br><br>Counsel for the Reorganized Debtor | ASHBY & GEDDES, P.A.<br>Gregory A. Taylor<br>500 Delaware Avenue<br>8th Floor<br>Wilmington, Delaware 19801<br>        -and-<br>JONES DAY<br>Pedro A. Jimenez<br>Laird E. Nelson<br>222 E. 41st Street<br>New York, NY 10017<br><br>Counsel for CBRE Capital Advisors, Inc. |

## OPINION[1]

Before the Court is the Final Fee Application of CBRE Capital Advisors, Inc. ("CBRE"), [2] as financial advisor and investment banker to PJ Financing Company, LLC (the "Reorganized Debtor" and, for

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] Dkt. No. 1121.

events prior to confirmation of the Plan, the "Debtor"). The Reorganized Debtor has filed a Limited Objection to CBRE's Final Fee Application (the "Limited Objection")[3] contending that CBRE miscalculated its fees. First, the Reorganized Debtor argues that CBRE uses an incorrect amount of debt "re-tranched" in calculating the Restructuring Fee.[4] Next, it contends that CBRE miscalculated and overstated its New Equity Fee. Finally, the Reorganized Debtor challenges CBRE's requested expense reimbursement as unreasonable. CBRE responds that the fees requested are not miscalculated and that its expenses are justified. For the reasons that follow, the Court will overrule the objection and approve CBRE's fees and expenses in the amounts requested.

## I. BACKGROUND

The Debtor filed a voluntary bankruptcy petition on March 7, 2011 in order to develop and implement a financial restructuring. To that end, it moved to retain CBRE by application dated March 22, 2011.[5] The Debtor attached, as an exhibit to the retention application, the letter agreement with CBRE (the "Engagement Letter").[6] The United States Trustee objected[7] to the proposed retention of CBRE as did Torchlight Loan Services, LLC, which is the special servicer for the Debtor's secured lenders ("Torchlight").[8] Hard-fought negotiations to resolve both objections led to substantial modifications to the terms of the Engagement Letter. By CBRE's estimation, these modifications operated to reduce its fees by $497,147.80.[9] The first material modification reduced CBRE's monthly fees from $125,000 to $100,000 and CBRE agreed to forfeit its monthly fee for July 2011. Second, the Engagement Letter's language was modified to reflect that CBRE be retained to act solely as a financial advisor to the Debtor. Third, CBRE waived any

---

[3] Dkt. No. 1153.

[4] Capitalized terms not defined herein are defined in the Engagement Letter. *See* Dkt. No. 65 Ex. C.

[5] Dkt. No. 65.

[6] Dkt. No. 65 Ex. C.

[7] Dkt. No. 86.

[8] Dkt. No. 213.

[9] *See* CBRE's Reply Br. ¶ 3 [Dkt. No. 1175].

right to receive a Sale Transaction Fee if Torchlight obtained ownership of the Reorganized Debtor's property through a credit bid at the sale. On August 16, 2011, the Court authorized the Debtor to retain CBRE on the foregoing revised terms (the "Retention Order"), subject to review of CBRE's Final Fee Application under § 330 of the Bankruptcy Code.[10]

The Debtor filed a plan of reorganization on September 19, 2011,[11] but that plan fell apart after disagreement arose between the creditors and the Debtor.  With the help of a mediation process successfully conducted by the Honorable Raymond T. Lyons, Jr.,[12] the parties agreed to extended deadlines and procedures relating to an auction process.[13]  After a lengthy and robust auction, the Debtor filed the First Amended Joint Plan of Reorganization of the Debtors and the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code (the "Plan") on January 25, 2012.[14]  The Plan identified "PJ Finance Company Manager, LLC and WestCorp PJ Portfolio, LLC, or their designees, as funded by Gaia Real Estate Investments LLC" as the Plan Sponsors.  The Court confirmed the Plan by Order dated May 8, 2012.[15]  The financial restructuring effected through the Plan provided full recovery to all unsecured creditors.

On June 25, 2012, CBRE timely filed its Eleventh Monthly and Final Fee Applications requesting a final allowance of fees and expenses in the amount of $1,886,190 in fees and $138,541.45 in expenses. The requested fees include $1,316,129 of monthly advisory fees, and a transaction fee of $570,060 after applying the monthly fee credit.[16]  The Reorganized Debtor objected to the Fee Application, contending that CBRE has improperly calculated the transaction fee and that, after applying appropriate offsets and contractual reductions, no transaction

---

[10] Dkt. No. 379.

[11] Dkt. No. 447.

[12] The Court expresses its appreciation to Judge Lyons for his valuable assistance in these proceedings.

[13] *See* Dkt. No. 549.

[14] Dkt. No. 735.

[15] Dkt. No. 1029.

[16] For CBRE's transaction fee calculation, *see infra* Part III.A., B.

fee is due. It also objects to the amount of expenses, particularly CBRE's legal fees, as not being actual and necessary expenses pursuant to § 330(a)(1)(B).

On September 27, 2012, the Court conducted a hearing and heard the testimony of Glenn Carlin, a Senior Manager Director of CBRE.[17] The Court held a subsequent telephonic hearing for closing arguments on October 9, 2012.[18] The matter has been fully briefed and argued, and is ripe for decision.

## II. JURISDICTION & VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), (b)(1), and 1334. Venue is proper pursuant to §§ 28 U.S.C. 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

## III. PARTIES' POSITIONS

There is no dispute among the parties as to the monthly advisory fee of $1,316,129.[19] Further, the parties agree that the monthly fee credit is $658,065.[20] The parties disagree on the correct amount of the Restructuring Fee, New Equity Fee, and the requested expenses of $138,541.45, which include attorneys' fees in the amount of $114,879.44.

### A. The Restructuring Fee

CBRE requests a Restructuring Fee of $575,000.[21] It calculates the Restructuring Fee by using $80 million as the amount of debt "re-

---

[17] Dkt. No. 1197.

[18] Dkt. No. 1208.

[19] *See* Limited Objection ¶ 19 [Dkt. No. 1153].

[20] *See* Engagement Letter ¶ 3(a) (providing that "fifty percent (50%) of the aggregate amount of Monthly Fees paid by the [Debtor] shall be credited against the aggregate amount of any Restructuring Fee…[or] New Equity Fee"); Limited Objection ¶ 19.

[21] *See* Engagement Letter ¶ 3(b). The amount of the Restructuring Fee is calculated based on the amount of debt "re-tranched." The Engagement Letter provides "0.625% of the aggregate amount of indebtedness forgiven or re-tranched, up to $50,000,000 and (ii) 0.875% of the aggregate amount of indebtedness forgiven or re-tranched in excess of $50,000,000." *Id.* Based on $80 million of debt re-tranched, CBRE's calculation is: ($50,000,000 X 0.625%) + ($30,000,000 X 0.875%) = $575,000.

tranched."  The $80 million is calculated by adding the amount of debt in the B Note and C Note together.  Although CBRE believes that the entire amount of debt, $503 million representing the A, B, and C Notes, was "re-tranched," CBRE determined that the resulting Restructuring Fee would be unreasonable and therefore, its calculation excludes the A Note.[22]

The Reorganized Debtor disagrees with the amount of debt "re-tranched" and believes that only $52 million was re-tranched.  It bases its analysis on the difference between the total prepetition debt of $475 million and the A Note debt of $423 million.  Using $52 million as the amount of debt re-tranched, the Restructuring Fee is $330,000.[23]  The Reorganized Debtor argues that the objective of the Engagement Letter was to incentivize CBRE to negotiate a decrease in the debt and, in this case, the total debt actually increased by $28 million.[24]  In response, CBRE argues that if the Court accepts the Reorganized Debtor's inter-pretation of the Engagement Letter, the Restructuring Fee would be re-legated to fees for debt forgiven, which, CBRE contends, is an improper reading of the agreement.

## B. The New Equity Fee

CBRE requests a New Equity Fee in the amount of $653,125.  The fee is based on $27.5 million of new equity raised.  Although only $22.5 million in new equity was ultimately needed by the Reorganized Deb-tor, Mr. Carlin testified that CBRE used $27.5 million in its calculation because that is the amount of "new equity raised rather than funded or issued and that the term 'raised' as used in the investment banking in-dustry refers to the amount of capital committed by a party."[25]  CBRE also argues that it is irrelevant whether the additional $5 million was actually used by the Reorganized Debtor because the term "raised" re-

---

[22] *See* CBRE's Reply Br. ¶ 8-9 [Dkt. No. 1175].
[23] *See* Limited Objection Ex. A.  Based on $50 million of debt re-tranched, the Reorganized Debtor's calculation is: ($50,000,000 X 0.625%) + ($2,000,000 X 0.875%) = $330,000.
[24] *See id.* ¶ 8.
[25] Hr'g Tr. 17, Sept. 27, 2012 [Dkt. No. 1197].

fers to the amount of capital committed, not used.[26]   The New Equity Fee also takes into account the joint venture agreement between Gaia Real Estate Investments LLC ("Gaia") and "an affiliate of Starwood" ("Starwood") whereby Gaia invested 10% and Starwood invested 90% of the total new equity invested.  CBRE is paid a New Equity Fee of 1.25% on Gaia's new equity invested and 2.50% on any other new equity invested.[27]   Therefore, CBRE allocated 90% of the total equity invested, representing Starwood's investment, toward the higher rate and the remaining 10%, representing Gaia's investment, toward the lower rate, as described in the Engagement Letter.

The Reorganized Debtor objects to CBRE's calculation for two reasons.  First, it argues that the amount of new equity raised is $22.5 million, not $27.5 million.  It argues that only $22.5 million was needed and the extra $5 million was not "issued, sold or placed" as equity; therefore, only $22.5 million should be used when calculating the New Equity Fee.[28]   Second, the Reorganized Debtor believes that Gaia is the sole new equity investor.  It argues that the new equity investor should be determined by the identity of the auction winner, and not by a joint venture created after the auction took place.[29]   As such, the Reorganized Debtor believes that the new equity invested should be attributed to Gaia in full.  Therefore, CBRE's New Equity Fee should utilize only the lower rate of 1.25% for a total New Equity Fee of $281,250.[30]

---

[26] *Id.*

[27] *See* Engagement Letter ¶ 3(d) [Dkt. No. 65 Ex. C].  The Engagement Letter provides CBRE a New Equity Fee "(i) in the event that Gaia…is the new equity investor, (W) 1.25% of the aggregate gross proceeds in New Equity raised, up to the first $30,000,000…and (ii) for any other new equity investor, (W) 2.50% of the aggregate gross proceeds in New Equity raised, up to the first $30,000,000…."  *Id.*  Based on $27.5 million of new equity raised, CBRE's calculation is: ($27,500,000 X 10% X 1.25%) + ($27,500,000 X 90% X 2.5%) = $653,125.

[28] *See* Limited Objection ¶ 14 [Dkt. No. 1153].

[29] *See id.* ¶ 18.

[30] Based on $22.5 million of new equity and Gaia as the sole investor, the Reorganized Debtor's calculation is: ($22,500,000 X 1.25%) = $281,250.

The Reorganized Debtor argues that if the Court accepts its calculations, no transaction fee is due to CBRE because the total Restructuring Fee and New Equity Fee combined are less than the monthly fee credit of $658,065.[31]  By way of contrast, if the Court accepts CBRE's calculations, the total transaction fee due is $570,060.[32]

## C. Attorneys Fees Issue

CBRE seeks reimbursement for actual, necessary expenses in the amount of $138,541.45, which includes $114,879.44 in legal expenses. CBRE stated that taking into consideration its contested retention and preparation of all monthly, interim, and final fee applications, the legal expenses are reasonable.

The Reorganized Debtor objects to the legal fees as unreasonable.  Specifically, it argues that CBRE caused its attorneys to expend $23,925 in legal fees solely to research and calculate comparable transactions.  The Reorganized Debtor asks the Court to make a reasonableness determination of the actual, necessary expenses under § 330(a)(1)(B).

## IV. LEGAL ANALYSIS

Bankruptcy courts have an independent duty to review fee requests of all professionals in Chapter 11 cases to assure that the fees are necessary and reasonable.  *See, e.g., In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 841 (3d Cir. 1994).  As the Retention Order expressly provided, the Court shall review all compensation and expenses paid to CBRE, not under § 328(a), but under the standards set forth in § 330 of the Code. [33]

Section 330(a)(1) provides for "reasonable compensation for actual, necessary services rendered by…[a] professional person…and (B) reimbursement for actual, necessary expenses."    11 U.S.C. § 330(a)(1)(A), (B).  The Court may, *sua sponte* or by motion of any party

---

[31] *See* Limited Objection Ex. A.  The Reorganized Debtor's calculation is: $330,000 + $281,250 – $658,065 = ($46,815).

[32] CBRE's transaction fee calculation is: $575,000 + $653,125 - $658,065 = $570,060

[33] Dkt. No. 379.

in interest, "award compensation that is less than the amount of compensation that is requested." 11 U.S.C. § 330(a)(2). In determining the amount of reasonable compensation for professionals, the Court "shall consider the nature, the extent, and the value of such services…." 11 U.S.C. § 330(a)(3). When evaluating reasonable compensation, the Court shall consider many factors including, but not limited to:

> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[34]

*Id.* "Section 330(a) provides a two-tiered test for determining whether and in what amount to compensate bankruptcy professionals." *In re Uni-Marts*, 2010 WL 1347640, at *2 (citation omitted). First, the Court must determine that the services provided were actual and necessary services. Second, the Court must assess the professionals' fee request for reasonableness. *Id.* Although the Debtor bears the initial burden when applying for compensation and reimbursement of expenses, the

---

[34] These six factors usually apply to professionals paid on an hourly basis. *See In re Uni-Marts, LLC*, No. 08-11037-MFW, 2010 WL 1347640, at *2 (Bankr. D. Del. March 31, 2010). However, the Retention Order expressly provides that the Court reviews CBRE's fees and expenses under § 330.

opposing party "must carry the burden of explaining what therein is unreasonable or, at least, what would be reasonable under the circumstances." *In re Blackwood Assocs.*, 165 B.R. 108, 112 (Bankr. E.D.N.Y. 1994).

## A. The Restructuring Fee

The Engagement Letter provides that the Restructuring Fee is based on the "amount of indebtedness forgiven or re-tranched."[35]  The term "re-tranche" is not defined in the Engagement Letter, but Black's Law Dictionary defines "tranche" as a "bond issue derived from a pooling of similar debt obligations" and "usually differs from other issues by maturity date or rate of return." *Black's Law Dictionary* 1635 (9th ed. 2009).  Mr. Carlin, a Senior Managing Director of CBRE with over twenty years of investment banking experience, proffered a similar definition of the word "tranche" and stated that his understanding of the definition of the word "re-tranche" is "any change to that debt, whether it's a modification to rates, term, [or] anything of substance."[36]

Taking this definition, CBRE argues that $503 million of debt is re-tranched because the total prepetition obligation "was exchange[d] for three new debt instruments with revised interest rates, maturity and other material terms."[37]  As noted above, CBRE seeks a Restructuring Fee on $80 million of debt, which represents only the B and C Notes and it treated the A Note as not having been re-tranched with respect to its calculation.[38]  The Reorganized Debtor does not offer its own definition of the word "re-tranche" and does not disagree with CBRE's definition.  Rather, it argues that only $52 million of debt was re-tranched because that amount represents the difference of the total prepetition debt of $475 million to the A Note debt of $423 million.  The Reorganized Debtor ignores the B and C Notes in its calculation of the total amount of debt re-tranched.

[35] Engagement Letter ¶ 3(b).
[36] Hr'g Tr. 27.
[37] Hr'g Tr. 14-15.  Based on $503 million of debt re-tranched, CBRE stated that the Restructuring Fee would be $4,276,250.  Hr'g Tr. 15
[38] *See id.*

Based on the record before the Court and an analysis of the Engagement Letter, the Court finds that CBRE's definition of "re-tranche" is consistent with the terms of the agreement.  Furthermore, the Reorganized Debtor's calculation has little basis in either the Engagement Letter or the definition of "re-tranche."   As a result, the Court agrees that $80 million of debt was re-tranched.

## B. The New Equity Fee

The Engagement Letter provides CBRE with a New Equity Fee equal to 1.25% of new equity raised by Gaia and 2.50% of new equity raised by "any other new equity investor."[39]  Carlin testified that "the new equity fee is based on equity raised" and "the term 'raised' as used in the investment banking industry refers to the amount of capital committed by a party."[40]  CBRE argues that "raised" means the amount of capital committed by the parties regardless of whether the funds are used whereas, the Reorganized Debtor contends that the amount of equity "raised" should be limited to the amount of money actually used. It argues that because the additional $5 million of funding was "at the option of the Plan Sponsor," the New Equity Fee should be based on only the $22.5 million of new equity used.[41]

Based on the record before the Court and an analysis of the Engagement Letter, the Court finds that "raised" as used in the Engagement Letter refers to the amount of money committed by a party, and not necessarily the amount used or drawn.  Although "raised" is not defined in the Engagement Letter, the Court agrees with CBRE's definition because the additional $5 million was capital that the investors were contractually obligated to provide if it was determined to be necessary.  The bid sheet contemplated both the $22.5 million of capital funded upon the Reorganized Debtor's emergence and the additional $5 million that was ultimately not funded.  Carlin testified that the ad-

---

[39] Engagement Letter ¶ 3(d) [Dkt. No. 65 Ex. C].
[40] Hr'g Tr. 17.
[41] *See* CBRE's Reply Br. ¶ 13-14 [Dkt. No. 1175].

ditional $5 million was a binding commitment of the bidder.[42]  Carlin further testified that CBRE asked all bidders for "some wiggle room" in the form of the additional $5 million of funding[43] and "[w]ithout it, [CBRE] would not have considered [the winning bid] a higher or otherwise better bid."[44]  It is evident from the Engagement Letter and the testimony that $27.5 million of new equity was raised.  For all these reasons, the amount of debt "raised" pursuant to the Engagement Letter, and for the purposes of the New Equity Fee, was $27.5 million.

The Reorganized Debtor also objects to the composition of the investors as it pertains to the computation of the New Equity Fee.  It argues that Gaia, as the auction winner, should be considered the sole investor for the purposes of the New Equity Fee.[45]  To support its proposition, the Reorganized Debtor argues that the Plan Sponsor, and winner of the auction, was an entity "as funded by Gaia Real Estate Investments LLC."[46]  Regardless of where Gaia obtains its funding, it argues, Gaia is the sole new equity investor.  As the only new equity investor, the New Equity Fee calculation should utilize the lower percentage of 1.25% attributable to Gaia pursuant to the Engagement Letter.  Finally, the Reorganized Debtor argues that it should not have to pay a larger New Equity Fee because of a joint venture that Gaia entered into after the auction concluded.

However, CBRE argues that the Engagement Letter is unambiguous.  The Engagement Letter states that "in the event that Gaia…is the new equity investor" apply a 1.25% fee, and "for any other new equity investor" apply a 2.50% fee of the new equity raised.[47]  Pursuant to the plain language of the Engagement Letter, CBRE argues that Starwood, who provided 90% of the new equity invested, should be considered "any other new equity investor."  As such, CBRE argues that it is

---

[42] See Hr'g Tr. 35.  Carlin also referred to it as a "critical ingredient to the offer."  Hr'g Tr. 62.

[43] Hr'g Tr. 61-62.

[44] Hr'g Tr. 62.

[45] See Hr'g Tr. 35.

[46] "Plan Sponsor" is defined in the Plan.  See Art. I(A)(79) [Dkt. No. 735].

[47] Engagement Letter ¶ 3(d) [Dkt. No. 65 Ex. C].

entitled to a 2.50% New Equity Fee for the 90% of equity invested by Starwood and a 1.25% fee for the 10% of equity invested by Gaia.

When analyzing the operative language of the Engagement Letter, the Court agrees with CBRE that Starwood is an "other new equity investor."  The Engagement Letter, in fact, does not speak in terms of auction winner but rather in terms of new equity investor.  This should end the inquiry.  Starwood is not "Gaia Real Estate Investments LLC (and/or its affiliates or subsidiaries, collectively 'Gaia')" as the Engagement Letter provides.[48]  Because Starwood cannot be characterized as an affiliate or subsidiary of Gaia, its equity investment falls into the second category of "any other equity investor."  It is irrelevant that the Plan Sponsor was "an entity as funded by Gaia" because the plain language of the Engagement Letter, which was objected to and modified in the Retention Order, reads "any other new equity investor."  Further, the Reorganized Debtor does not disagree that Starwood, pursuant to a joint venture agreement, provided 90% of the new equity raised.  Therefore, the Court finds that Starwood is "any other new equity investor" for 90% of the new equity raised and Gaia is the new equity investor for the remaining 10%.

## C. Reasonableness

Now, the Court turns to the reasonableness of the requested fees and expenses under § 330.  At the outset, the Court notes that this case was highly successful.  With the help of Judge Lyons,  who mediated this case, the Debtor and its creditors agreed to a plan of reorganization and sale procedures as opposed to dismissing the case or converting to liquidation.[49]  This led to a long, but successful, auction with numerous bumps along the way, including closing the auction and reopening it.  However, this unusual sale process led to a 100% recovery for all unsecured creditors.

Under these circumstances, and in the context of a successful reorganization that CBRE was instrumental in achieving, the Court finds

---

[48] *Id.*

[49] *See* Dkt. No. 549.

that the requested compensation is reasonable under § 330(a)(1)(A).  In determining reasonable compensation, the Court takes into considera- tion all relevant factors including those listed under § 330(a)(3).  In light of CBRE's contested retention and the long auction process, the Court finds that the total time spent on the case by CBRE is reasonable.[50]  Ad- ditionally, no one has challenged the necessary and beneficial work that CBRE provided to this case.  As previously discussed, CBRE was in- strumental in this successful reorganization.  The Court takes further comfort in the substantial negotiations and material improvements, from the Reorganized Debtor's perspective, to the terms of CBRE's re- tention that were built into the engagement prior to Court approval. Finally, CBRE has provided the Court with examples of comparable transactions with approved fees in a similar range to the amounts re- quested in this application.  In light of these factors, CBRE's requested fees of $1,886,190 will be approved as reasonable under § 330.

Similarly, the Court finds that CBRE's actual, necessary expenses are reasonable under §§ 330(a)(1)(B) and 330(a)(3).  Of the requested $138,541.45 in expenses, $114,879.44 is attributable to legal expenses. Taking into consideration the circumstances of this case, which in- cluded a lengthy and contentious retention battle, an extended auction process and numerous monthly fee applications, the Court finds that the requested expenses are actual, necessary, and reasonable.  The Reorganized Debtor specifically objects to $23,925 in legal fees that were incurred in calculating comparable transactions.  However, it was important for CBRE to look into comparable transactions when calcu- lating and applying for its fees.  As discussed above, CBRE first calcu- lated the Restructuring Fee to be over $4 million.[51]  In attempting to avoid this exact dispute, it re-evaluated its calculations and revisited

---

[50] CBRE spent a total of 1941 hours working on this case.  *See* CBRE's Eleventh Monthly and Final Fee Application at 4 [Dkt. No. 1121].  This work consisted of, but was not limited to, valuation analysis, capital structure review, prepa- ration for depositions and court filings, marketing the company for potential investors, and working with other professionals and parties-in-interest.  *Id.*

[51] *See supra* note 38 and accompanying text.

the definition of the word "re-tranche" in the Engagement Letter. Therefore, the Court finds that the time spent evaluating comparable transactions was necessary in calculating its Restructuring Fee in an effort to apply for reasonable fees and to avoid further litigation.  For these reasons, the Court finds that CBRE's expenses of $138,541.45 are reasonable and will be approved as requested.

## V. CONCLUSION

For the foregoing reasons, the Court will enter an order approving CBRE's Eleventh Monthly and Final Fee Applications as requested and overrule the Reorganized Debtor's Limited Objection.  The Final Fee Application is therefore **GRANTED**.  An appropriate Order follows.

**BY THE COURT**:

Dated: November 20, 2012
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge